**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AL LUTZKER, Derivatively and On Behalf of AQUA METALS, INC.<br><br>        Plaintiff,<br><br>  v.<br><br>STEPHEN R. CLARKE, THOMAS MURPHY, MARK WEINSWIG, SELWYN MOULD, VINCENT L. DIVITO, MARK SLADE AND MARK STEVENSON<br><br>        Defendants,<br><br>  and<br><br>AQUA METALS, INC.<br><br>        Nominal Defendant. | Case No.:<br><br><br>JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Al Lutzker ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant Aqua Metals, Inc. ("Aqua Metals" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsels' investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Aqua Metals with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Aqua Metals; (iii) three purported class action lawsuits filed in the United Stated District Court for the Northern District California against Aqua Metals, Inc., and Individual Defendants Stephen R. Clarke ("Clarke"),

Thomas Murphy ("Murphy") and Mark Weinswig ("Weinswig") alleging violations of the anti-fraud provisions of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, between May 19, 2016 and November 9, 2017 (the "Relevant Period") with respect to Aqua Metals' lead recycling operations; and (iv) other publicly available information, including media and analyst reports, concerning Aqua Metals.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty and violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC rule 14a-9 promulgated thereunder brought on behalf of nominal defendant Aqua Metals against certain officers and members of the Company's Board of Directors (the "Board").

2.      Aqua Metals was purportedly formed to engage in the business of recycling lead through a novel process called "AquaRefining."  The Company claims that it has focused its efforts on developing and testing the AquaRefining process, developing a business plan, raising working capital, and developing its initial lead acid battery, or LAB, recycling facility in the Tahoe Regional Industrial Center, in McCarran, Nevada.

3.      On May 9, 2017, after the market closed, Aqua Metals issued a press release entitled "Aqua Metals Provides First Quarter 2017 Corporate Update."  Therein, the Company stated that it was "currently in the process of scaling up production of AquaRefined lead to 120 tons/day by the end of 2017."

4.      On the same day, the Company held a conference call to discuss its Q1 2017 results. On the call, Defendant Clarke, the Chairman and Chief Executive Officer ("CEO") of

Aqua Metals, stated that the Company experienced some "issues" and "challenges" as it ramped up its recycling process.  Specifically, Clarke stated that "it took longer than we planned to get the breaking and separation up and running" since the Company's AquaRefining process "needed to achieve [a] much higher degree of separation than is normal in this industry." Another challenge was that the Company "needed to rethink and rework the input conveyor to the breaker to upgrade it to support the higher feed rates that we want to achieve to manage 160 tons a day of lead production."

5.      On this news, the Company's stock price fell $4.34 per share, or 26%, to close at $12.31 per share on May 10, 2017, on unusually heavy trading volume.

6.      On August 9, 2017, after the market closed, Aqua Metals issued a press release entitled "Aqua Metals Provides Second Quarter 2017 Corporate Update."  Therein, the Company revealed that it was "currently in the process of scaling up AquaRefining operations to include 16 modules by the end of 2017," but made no mention of "120 tons/day" as it did in its Q1 2017 press release.

7.      On the same day, the Company held a conference call to discuss its Q2 2017 results. On the call, Clarke stated that "AquaRefining works. We've got four modules operating now." Clarke also disclosed that the Company was considering "operat[ing] the overall facility with an output of less than 120 tons a day" in order to optimize profitability.  Clarke further disclosed that, contrary to the Company's earlier representation that breaking and separation were "up and running," in fact, the Company had made and installed improvements such that "breaking and separation is now operational," and "breaking and separation is operating reliably."

8.      On this news, the Company's stock price fell $2.56 per share, or 23.6%, to close at $8.31 per share on August 10, 2017, on unusually heavy trading volume.

9.      On October 23, 2017, the Company issued a press release entitled "Aqua Metals Provides Update on Plant's Operations."   Therein, the Company stated that "[f]our modules are assembled, commissioned and are being used to determine the optimal operating parameters, including electrolyte pH, lead concentration, operating temperature, electrolyte flow rate and free acid levels."   However, the Company disclosed that Aqua Metals had only "produced small quantities of AquaRefined lead during the commissioning process" and that "under certain conditions, the operators would need to periodically assist the lead removal."   The Company further stated that "Aqua Metals' production process has multiple stages prior to AquaRefining, including battery breaking, separation, desulphurization, and electrolyte production" and disclosed that it was "in the process of synchronizing all of these stages, which is critical to maximizing efficiency, optimizing working procedures and minimizing waste."

10.     On this news, the Company's stock price fell $0.96 per share, or 17.9%, to close at $4.41 per share on October 23, 2017, on unusually heavy trading volume.   The stock price continued to decline on the following day, falling $0.40 per share, or 9.1%, to close at $4.01 per share on October 24, 2017, on unusually heavy trading volume.

11.     On November 9, 2017, after the market closed, Aqua Metals issued a press release entitled "Aqua Metals Provides Third Quarter 2017 Corporate Update."   Therein, the Company revealed that it "faced . . . many challenges as [it] worked to ramp up production."

12.     On the same day, the Company held a conference call to discuss its Q3 2017 results. On the call, Clarke revealed that "the four operating modules are being used to . . . accelerate updates aimed at providing a level of robustness suitable for operating by third parties

with non-specialist operators," and to "map out operating parameters and performance over the full range of operating conditions." An analyst asked Clarke about the "utilization rate" of the four modules. Clarke responded by stating that "[w]e're not providing individual tonnage per day, utilization rates or any of that data." Clarke also stated on the call that "the battery breaker is now running consistently seven days a week." An analyst asked "how many tons per day are you guys currently running through the battery breaking system and through the entire process?" Clarke responded: "No. At this time we have provided all the color that we're willing to provide at this point."

13.     On this news, the Company's stock price fell $0.08 per share, or 2.1%, to close at $3.71 per share on November 10, 2017. The stock price continued to decline on the following trading days, falling $0.13 per share (3.5%) on November 13, 2017, and $0.58 per share (16.2%) on November 14, 2017, to close at $3.00 per share on November 14, 2017.

14.     From May 19, 2016 through November 9, 2017, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose: (1) that Aqua Metals' breaking and separating process was facing substantial obstacles due to AquaRefining's need for a much higher degree of separation than is normal in the industry; (2) that the Company's breaking and separating process was not operating reliably or efficiently; (3) that the breaking and separating obstacles and issues were negatively impacting the Company's output; (4) that the Company's four "operating modules" were being used primarily for experimentation, rather than production; (5) that module operators were assisting with lead removal; (6) that, as a result of the foregoing, the ramp up of the Company's recycling process was being significantly hindered and delayed; and (7) that, as a

result of the foregoing, the Individual Defendants' statements about Aqua Metals' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

15.     The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by willfully engaging in the deceptions alleged herein.  In addition, Individual Defendants Selwyn Mould ("Mould") and Murphy breached their fiduciary duties of loyalty and good faith by selling shares of Company common stock while in possession and control of material adverse non-public information that was a proprietary asset of the Company.  Furthermore, the Individual Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by soliciting Aqua Metals shareholder votes for, *inter alia,* director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings in connection with its AquaRefining system.

16.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Aqua Metals has sustained damages as described below.

### JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

18.     This Court has jurisdiction over each defendant because they reside in this district or have sufficient minimum contacts with this District to render the exercise of jurisdiction by

the Court permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over the nominal defendant because it is authorized to do business in this state, has consented to service in this state and is incorporated within this district.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Aqua Metals occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

20.     Plaintiff is a stockholder of Aqua Metals, was a stockholder of Aqua Metals at the time of the wrongdoing alleged herein, and has been a stockholder of Aqua Metals continuously since that time.                    .

21.     Nominal Defendant Aqua Metals, Inc. is incorporated in Delaware and its principal executive offices are in Alameda, California.  Aqua Metals' common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "AQMS."

22.     Defendant Clarke was the CEO and Chairman of Aqua Metals at all relevant times.  From May 2013 to June 2014, Clarke, along with Defendants Mould and Murphy, engaged in research and development that ultimately lead to their development of the AquaRefining process. From 2008 to May 2013, Defendant Clarke was employed as the chief executive officer of Applied Intellectual Capital, Ltd., an Isle of Jersey company co-founded by Clarke in 1999 to engage in the business of incubating and developing electro-chemical technologies.  Applied Intellectual Capital (delisted - formerly AINC:LN) was publicly traded in

the United Kingdom on the AIM exchange (effectively a penny stock exchange in the UK) from 2007 to 2009.  Like Aqua Metals, Applied Intellectual Capital was also focused on battery technologies.

23.     Defendant Murphy was the Chief Financial Officer ("CFO") of Aqua Metals until August 10, 2017 and a director until August 30, 2017.  He is a co-founder of Aqua Metals and worked alongside Defendants Clarke and Mould in the development of the AquaRefining process and the Company's current business.  From September 2009 to May 2013, Murphy served as chief financial officer of Applied Intellectual Capital, Ltd.  Defendant Murphy made the following stock sales while in possession of inside information that the stock price of Aqua Metals was artificially inflated:

| Insider | Transaction | Type | Value | Date | Shares |
|---|---|---|---|---|---|
| MURPHY THOMAS MICHAEL | Automatic Sale at $17.52 per share. | Direct | 350,400 | May 7, 2017 | 20,000 |

| Insider | Transaction | Type | Value | Date | Shares |
|---|---|---|---|---|---|
| MURPHY THOMAS MICHAEL | Automatic Sale at $17.25 per share. | Direct | 345,000 | Apr 9, 2017 | 20,000 |

| Insider | Transaction | Type | Value | Date | Shares |
|---|---|---|---|---|---|
| MURPHY THOMAS MICHAEL | Sale at $17.24 per share. | Direct | 344,799 | Mar 7, 2017 | 20,000 |

24.     Defendant Weinswig became the CFO of Aqua Metals on August 10, 2017 and continues to serve in that role for the Company.

25.     Defendant Mould is a co-founder of the Company and has served as its Chief
Operating Officer ("COO") since inception in June 2014.  From May 2013 to June 2014, Mould,
along with Defendants Clarke and Murphy, engaged in research and development that ultimately
lead to their development of our AquaRefining process.   On August 30, 2017, Defendant
Murphy resigned from the Board.  On the same day, the Board, acting on the recommendation of
the Board's Nominating and Corporate Governance Committee, appointed Defendant Mould to
the vacancy on the Board created by Murphy's resignation.  From 2008 to May 2013, Mould
served as chief operating officer of Applied Intellectual Capital, Ltd.  Defendant Mould made the
following stock sales while in possession of inside information that the stock price of Aqua
Metals was artificially inflated:

| Insider | Transaction | Type | Value | Date | Shares |
|---|---|---|---|---|---|
| MOULD SELWYN | Automatic Sale at $16.53 per share. | Direct | 330,600 | Apr 30, 2017 | 20,000 |

| Insider | Transaction | Type | Value | Date | Shares |
|---|---|---|---|---|---|
| MOULD SELWYN | Automatic Sale at $18.92 per share. | Direct | 378,400 | Apr 2, 2017 | 20,000 |

| Insider | Transaction | Type | Value | Date | Shares |
|---|---|---|---|---|---|
| MOULD SELWYN | Sale at $17.03 per share. | Direct | 340,600 | Mar 6, 2017 | 20,000 |

26.     Defendant Vincent L. DiVito ("DiVito") has served as a member of the
Company's Board since May 2015.  DiVito chairs the Board's Audit Committee.

27.     Defendant Mark Slade ("Slade") has served as a member of the Company's Board
since June 2015.  Slade is a member of the Audit Committee.

28.     Defendant Mark Stevenson ("Stevenson") has served as a member of the Company's Board since December 2016.  Stevenson is a member of the Audit Committee.

29.     The defendants referenced above in ¶¶ 22-28 are referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

30.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the Company.  By virtue of such duties, the officers and directors of Aqua Metals were required to, among other things:

       a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

       b.     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

       c.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

       d.     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

       e.     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

    33.    Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a

knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34. In addition, the Company has also adopted a Code of Conduct (the "Code"). The Code states in its preamble:

**We Comply with the Law**

As employees, officers and directors of a publicly-traded company, each of us must comply with the letter and spirit of every applicable local, state, federal and foreign law or regulation. Violations of these laws can be extremely costly to Aqua Metals, Inc. and its subsidiaries (collectively, the "Company") and can subject us to both civil and criminal penalties. Each of us is responsible for understanding the laws and regulations that relate to our responsibilities.

35. The Code goes on to state:

**We Acknowledge Special Ethical Obligations for Financial Reporting**

As a public company, it is of critical importance that the Company's filings with the Securities and Exchange Commission are accurate and timely. Depending on our position with the Company, any of us, whether employees, officers or directors, may be called upon to provide information to assure that the Company' public reports and other public communications are complete, fair and understandable. The Company expects all of us to take this responsibility seriously and to provide prompt and accurate answers to inquiries related to its public disclosure requirements. The Chief Executive Officer and Chief Financial Officer have a special role both to adhere to these principles themselves and also to insure that a culture exists throughout the Company as a whole that insures [sic] the fair and timely reporting of the Company' financial results and condition. The Chief Executive Officer and Chief Financial Officer, in addition to adhering to all other provisions of this Code of Conduct, are responsible for promptly bringing to the attention of the Audit Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings or otherwise assisting the Audit Committee in fulfilling its responsibilities as specified in its Chart.

\*        \*        \*

**Compliance with the Code of Conduct**

We all have a responsibility to comply with the letter and spirit, understand and follow the Code of Conduct. In addition, we are all expected to perform our work with honesty and integrity in any areas not specifically addressed by the Code of Conduct.  A violation of this Code of Conduct may result in appropriate disciplinary action including the possible termination from employment with the Company, without additional warning.

36.     As noted in the Company's DEF 14A filed with the SEC on April 24, 2017 (the

"2017 Proxy"):

Our Board has an active role in overseeing our areas of risk. While the full Board has overall responsibility for risk oversight, the Board has assigned certain areas of risk primarily to designated committees, which report back to the full Board.

37.     One such "designated committee" is the Audit Committee.   The Audit

Committee's Charter states in pertinent part:

The primary purpose of the Committee is to oversee on behalf of the Board: (i) the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company; (ii) the performance of the internal audit services function (if any); (iii) the annual independent audit of the Company's financial statements, the engagement of the independent auditors and the evaluation of the independent auditors' qualifications, independence and performance; (iv) the compliance by the Company with legal and regulatory requirements, including the Company's disclosure controls and procedures; (v) the evaluation of risk assessment and risk management policies; and (vi) the fulfillment of the other responsibilities set out herein.

*       *       *

To fulfill its responsibilities, the Committee shall:

**With respect to the annual financial statements:**

- review and discuss with management, the Company's internal auditor (if any) and the independent auditors, the Company's annual audited financial statements, including specific disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations." This review shall include a discussion of major issues regarding accounting principles and financial statement presentations, including a review of any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and

judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the Company's financial statements. The review shall also include a discussion of the independent auditors' judgments about the quality and appropriateness of the Company's accounting principles and financial disclosure practices, as applied in its financial reporting, including, without limitation, a review of critical accounting policies, estimates, reserves and accruals, judgmental areas, audit adjustments, whether or not recorded, any significant changes in the Company's selection or application of accounting principles, the effects of significant policies in controversial or emerging areas for which there is a lack of authoritative guidance, all material off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities or other persons, that may have a material current or future effect on financial condition, changes in financial condition, results of operations, liquidity, capital resources, capital reserves or significant components of revenues or expenses and such other inquiries as may be appropriate. Based on this review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited financial statements in the Company's annual reports to stockholders, or Annual Reports on Form 10-K, if and when applicable, for filing with the SEC;

- discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, relating to the conduct of the audit and any other material written communications between the independent auditor and management, including but not limited to, the management representation letter and schedule of adjusted differences and a listing of adjustments and reclassifications not recorded, if any;

- prepare the report required, if and when applicable, by the SEC to be included in the Company's annual proxy statement and any other reports of the Committee that may be required by applicable securities laws or the Nasdaq listing requirements or rules; and

- discuss with the independent auditors and internal auditor (if any) whether they are aware of any action by any officer or director, or any other person acting under the direction thereof, that may have violated Rule 13b2-2(b)(1) under the Exchange Act, which prohibits improper influence on the conduct of audits, after the Company registers as a reporting company under the Exchange Act.

**With respect to quarterly financial statements:**

- review and discuss with management, the internal auditor (if any) and the independent auditors the Company's quarterly financial statements, including specific disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the independent auditors' review of the quarterly financial statements (including a review of the matters included in paragraph 8 above), prior to submission to shareholders, any governmental body, the Nasdaq or the public. The Chairman of the Committee or any subcommittee of the Committee may represent the entire Committee for the purpose of this review; and

- discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, relating to the conduct of their review.

**Discussions with management:**

- review and discuss with management the Company's earnings press releases or other written communications with stockholders regarding financial results, including the use, if any, of "pro forma" or "adjusted" non-GAAP financial measures (as defined in Regulation G), as well as any financial information and earnings guidance that may be provided to analysts and rating agencies, and the Company's Current Reports on Form 8-K, if any, or reports of similar substance, that contain historical or pro forma financial statements. Such discussions may be done generally (i.e., discussion of the types of information to be disclosed and the types of presentations to be made). The Chairman of the Committee or any subcommittee of the Committee may represent the entire Committee for the purpose of this review.

38.     The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the breaches of fiduciary duty and the violations of Section 14(a) and SEC Rule 14a-9 described herein.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

39.     Aqua Metals was purportedly formed to engage in the business of recycling lead through a novel process called "AquaRefining." The Company claims that it has focused its efforts on developing and testing the AquaRefining process, developing a business plan, raising

working capital, and developing its initial lead acid battery, or LAB, recycling facility in the Tahoe Regional Industrial Center, in McCarran, Nevada.   As such, the Company's whole business is centered on "AquaRefining" and it is the Company's only product.

**MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED BY THE INDIVIDUAL DEFENDANTS**

40.    On May 19, 2016, Aqua Metals issued a press release ("May 2016 Press Release") announcing a partnership between Interstate Battery System International, Inc. ("Interstate Battery") and Aqua Metals ("Interstate Battery Partnership"). The press release stated in relevant part:

> ALAMEDA, Calif., May 19, 2016 (GLOBE NEWSWIRE) -- Aqua Metals, Inc. (NASDAQ: AQMS) (Aqua Metals), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, today announced the signing of definitive agreements with Interstate Batteries. Interstate Batteries is the No. 1 replacement battery brand, the largest independent battery distribution system in North America and the country's leading battery recycler.
>
> Upon the closing of these agreements, Interstate Batteries has agreed to supply more than a million automotive and other lead-acid batteries as feedstock for Aqua Metals' AquaRefineries. This partnership will start with Aqua Metals' first AquaRefinery, which will be located in Nevada's TahoeReno Industrial Complex (TRIC) and is set to open in July 2016. Interstate Batteries will also make a strategic investment of approximately $10 million into Aqua Metals.
>
> *        *        *
>
> "Interstate Batteries seeks out innovation, pursues opportunities and invests in the technology we need to succeed not just today, but also tomorrow," said Scott Miller, president and CEO of Interstate Batteries. "Our focus is on the future of our industry and continued growth. Aqua Metals' breakthrough technology is a promising new way for recycling lead-acid batteries."
>
> Aqua Metals' patent-pending AquaRefining process is an environmentally friendly electrochemical process for recycling lead-acid batteries. AquaRefining is a closed-loop, room temperature, water-based recycling method that is fundamentally non-polluting, yet able to yield nearly 100 percent lead recovery.
>
> "With its forward-thinking environmental goals, broad distribution network and strong brand name, Interstate Batteries is an ideal partner for us as we scale our

business," said Dr. Stephen Clarke, chairman and CEO of Aqua Metals. "As we grow, we are able to create a more sustainable ecosystem for lead as a power source. We look forward to growing our partnership with Interstate Batteries."

41.     Following this press release and in response to what appeared at the time as positive news, the price per share of Aqua Metals increased $2.26, or nearly 29%, from a close of $7.80 on May 18, 2016, to a close of $10.06 on May 19, 2016.

42.     On August 2, 2016, Aqua Metals issued a press release announcing the opening of the Tahoe-Reno Industrial Center ("TRIC") in McCarran, Nevada ("August 2016 Press Release"). The press release stated in relevant part:

> ALAMEDA, Calif., Aug. 02, 2016 (GLOBE NEWSWIRE) -- Aqua Metals, Inc. (NASDAQ:AQMS) (Aqua Metals), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, held an open house at its first AquaRefinery at the Tahoe-Reno Industrial Center (TRIC) in McCarran, Nevada. AquaRefining is the world's first environmentally friendly process to recycle lead-acid batteries (LABs).

> *        *        *

> "The first AquaRefinery at TRIC is an exciting start to a cleaner future for the lead industry," said Stephen Clarke, CEO of Aqua Metals. "Lead-acid batteries are over 99% recyclable, but until now, there has been no way to recycle lead in an environmentally friendly fashion. With this AquaRefinery and more expected to come, Aqua Metals is doing its part to create the most sustainable battery technology the world has ever seen, while also providing economic benefits to recyclers, manufacturers and distributors."

> The proprietary AquaRefining technology extracts lead from LABs with a room temperature, closed-loop, water-based process that results in vast reductions of hazardous waste and direct human contact with the lead itself. The process produces lead that is as pure as – or purer than – mined lead, requiring no secondary processing. Battery Systems Inc. has a 200,000 square foot battery distribution and collection facility adjacent to Aqua Metals' TRIC facility. Interstate Batteries, which made a $10 million investment into Aqua Metals, has already committed to provide used LABs to recycle at the facility. Interstate Batteries controls 20 percent of the lead-acid battery recycling market in the United States.

> *        *        *

"This first-ever AquaRefinery has the potential to change our industry, and our planet," said Scott Miller, president and CEO of Interstate Batteries. "While we've been in the battery business for more than six decades, Interstate continues to seek out innovation and invest in technology for today, and tomorrow. Because Aqua Metals' breakthrough technology is so promising, Interstate Batteries is supplying more than a million automotive and other lead-acid batteries to the AquaRefinery over the next year. We feel we're making a smart investment in our future, and in the future of our industry."

43.    On November 1, 2016, after the market close, Aqua Metals issued a press release also attached as Exhibit 99.1 to a Form 8-K filed with the SEC ("November 2016 Press Release") announcing production of the first refined lead at the TRIC. The press release stated in relevant part:

ALAMEDA, Calif. – November 1, 2016 – Aqua Metals (NASDAQ: AQMS) today announced that it has produced the first-ever AquaRefined lead at its flagship AquaRefinery in McCarran, Nevada. AquaRefining is a water-based, room-temperature process and is the only clean lead recycling method.

"This is a major milestone – not just for our company, but for the entire industry," said Dr. Stephen R. Clarke, Chairman and CEO of Aqua Metals. "Our commercial-scale AquaRefining modules have the potential to revolutionize lead recycling and make lead-acid batteries the only truly sustainable battery technology. We are confident that our lead products will exceed the most rigorous industry specifications. I am extremely proud of our entire team for making this dream a reality."

AquaRefining uses an entirely reusable water-based technology to produce ingots of ultrapure lead. Through its own on-site assay, Aqua Metals has verified that the lead produced in the AquaRefining module is over 99.99 percent pure. The Company will send its initial production samples to several U.S. battery manufacturing companies—which collectively represent over 50 percent of U.S. battery production—to allow them to conduct their own assays.

Aqua Metals previously demonstrated the effectiveness of its technology at bench scale, pilot scale and with a single, full-size electrolyzer. The Company has now produced high-quality AquaRefined lead with a commercial-scale AquaRefining module at its facility in the Tahoe-Reno Industrial Center in Nevada.

"This is the most critical step in the commissioning process of the Nevada AquaRefinery," Dr. Clarke continued. "Over the coming weeks we plan to fully integrate the front-end battery-breaking portion of the facility."

44.     On February 9, 2017, the Company issued a press release entitled "Johnson Controls and Aqua Metals sign break-through battery recycling technology partnership." Therein, the Company, in relevant part, stated:

Johnson Controls (NYSE: JCI), finalized an agreement covering North America, China and Europe for a cutting-edge electrochemical battery recycling technology. Under terms of a multi-faceted deal, the company is investing in AquaMetals (NASDAQ: AQMS).

"Our partnership with Johnson Controls is a tremendous step forward and is an opportunity for us to work with the global leader in automotive battery manufacturing and responsible recycling," said Dr. Stephen Clarke, chairman and CEO of Aqua Metals. "We will build on this exciting relationship in order to enable clean and efficient battery recycling around the world."

Under the agreement Johnson Controls will also:

• Become the first licensee for AquaRefining™ technology
• Supply Aqua Metals with batteries to recycle as a service, as part of the Johnson Controls closed-loop network
• Purchase AquaRefined™ metals produced from Aqua Metals' facilities
• Acquire just under 5 percent of Aqua Metals outstanding shares

"Agreements like this are a part of our continuing strategy to invest in clean technologies, building on our commitment to create a more sustainable and environmentally responsible industry," said Joe Walicki, president of Johnson Controls Power Solutions.

Aqua Metals, which recently opened its first plant in McCarran, Nevada, uses an advanced electrochemical process for recycling batteries. As it scales up capacity, Aqua Metals plans to hire hundreds of employees for existing and future operations across the United States.

**About Aqua Metals**

Aqua Metals (NASDAQ: AQMS) is reinventing lead recycling with its patent-pending AquaRefining™ technology. Unlike smelting, AquaRefining is a room temperature, water-based process that is fundamentally non-polluting. These modular systems allow the lead-acid battery industry to simultaneously improve environmental impact and scale production to meet rapidly growing demand. Aqua Metals is based in Alameda, California, and has built its first recycling facility in Nevada's Tahoe Reno Industrial Complex.

45.     Following this press release and in response to what also appeared at the time as positive news, the price per share of Aqua Metals increased $4.75, or approximately 41.6%, from a close of $11.41 on February 8, 2017, to a close of $16.16 on February 9, 2017.

46.     On February 14, 2017, Aqua Metals issued a press release entitled "Aqua Metals Provides Fourth Quarter and Year End Corporate Update."  Therein, the Company, in relevant part, stated:

ALAMEDA, Calif., February 14, 2016 - Aqua Metals, Inc. (NASDAQ:AQMS), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, has provided a corporate update and announced results for the fourth quarter and fiscal year ended December 31, 2016.

**Company Highlights:**

- Successfully commissioned and in the process of scaling up production of AquaRefined lead at AquaRefinery 1 in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC)

- Signed a strategic partnership covering North America, China and Europe with Johnson Controls, the world's largest manufacturer of automotive batteries. Under the agreements, Johnson Controls has invested $10.6 million for approximately 5% of Aqua Metals outstanding shares; become the first licensee for AquaRefining technology; agreed to supply Aqua Metals with batteries to recycle as a service; and agreed to purchase AquaRefined metals produced from Aqua Metals' facilities.

- Signed a strategic partnership with Interstate Batteries, the No. 1 replacement battery brand, the largest independent battery distribution system in North America and the country's leading battery recycler. Under the agreements, Interstate Batteries made a strategic investment of approximately $10.0 million into Aqua Metals, and agreed to supply leadacidbatteries as feedstock to Aqua Metals.

**Management Commentary**

"2016 was a pivotal year for the company, as we successfully built, commissioned and began producing products at the world's first AquaRefinery and deepened our strategic relationships with major players throughout the industry," said Dr. Stephen Clarke, Chairman and CEO of Aqua Metals. "Our partnerships, most recently with Johnson Controls -- the global leader in automotive battery manufacturing and responsible recycling -- and Interstate Batteries -- the largest independent battery distribution system in North America and the country's

leading battery recycler. -- and Battery Systems Inc. -- one of the largest independent battery distributors in the U.S. effectively rounds out a sustainable ecosystem for the automotive lead acid battery industry and provides a level of supply and offtake to support our expansion of AquaRefinery 1 and the construction of additional facilities.

"As we move through 2017, we will continue the expansion of AquaRefinery 1, look to build additional AquaRefineries and build out our licensing program. This will include progressing discussions to conclusion with providers of debt or other non-diluting finance for additional AquaRefineries, evaluating complementary licensing opportunities and beginning work on higher value products and markets."

47.     On the same day, February 14, 2017, the Company held a conference call to discuss its Q4 2016 FY 2016 financial results. On the call, the Defendant Clarke, in relevant part, stated:

One of the headlines today is that the first ever AquaRefinery located at the Tahoe Reno Industrial Center, has moved from commissioning to operational. That means that we are breaking batteries and making lead from the batteries that we've broken, both from – both metallic lead and Aqua refined lead. It's continuing to ramp up.  We are not at full scale yet and there is more work to be done.

*        *        *

[I]t typically takes 18 months to install commission and dial-in a battery breaking and separations machine and we've done that in less than six months. And the reason we've been able to do that, is entirely down to the insights and hard work and dedication of the management team, at the Tahoe Reno Centre, of Mike Krickel and his staff, incredibly experienced battery recycling individuals. And that's been backed up with pretty strong team of leading the electrochemical engineers who have operated a large plant.

*        *        *

[W]e spent some time dealing with jams on the conveyor belt for the breaker, calibrating the several sourcing steps in that. We had some issues with seals and bearing which required redesigns and change outs. And we accomplished all of that in six months, which I believe is quite remarkable given industry standards.

48.     On March 2, 2017, the Company filed its annual report on Form 10-K for the year ended December 31, 2016.  The 10-K was signed by Defendants Clarke, Murphy, DiVito, Slade and Stevenson, and reaffirmed the Company's statements about its financial results contained in the press release issued on February 14, 2017.

49.     The above statements identified in ¶¶ 46-48 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose:  (1) that Aqua Metals' breaking and separating process was facing substantial obstacles due to AquaRefining's need for a much higher degree of separation than is normal in the industry; (2) that the Company's breaking and separating process was not operating reliably or efficiently; (3) that the breaking and separating obstacles and issues were negatively impacting the Company's output; (4) that, as a result of the foregoing, the ramp up of the Company's recycling process was being significantly hindered and delayed; and (5) that, as a result of the foregoing, the Individual Defendants' statements about Aqua Metals' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

50.     On May 9, 2017, after the market closed, Aqua Metals issued a press release entitled "Aqua Metals Provides First Quarter 2017 Corporate Update."  Therein, the Company stated that it was "currently in the process of scaling up production of AquaRefined lead to 120 tons/day by the end of 2017."  The press release also stated, in pertinent part:

> ALAMEDA, Calif. May 9, 2017 - Aqua Metals, Inc. (NASDAQ:AQMS), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, has provided a corporate update and announced results for the first quarter ended March 31, 2017.
>
> **Company Highlights**

- Began production at AquaRefinery 1 in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC). The company is currently in the process of scaling up production of AquaRefined lead to 120 tons/day by the end of 2017.

- In the first quarter of 2017, signed a strategic partnership covering North America, China and Europe with Johnson Controls, the world's largest manufacturer of automotive batteries. Under the agreements, Johnson Controls invested $10.6 million for approximately 5% of Aqua Metals outstanding shares, and agreed to become the first licensee for AquaRefining technology, supply Aqua Metals with batteries to recycle as a service and purchase AquaRefined metals produced from Aqua Metals' facilities.

- Acquired UK-based Ebonex IPR Limited (Ebonex), an IP-based company that has developed patented technology in the field of advanced materials and manufacturing methods for advanced lead acid batteries. This acquisition provides Aqua metals with the potential to accelerate its development of lead nano-fibers as a high performance active material. It also provides ownership of patents, know-how, tooling and equipment to produce high performance battery electrodes and advanced "bipolar" lead acid battery technologies.

- Evaluating alternative strategies for additional AquaRefineries, to accelerate their deployment.

- Arranged an invitational sell-side analyst day during May and planning additional invitationals for buy-side analysts and key investors.

**Management Commentary**

"With the world's first AquaRefinery now in commercial operation and generating revenue, we are aggressively scaling up operations and ramping our capacity to reach 120 metric tonnes per day by the end of 2017," said Dr. Stephen Clarke, Chairman and CEO of Aqua Metals. "We currently have shifts A and B completely staffed, and plan to complete our recruitment efforts for shifts C and D in the next month. Since day one, we've remained focused on building a team and the proper foundation, which would allow us to rapidly expand our innovative lead recycling technology and deliver better quality solutions to our partners and the market as a whole.

"Given we have all of the necessary permitting in place and the support provided by strategic partnerships with some of the largest players in the battery industry, we are taking the opportunity to implement the lessons learned during commissioning of AquaRefinery 1 which will accelerate our roll-out of additional facilities. These improvements and our ongoing work with our strategic partners is creating a blueprint for future facilities – both for our own and for our partners. Our goal is to roll-out facilities in the rest of North America, China, the European Union and elsewhere, based upon this blueprint."

Clarke, continued: "Since our last update, we've not only expanded our current strategic relationships, but continued discussions with potential strategic partners in complementary areas, which could help us accelerate expansion. As a technology company, we are keenly focused on delivering high value products that can be used for advanced battery applications. With this in mind, we recently announced our acquisition of Ebonex, which we acquired for the purpose of accelerating the development and testing of our nano-structured lead as a high performance active material and potentially use their Ebonex™ material as a complimentary additive. Through this acquisition, our goal is to develop technology, equipment and processes that will eventually allow our customers to deliver 'better' batteries.

"For the remainder of 2017, we plan to ramp up production at AquaRefinery 1 and to prepare for accelerated build-out of additional facilities, while concurrently moving forward with our plans for additional AquaRefineries, securing nondilutive financing to accommodate our growth and finalizing our plan to retrofit a to-be-named recycling facility with our strategic partner in 2018."

**First Quarter 2017 Financials**

The Company incurred an operating loss of $4.5 million during the first quarter of 2017 compared to an operating loss of $2.2 million in the first quarter of 2016.

Net loss for the first quarter of 2017 was $4.9 million, or ($0.26) per basic and diluted share, compared to a net loss of $2.2 million, or ($0.15) per basic and diluted share, in the first quarter of 2016.

The Company had $30.6 million in cash and cash equivalents as of March 31, 2017, compared to $26.6 million as of December 31, 2016. The total number of shares outstanding was 20,141,636 as of May 8, 2017.

51.     On the same day, May 9, 2017, the Company held a conference call to discuss its

Q1 2017 results.  On the call, Defendant Clarke, in relevant part, stated:

On the next slide I'm going to go through some of the improvements that we developed and some of the issues we faced and the challenges that we had as we ramped up this process. . . . [I]t took longer than we planned to get the breaking and separation up and running, but actually considerably shorter than industry norms.

One of the challenges that was unique to us that we faced is that, because we don't have a smelter, we don't have a furnace, we needed to achieve much higher degree of separation than is normal in this industry. And what I mean by that is our plastic had to be clean plastic with no lead oxide and no lead dust on it. Our

metallic lead had to be metallic lead with no plastic and no lead oxide and no lead sulfate on it. Our lead compounds had to be lead oxide, lead sulfate and other lead compounds with no plastic and no metallic lead in it. That's a really tough order and we achieved it. And we worked very closely with Wirtz Engineering who have been tremendous in this operation. We asked them to do things that no other battery breaking Company has ever been asked to do. It took us a while to get there but we achieved it and we developed and implemented numerous, far too numerous to mention, upgrades to support what is essentially an industry-leading level of separation. And we think that's something that we are working actually on developing to know how and maybe even some IP down the line. But when we talk about breaking and separation we are operating at levels of separation that we don't know of anybody else in the industry even close to.

One of the other things that we -- well, a couple of other things that we have done in the breaking and separation areas, we figured out fairly early on that to be able to operate over 24 hours and match timing of phasing between breaking and the next stages down the line, we needed to improve and upgrade our holding tanks, which we are doing, with higher capacity holding tanks with better mixing. One of the other issues that we faced, we needed to rethink and rework the input conveyor to the breaker to upgrade it to support the higher feed rates that we want to achieve to manage 160 tonnes a day of lead production. Initially we undersized that because we planned for 80 tonnes a day. And rather than stop when we are at scale we thought we would upgrade it sooner rather than later.

52.     On this news, the Company's stock price fell $4.34 per share, or 26%, to close at $12.31 per share on May 10, 2017, on unusually heavy trading volume.

53.     On May 10, 2017, after the market closed, the Company filed its quarterly report on Form 10-Q for the quarter ended March 31, 2017.  The 10-Q was signed by Defendants Clarke and Murphy, and reaffirmed the Company's statements about its financial results contained in the press release issued on May 9, 2017.

54.     The above statements identified in ¶¶ 50-51 & 53 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose:  (1) that Aqua Metals' breaking and separating process was facing substantial obstacles due to AquaRefining's need for a much higher degree of separation than is normal in the industry; (2) that the Company's breaking and separating process was not operating reliably or efficiently; (3)

that the breaking and separating obstacles and issues were negatively impacting the Company's output; (4) that, as a result of the foregoing, the ramp up of the Company's recycling process was being significantly hindered and delayed; and (5) that, as a result of the foregoing, the Individual Defendants' statements about Aqua Metals' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

55.     On August 9, 2017, after the market closed, Aqua Metals issued a press release entitled "Aqua Metals Provides Second Quarter 2017 Corporate Update."  Therein, the Company revealed that it was "currently in the process of scaling up AquaRefining operations to include 16 modules by the end of 2017," but made no mention of "120 tons/day" as it did in its Q1 2017 press release.  The press release also revealed that the Company "faced . . . many challenges as [it] worked to ramp up production."  In pertinent part, the Company stated:

> ALAMEDA, Calif., August 9, 2017 - Aqua Metals, Inc. (NASDAQ:AQMS), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, has provided a corporate update and announced results for the second quarter ended June 30, 2017.
>
> **Company Highlights**
>
> - Recognized our first revenues from AquaRefinery 1 at the Tahoe Reno Industrial Center (TRIC) in McCarran, Nevada.
>
> - As of July, the Company had four AquaRefining modules commissioned and in operation. The Company is currently in the process of scaling up AquaRefining operations to include 16 modules by the end of 2017.
>
> - Secured international patents in Korea (Korea Patent No. 10-1739414) and Australia (Australia Patent No. AU2014353227) for "Devices and Method for Smelterless Recycling of Lead Acid Batteries." The Company's IP Strategy includes planned filings for more than 20 patents, organized into several families covering "matter," "devices" and "processes", in up to 20 different regions.
>
> - Appointed Mark Weinswig as Chief Financial Officer, effective August 10th, who joins Aqua Metals with extensive strategic and operational financial leadership, including nearly 20 years with technology manufacturing

companies, such as Emcore, Coherent and Oclaro. Mr. Weinswig succeeds Thomas Murphy, who is retiring from the position. Mr. Murphy will remain a consultant to the Company on a number of matters and to ensure a smooth transition.

- Acquired UK-based Ebonex IPR Limited (Ebonex), an IP-based company that has developed patented technology in the rapidly developing market for advanced 48V bipolar lead acid batteries for automotive use. This acquisition provides Aqua Metals with the opportunity to accelerate its development of lead nano-fibers as a high performance active material and secured ownership of highly corrosion resistant electrode substrate materials. This acquisition is complementary to the work Aqua Metals has begun with 3rd parties.

- Successfully hosted several invitational investor and analyst days at AquaRefinery 1 in late May and early August. These events showcased the production process at the AquaRefinery, including battery feedstock deliveries, battery breaking and separation, desulfurization and pre-AquaRefining digestion processes and AquaRefining on four running AquaRefining modules.

- Received several accolades, including the Platts Global Metals Award, presented by S&P Global Platts, for the Breakthrough Solution of the Year, as well as the San Francisco Business Times Technology and Innovation Award.

**Management Commentary**

"In the second quarter, the company faced and overcame many challenges as we worked to ramp up production. With four AquaRefining modules now on-line and our front-end processes operational, we are totally focused on commissioning the balance of the 16 AquaRefining modules and the production of AquaRefined lead. With the operational experience we have gained, we are able to start planning the supply of modules to licensees. The progress that we made is all down to the hard work, creativity and dedication of the team we have built and the continued support of our partners," said Dr. Stephen Clarke, Chairman and CEO of Aqua Metals.

**Second Quarter 2017 Financials**

Total revenues in the second quarter of 2017 were $603,000, which represents the first commercial revenues generated by the company.

The Company incurred an operating loss of $8.0 million during the second quarter of 2017 compared to an operating loss of $2.8 million in the second quarter of 2016.

Net loss for the second quarter of 2017 was $8.4 million, or ($0.42) per basic and diluted share, compared to a net loss of $2.9 million, or ($0.20) per basic and diluted share, in the second quarter of 2016.

The Company had $22.0 million in cash and cash equivalents as of June 30, 2017, compared to $30.6 million as of March 31, 2017.

56.     On the same day, August 9, 2017, the Company held a conference call to discuss

its Q2 2017 results.  On the call, Defendant Clarke, in relevant part, stated:

And I'm going to start off with a summary of the operational update for the facility. So, the headlines there are the breaking and separation is now operational. We mentioned before in previous earnings calls that we would identify some issues around conventional breaking and we were making some improvements – and we've done that, they are installed successfully on - and I'm pleased to say that breaking this operation is operated reliably.

*        *        *

So I'm going to expand on some of those points. Now I'm going to start off with the breaking and separation area, and I will move to the slide that shows a photograph of the battery breaking equipment as it is now configured.

What you're looking at is a photograph of the breakup which is a box at the top of the equipment in the photograph. And first thing I'd like to point out is that unlike pretty much any other battery breaking equipment in the world, we've chosen to put our inside a soundproof and environment contained box essentially that reduces the noise levels in a facility, but more importantly it provides an atmospheric control around the breaking equipment to control dust.

And so you noticed that how clean the equipment is in our photograph, that's normal for us, but quite unusual in many parts of the battery breaking industry. And what you can see also in our photograph is various feed strings leading into super sac which are collecting plastic separators and some of the lead components.

So the key point here is that as I mentioned in the last earnings call, we determine there was a need for us to operate our breaker at a higher level of separation that is common in the battery recycling industry. And the reason for that is in the conventional breaking operation all of the output goes into a smelter and we are a smelter free operation. We don't have the ability to take materials that we can't find at home for and put them in the smelter. So we have to operate our smelter at much higher standard.

And what we did to get there was we leverage not only the battery recycling industry, we looked at the best that we could find, we looked at best-in-class. And then we went outside the battery breaking industry and we brought technologies and know-how and in some cases personnel from advanced materials handling and mining industries.

And I'm pleased to say that right now we're operating what we believe to be the best-in-class in battery breaking and separation. And in fact, I didn't expect this to be at this position in having our own IP around battery breaking and separation and this is important to us in the sense that if we are building our own standalone AquaRefining facilities, than we need the ability to break and separate batteries at a far higher standard than its currently commercially available elsewhere and we will achieve that, that's important.

Those improvements will continue and our expectation is that over the next two or three years will be continuing to make improvements in battery breaking and separation and that will add additional intellectual property and services that we can provide to our customers.

\*       \*       \*

AquaRefining works. We've got four modules operating now. We expect to have 16 operating by the end of 2017.

\*       \*       \*

However, as you'll see in our numbers, the lead compounds have a low value in the less established market than lead alloys. And moving forward, our focus is really about the AquaRefined products and the licensing of AquaRefining equipment.

So it's all about AquaRefining but optimal product mix and profitability. We're focused on running all of our AquaRefining modules to the maximum benefit. And that means that we may choose to operate the overall facility with an output of lessthan 120 tons a day, but with maximized AquaRefining. And we're looking to change our product mix to a higher level of AquaRefining product.

57.     On the same day, August 9, 2017, after the market closed, the Company filed its quarterly report on Form 10-Q for the quarter ended June 30, 2017.  The 10-Q was signed by Defendants Clarke and Murphy and reaffirmed the Company's statements about its financial results contained in the press release issued on the same day.

58.     On this news, the Company's stock price fell $2.56 per share, or 23.6%, to close at $8.31 per share on August 10, 2017, on unusually heavy trading volume.

59.     The above statements identified in ¶¶ 55-57 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose:  (1) that Aqua Metals' breaking and separating process was facing substantial obstacles due to AquaRefining's need for a much higher degree of separation than is normal in the industry; (2) that the Company's breaking and separating process was not operating reliably or efficiently; (3) that the breaking and separating obstacles and issues were negatively impacting the Company's output; (4) that the Company's four "operating modules" were being used primarily for experimentation, rather than production; (5) that module operators were assisting with lead removal; (6) that, as a result of the foregoing, the ramp up of the Company's recycling process was being significantly hindered and delayed; and (7) that, as a result of the foregoing, the Individual Defendants' statements about Aqua Metals' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

60.     On October 23, 2017, the Company issued a press release entitled "Aqua Metals Provides Update on Plant's Operations."  Therein, the Company disclosed that "[f]our modules are assembled, commissioned and are being used to determine the optimal operating parameters, including electrolyte pH, lead concentration, operating temperature, electrolyte flow rate and free acid levels" but that it had only "produced small quantities of AquaRefined lead during the commissioning process."  The Company further stated that "Aqua Metals' production process has multiple stages prior to AquaRefining, including battery breaking, separation, desulphurization, and electrolyte production" and disclosed that it was "in the process of

synchronizing all of these stages, which is critical to maximizing efficiency, optimizing working

procedures and minimizing waste." In pertinent part, the Company stated:

> Aqua Metals, Inc. (NASDAQ:AQMS), ("Aqua Metals" or the "Company"), which is proceeding to commercialize its proprietary electrochemical lead recycling technology called AquaRefining™, has provided the following update on operations at its McCarran, Nevada facility.

> Aqua Metals continues to make progress on the world's first AquaRefining lead recycling facility. The Company now has a total of 15 AquaRefining modules onsite and in-place, with one to be shipped.

> Four modules are assembled, commissioned and are being used to determine the optimal operating parameters, including electrolyte pH, lead concentration, operating temperature, electrolyte flow rate and free acid levels.

> An additional four modules are close to being fully assembled and the balance of the modules are in the process of assembly. Accordingly, the Company expects to have all 16 modules installed and commissioned by the end of the year.

> The Company has produced small quantities of AquaRefined lead during the commissioning process. Ramp up of AquaRefined lead production is expected to continue through the fourth quarter of 2017 and into 2018 as modules are brought on-line and shifts are added.

> An important part of the commissioning process is to operate the modules consistently at progressively higher electrical currents to determine the appropriate control parameters and operating procedures. Once completed these parameters and procedures can be replicated across all modules. During module commissioning, the Company also found that under certain conditions, the operators would need to periodically assist the lead removal. Several solutions have now been tested and the Company is evaluating which options are best for long term use.

> Aqua Metals' production process has multiple stages prior to AquaRefining, including battery breaking, separation, desulphurization, and electrolyte production. The final stage of production involves processing AquaRefined lead and the metallic lead recovered from batteries through an ingot production line. The Company is in the process of synchronizing all of these stages, which is critical to maximizing efficiency, optimizing working procedures and minimizing waste.

> For over six months, Aqua Metals has been breaking batteries and selling lead compounds. Aqua Metals is currently in the process of taking the next major step by transitioning to the production of lead ingots that are produced from battery

grids and a small amount of AquaRefined lead. These lead ingots will be sold as lead "bullion". The next step will be to produce and sell ingots of lead alloy, and the last step will be to produce and sell ingots of AquaRefined lead. Aqua Metals expects to ramp lead production of its AquaRefining modules in the first quarter of 2018.

61.     On this news, the Company's stock price fell $0.96 per share, or 17.9%, to close at $4.41 per share on October 23, 2017, on unusually heavy trading volume.  The stock price continued to decline on the following day, falling $0.40 per share, or 9.1%, to close at $4.01 per share on October 24, 2017, on unusually heavy trading volume.

62.     The above statements identified in ¶ 60 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose:  (1) that Aqua Metals' breaking and separating process was facing substantial obstacles due to AquaRefining's need for a much higher degree of separation than is normal in the industry; (2) that the Company's breaking and separating process was not operating reliably or efficiently; (3) that the breaking and separating obstacles and issues were negatively impacting the Company's output; (4) that, as a result of the foregoing, the ramp up of the Company's recycling process was being significantly hindered and delayed; and (5) that, as a result of the foregoing, the Individual Defendants' statements about Aqua Metals' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

## MATERIALLY FALSE AND MISLEADING PROXY STATEMENT ISSUED BY THE INDIVIDUAL DEFENDANTS

63.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants likewise caused the Company to issue a false and misleading proxy statement, which sought shareholder votes for, *inter alia,* director re-election.

64.     On April 24, 2017, the Individual Defendants caused the Company to file with the SEC on Form DEF 14A and disseminated to shareholders a Proxy Statement (the "2017 Proxy") in connection with the Company's annual shareholder meeting.   The Individual Defendants drafted, approved, reviewed, and/or signed the 2017 Proxy before it was filed with the SEC and disseminated to Aqua Metals' shareholders.   The Individual Defendants knew or were deliberately conscious in not knowing, that the 2017 Proxy was likewise materially false and misleading.

65.     Among other things, the 2017 Proxy provided information about the director nominees up for election, Defendants Clarke, Murphy, DiVito, Slade and Stevenson.   In addition, the 2017 Proxy described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

66.     The 2017 Proxy was false and misleading because it solicited Aqua Metal shareholder votes for director reelection even though the Individual Defendants were aware, but had failed to disclose:   (1) that Aqua Metals' breaking and separating process was facing substantial obstacles due to AquaRefining's need for a much higher degree of separation than is normal in the industry; (2) that the Company's breaking and separating process was not operating reliably or efficiently; (3) that the breaking and separating obstacles and issues were negatively impacting the Company's output; (4) that, as a result of the foregoing, the ramp up of the Company's recycling process was being significantly hindered and delayed; and (5) that, as a result of the foregoing, the Individual Defendants' statements about Aqua Metals' business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

**THE TRUTH IS REVEALED**

67.     On November 9, 2017, after the market closed, Aqua Metals issued a press release

entitled "Aqua Metals Provides Third Quarter 2017 Corporate Update."  Therein, the Company

revealed that, contrary to its earlier representation that it had "four modules operating now," in

reality, it had "a total of 16 AquaRefining modules on-site and in-place," eight "in the final

stages of on-site assembly," four "fully assembled but not yet in operation," and the remaining

four "assembled and being used to determine the optimal operating parameters for all 16

modules." In pertinent part, the Company stated:

> Aqua Metals, Inc. (NASDAQ:AQMS), ("Aqua Metals" or the "Company"),
> which is proceeding to commercialize its proprietary electrochemical lead
> recycling technology called AquaRefining™, has provided a corporate update and
> announced results for the third quarter ended September 30, 2017.
>
> **Company Highlights**
>
> - The Company currently has a total of 16 AquaRefining modules on-site and
>   in-place. Eight modules are in the final stages of on-site assembly. Four
>   modules are fully assembled but not yet in operation, and the remaining four
>   modules are assembled and being used to determine the optimal operating
>   parameters for all 16 modules.  The ingot production line has cast lead ingots,
>   which will be sent to customers in the fourth quarter of 2017.
>
> - The Company overcame significant challenges with breaking and separation,
>   and has significantly increased the amount of throughput.
>
> - Delivered written notice and commenced discussions with the Company's
>   strategic partner, Johnson Controls (JCI), concerning the retrofit of an existing
>   JCI smelter-based facility whereby Aqua Metals will provide AquaRefining
>   technology, engineering and systems integration.
>
> - Received Notice of Allowance for Aqua Metals' first U.S. patent application
>   from the United States Patent and Trademark Office (USPTO), as well as
>   Notice of Allowance for the first Canadian patent application from the
>   Canadian Intellectual Property Office (CIPO). The Company also secured
>   international patents in Australia, Japan and Korea. The Company's IP
>   strategy includes filings for multiple patents, organized into several families
>   covering "matter," "devices" and "processes," in multiple regions.

- Appointed Mark Weinswig as Chief Financial Officer, who joined Aqua Metals with extensive strategic and operational financial leadership.

- Received several accolades for AquaRefining technology, such as winning the *Popular Sciences'* best of "What's New" award in the engineering category, as well as AquaRefining being named a finalist for the 2017 I. Chem. E Global Awards' "Innovative Product" category.

**Management Commentary**

"During the third quarter, we made significant progress towards scaling operations at the world's first AquaRefining facility. We are currently in the process of transitioning to the production of lead ingots that are produced from battery grids and a small amount of AquaRefined lead," said Dr. Stephen Clarke, Chairman and CEO of Aqua Metals.

Clarke, continued: "Looking ahead, we still anticipate having all 16 AquaRefinery modules installed and operational by the end of the year and from there will transition them to continuous operation. Ramp up of AquaRefined lead production is expected to continue through the fourth quarter of 2017 and into 2018 as modules are brought on-line and shifts are added. We faced and overcame multiple challenges during the quarter, and should expect more as we work to scale production.

"Over the last several months, we have strengthened our management and technical team and refocused technology priorities. At this point we strongly believe that investing the resources to fully optimize the operating parameters for our process will better prepare us for both our own operations and the supply of AquaRefining equipment and services to 3rd parties. To that latter point, during the third quarter we commenced discussions regarding the supply of AquaRefining equipment, engineering and other services to support the addition of AquaRefining to a facility owned and operated by our strategic partner, Johnson Controls. We expect thisaspect of our business to expand and drive shareholder value over the long term."

Third Quarter 2017 Financials

Total revenues in the third quarter of 2017 were $0.6 million, compared to $0.6 million in the second quarter of 2017 and no revenue in the third quarter of 2016.

The Company incurred an operating loss of $5.8 million during the third quarter of 2017 compared to an operating loss of $3.3 million in the third quarter of 2016.

Net loss for the third quarter of 2017 was $6.3 million, or ($0.31) per diluted share, compared to a net loss of $3.5 million, or ($0.23) per diluted share, in the third quarter of 2016.

The Company had $17.5 million in cash and cash equivalents as of September 30, 2017, compared to $22.1 million as of June 30, 2017.

68.     On the same day, November 9, 2017, the Company held a conference call to discuss its Q3 2017 results.  On the call, Defendant Clarke made statements and answered analysts' questions.  In relevant part, Clarke stated:

Now I want to focus on our Reno facility to walk through each of the different process steps and provide an update on the status of each. As we've discussed before, our first process includes five steps. Our first step is our battery breaker and material separation system.

Previously, we reported difficulties and delays associated with this first step. So I'm pleased to note that we have achieved very significant improvements in reliability and throughput over the past few months, and the battery breaker is now running consistently seven days a week.

*        *        *

Currently, the four operating modules are being used to achieve the following: The first thing is to accelerate updates aimed at providing a level of robustness suitable for operating by third parties with non-specialist operators. The second feature -- purpose is to map out operating parameters and performance over the full range of operating conditions. The objective is to achieve the highest level of operational flexibility. We believe both activities are coming to a successful conclusion, after which we will apply the control parameters across all 16 modules.

*        *        *

**Analyst:**

Quickly, on some of the details of the current operations, could you maybe provide some additional color on—as to how many tons per day are you guys currently running through the battery breaking system and through the entire process?

**Clarke**

No. At this time we provided all the color that we're willing to provide at this point.

*        *        *

**Analyst:**

You mentioned in your prepared remarks that four AquaRefine modules are currently being used. Just kind of wondering what kind of utilization rate is with regards to those four modules? Are they being operated 24/7? Or are you still running in batches? How is it going?

**Clarke:**

We're not providing individual tonnage per day, utilization rates or any of that data. What we are saying is that we've got 16 on site. We've got 8 fully assembled. We achieved that. We put four on site and assembled them in less than a month, it was a tremendous effort. I'm confident we'll have all 16 assembled by the end of the year.

69.     On this news, the Company's stock price fell $0.08 per share, or 2.1%, to close at $3.71 per share on November 10, 2017.  The stock price continued to decline on the following trading days, falling $0.13 per share (3.5%) on November 13, 2017, and $0.58 per share (16.2%) on November 14, 2017, to close at $3.00 per share on November 14, 2017.

## DAMAGES TO AQUA METALS

70.     As a result of the Individual Defendants' wrongful conduct, Aqua Metals disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Aqua Metals's credibility.  Aqua Metals has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

71.     Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected Aqua Metals to three complaints for violations of the federal securities laws filed in the United States District Court for the Northern District of California.  As noted in an 8-K filed by the Company on January 5, 2018:

The following purported class action lawsuits were filed in the United Stated District Court for the Northern District California against Aqua Metals, Inc., Stephen R. Clarke, Thomas Murphy and Mark Weinswig: *Arlis Hampton vs.*

*Aqua Metals, Inc. et al.*, Case No 4:17-cv-07142-HSG; *Grant Heath vs. Aqua Metals, Inc. et al.*, Case No 3:17-cv-07196-JST; *Lotfy Arbab vs. Aqua Metals, Inc. et al.*, Case No 3:17-cv-07270WHA. Each of the complaints was filed by persons claiming to be stockholders of Aqua Metals and generally allege violations of the anti-fraud provisions of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, between May 19, 2016 and November 9, 2017 with respect to Aqua Metals' lead recycling operations. The complaints seek unspecified damages and plaintiffs' attorneys' fees and costs.

(the "Securities Class Actions").

72.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Aqua Metals' market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

73.     Moreover, these actions have irreparably damaged Aqua Metals' corporate image and goodwill.  For at least the foreseeable future, Aqua Metals will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Aqua Metals' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

74.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

75.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

76.     Plaintiff is an owner of Aqua Metals common stock and was an owner of Aqua Metals common stock at all times relevant hereto.

77.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

78.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Aqua Metals Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

79.     At the time this action was commenced, the Board consisted of five directors: Defendants Clarke, Mould, DiVito, Slade and Stevenson.  All five members of the Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO DEFENDANTS CLARKE, DIVITO, SLADE AND STEVENSON BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

80.     Defendants Clarke, DiVito, Slade and Stevenson all face a substantial likelihood of liability for their individual misconduct.  Defendants Clarke, DiVito, Slade and Stevenson were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

81.     Moreover, Defendants Clarke, DiVito, Slade and Stevenson, as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

82.     Defendants Clarke, DiVito, Slade and Stevenson's conscious and knowing making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Defendants Clarke, DiVito, Slade and Stevenson face a substantial likelihood of liability.  If Defendants Clarke, DiVito, Slade and Stevenson were to bring a suit on behalf of Aqua Metals to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile as to Defendants Clarke, DiVito, Slade and Stevenson.

**DEFENDANT CLARKE LACKS INDEPENDENCE**

83.     As an initial matter, Aqua Metals has conceded in its SEC filings that Clarke is not an independent director of the Company.  In its 2017 Proxy, Aqua Metals states that:

> Our Board has determined that, other than Mr. Clarke and Mr. Murphy, by virtue of their executive officer positions, none of our director nominees has a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each is "independent" as that term is defined under the applicable rules and regulations of the SEC and the listing requirements and rules of the Nasdaq Stock Market.

84.     In addition to this lack of independence, Clarke is not disinterested for purposes of demand futility because his principal occupation is CEO and Chairman of the Board of Aqua Metals.  According to the Company's SEC filings, in 2015 and 2016, Clarke received total compensation of $420,000 and $549,000, respectively.  These amounts are material to him.

85.     Defendant Clarke is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Actions.

**DEFENDANT MOULD LACKS INDEPENDENCE**

86.     As with Defendants Clarke and Murphy, Defendant Mould is an executive officer and one of the founders of Aqua Metals.  Thus, as noted in the 2017 Proxy for Defendants Clarke and Murphy, Defendant Mould's executive officer position means he lacks independence.

87.     In addition to this lack of independence, Mould is not disinterested for purposes of demand futility because his principal occupation is COO of Aqua Metals.  According to the Company's SEC filings, in 2015 and 2016, Mould received total compensation of $375,000 and $525,000, respectively.  These amounts are material to him.

**DEMAND IS EXCUSED BECAUSE ALL OF THE CURRENT BOARD MEMBERS ARE NOT DISINTERESTED AS THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

88.     Defendants Clarke, Mould, DiVito, Slade and Stevenson are not disinterested because they each face a substantial likelihood of liability in light of their false and misleading statements as outlined above.  All of these defendants signed the false and misleading 10-K filed with the SEC on March 2, 2017.  In addition, defendant Clarke signed the false and misleading 10-Qs filed with the SEC on May 10, 2017 and August 9, 2017.

**DEMAND IS EXCUSED AS TO DEFENDANTS DIVITO, SLADE AND STEVENSON BECAUSE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR THEIR ACTIONS AS MEMBERS OF THE AUDIT COMMITTEE**

89.     Defendants DiVito, Slade and Stevenson, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowing Defendants Clarke and Murphy to repeatedly make other false and

misleading statements to the investing public. More specifically, as members of the Audit Committee, Defendants DiVito, Slade and Stevenson were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Defendants DiVito, Slade and Stevenson, as members of the Audit Committee, consciously failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to Defendants DiVito, Slade and Stevenson.

### DEFENDANTS CLARKE AND MOULD ARE UNABLE TO INDEPENDENTLY CONSIDER A DEMAND DUE TO THEIR BUSINESS AFFILIATIONS

90.     Defendants Clarke and Mould lack the independence required to impartially consider a demand by Plaintiff due to their longstanding business relationship. Defendants Clarke, Mould and Murphy all worked together in executive positions at Applied Intellectual Capital, Ltd., and when that venture fell apart, they together founded Aqua Materials and once again placed themselves in executive positions.

### DEMAND IS FUTILE AS TO DEFENDANT MOULD BECAUSE HE FINANCIALLY BENEFITED FROM THE ABOVE-REFERENCED FALSE AND MISLEADING STATEMENTS

91.     As noted above, Defendant Mould personally benefited from the Individual Defendants false and misleading statements by having the opportunity to sell shares of Aqua Metals stock at artificially inflated prices, a benefit not shared by the rest of Aqua Metals' stockholders.

### DEMAND IS FUTILE AS TO DEFENDANTS CLARKE, MOULD, DIVITO, SLADE AND STEVENSON FOR THE FOLLOWING ADDITIONAL REASONS

92.     If Aqua Metals' current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers

Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Aqua Metal against the Individual Defendants, known as the "insured versus insured exclusion."

93.     As a result, if Defendants Clarke, Mould, DiVito, Slade and Stevenson were to sue themselves or certain of the officers of Aqua Metals, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, Defendants Clarke, Mould, DiVito, Slade and Stevenson cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

94.     Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Aqua Metals by prosecuting this action. Therefore, demand on Aqua Metals and its Board is futile and is excused. Aqua Metals has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, Defendants Clarke, Mould, DiVito, Slade and Stevenson have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, Defendants Clarke, Mould, DiVito, Slade and Stevenson are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

**COUNT I**
**AGAINST THE INDIVIDUAL DEFENDANTS**
**FOR BREACH OF FIDUCIARY DUTY**

95.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

96.     The Individual Defendants owed and owe Aqua Metals fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Aqua Metals the highest obligation of loyalty, good faith, due care, oversight, and candor.

97.      All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor.

98.     Each of the Individual Defendants had actual or constructive knowledge of and failed to disclose:  (1) that Aqua Metals' breaking and separating process was facing substantial obstacles due to AquaRefining's need for a much higher degree of separation than is normal in the industry; (2) that the Company's breaking and separating process was not operating reliably or efficiently; (3) that the breaking and separating obstacles and issues were negatively impacting the Company's output; (4) that, as a result of the foregoing, the ramp up of the Company's recycling process was being significantly hindered and delayed; and (5) that, as a result of the foregoing, the Individual Defendants' statements about Aqua Metals' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.  These actions caused severe risks to the Company financial viability and were causing harm to the Company by subjecting the Company to the Securities Class Actions.  The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

99.     The Individual Defendants consciously caused or allowed Aqua Metals to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements regarding its AquaRefining capabilities.

100.     The Individual Defendants consciously failed to supervise, and to exert internal controls over, and consciously disregarded their responsibilities involving the Company.

101.     As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Aqua Metals has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. The Individual Defendants breached their fiduciary duties owed to Aqua Metals and its shareholders by willfully, consciously, and/or intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee Aqua Metals' business, rendering them personally liable to the Company.

## COUNT II
## BREACH OF FIDUCIARY DUTY FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION AGAINST THE INSIDER SELLING DEFENDANTS (MURPHY AND MOULD)

102.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

103.     At the time of the stock sales set forth herein, defendants Murphy and Mould knew of the information described above, and sold Aqua Metals common stock on the basis of such information.

104.     The information described above was proprietary non-public information concerning the Company.  It was a proprietary asset belonging to the Company, which Murphy and Mould used for their own benefit when they sold Aqua Metals common stock.

105.     Defendants Murphy's and Mould's sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

106.     Since the use of the Company's proprietary information for their own gain constitutes a breach of defendants Murphy's and Mould's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits defendants Murphy and Mould obtained thereby.

## COUNT III
### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF § 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9

107.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.     SEC Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

109.     The 2017 Proxy violated Section 14(a) and Rule 14a-9 because it solicited Aqua Metals shareholder votes for, *inter alia,* director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings in connection with its AquaRefining system.

110.     As alleged herein, in the 2017 Proxy the Individual Defendants specifically referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.   Because the Company, under the Individual

Defendants' direction and on their watch, was issuing false and misleading statements, the Individual Defendants affirmatively violated the Code. The 2017 Proxy failed to disclose that express terms of the Code were being violated.

111.    The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2017 Proxy, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2017 Proxy.

112.    The Individual Defendants knew that the statements contained in the 2017 Proxy were materially false and misleading.

113.    The omissions and false and misleading statements in the 2017 Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the re-election of directors. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2017 Proxy and in other information reasonably available to shareholders.

114.    As a direct and proximate result of the dissemination of the false and/or misleading 2017 Proxy the Individual Defendants used to obtain shareholder approval of and thereby re-elect directors, nominal defendant Aqua Metals suffered damage and actual economic losses (i.e., wrongful re-election of directors) in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.       Declaring that Plaintiff may maintain this derivative action on behalf of Aqua Metals and that Plaintiff is a proper and adequate representative of the Company;

B.       Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.       Ordering defendants Murphy and Mould to disgorge the profits obtained as a result of their sale of Aqua Metals stock while in possession of insider information as described herein;

D.       Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.       Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.       Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  February 2, 2018                            Respectfully submitted,

                                                   **RIGRODSKY & LONG, P.A.**

                                                   By: *Brian D. Long*
                                                        Seth D. Rigrodsky (#3147)
                                                        Brian D. Long (#4347)
                                                        Gina M. Serra (#5387)
                                                        Jeremy J. Riley (#5791)
                                                        300 Delaware Avenue, Suite 1220
                                                        Wilmington, DE 19801
                                                        Phone:  (302) 295-5310
                                                        Fax:  (302) 654-7530

**HYNES KELLER & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Phone:  (484) 875-3116
Fax:  (914) 752-3041

*Attorneys for Plaintiff*