## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE AQUA METALS, INC. STOCKHOLDER DERIVATIVE LITIGATION | Master File No.: 1:18-cv-00201-LPS<br><br>**JURY DEMANDED** |

### CONSOLIDATED AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Al Lutzker, Chau Nguyen, Albert Stafford, Jerry Davis, Sherry Lu, Richard Byrne, and Christopher Ballentine, ("Plaintiffs"), by and through their counsel, derivatively on behalf of nominal defendant Aqua Metals, Inc. ("Aqua Metals" or the "Company"), submit this Consolidated Amended Verified Shareholder Derivative Complaint against defendants Stephen R. Clarke ("Clark"), Thomas Murphy ("Murphy"), Selwyn Mould ("Mould"), Vincent L. DiVito ("DiVito"), Mark Slade ("Slade"), and Mark Stevenson ("Stevenson") (collectively, the "Individual Defendants") and allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsels' investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Aqua Metals with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Aqua Metals; (iii) the complaint and other pleadings filed in a consolidated class action lawsuit captioned *In re Aqua Metals, Inc. Securities Litigation*, Case No. 4:17-cv-07142 (the "Securities Class Action"), pending in the United Stated District Court for the Northern District California; and (iv) other publicly available information, including media and analyst reports, concerning Aqua Metals. The Securities Class Action asserts claims against Aqua Metals, Inc., and Individual Defendants Clarke, Murphy and Mould, for violations of the anti-fraud provisions of the federal

securities laws arising out of the alleged issuance of false and misleading statements of material fact and the alleged omission to state material facts necessary to make other statements made not misleading with respect to Aqua Metals' lead recycling operations, between May 19, 2016 and November 9, 2017 (the "Relevant Period").

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of nominal defendant Aqua Metals against certain officers and members of the Company's Board of Directors (the "Board"). Plaintiffs assert claims for breach of fiduciary duty, violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC Rule 14a-9 promulgated thereunder, insider selling, and unjust enrichment.

2.      Aqua Metals was purportedly formed to engage in the business of recycling lead through a novel process called "AquaRefining," with a focus on developing and testing the AquaRefining process, developing a business plan, raising working capital, and developing its initial lead acid battery ("LAB") recycling facility in the Tahoe Regional Industrial Center in McCarran, Nevada.

3.      AquaRefining is purportedly a closed-loop, room temperature, water-based recycling method that is fundamentally non-polluting, yet able to yield nearly 100 percent lead recovery.

4.      The process of LAB recycling involves breaking down and extracting certain components from LAB batteries, the most important of which is lead, and subsequently selling the extracted components. LAB recycling is currently a $22 billion industry, and is expected to grow over the next several years.

5.      LAB recycling is a highly regulated industry, largely due to the fact that smelting and processing lead generates large amounts of noxious gases and particulate matter. During the Relevant Period, the Individual Defendants claimed that Aqua Metals' AquaRefining process would produce pure and ultra-pure lead at high yield, while being more cost-effective and environmentally-friendly than traditional lead refining methods, thereby revolutionizing the LAB recycling industry. Critical to the AquaRefining process are lead-processing modules made up of six electrolyzers, with each electrolyzer containing several rotating disks upon which lead is plated and dissolved into a biodegradable solvent, which is continuously removed and gathered.

6.      Throughout the Relevant Period, the Individual Defendants caused the Company to tout the success of its so-called "proven" AquaRefining technology to the investing public. The Individual Defendants held out the Company as achieving consecutive key milestones, including conducting successful tests, commissioning new AquaRefining facilities, and commencing commercial production of AquaRefining.

7.      News of the AquaRefining technology was well-received by both the investing public and the LAB industry. Prompted by the Individual Defendants' representations as to the Company's progress and achievements, the price of the Company's stock rose dramatically from its Initial Public Offering ("IPO") price of $5.00 per share in August 2015 to a high of $21.89 per share on March 13, 2017.

8.      This remarkable increase in share price during the Relevant Period, however, was based on a fallacy peddled by the Individual Defendants.

9.      The Individual Defendants caused the Company to make numerous false representations and omissions of material fact regarding the success, capability and operations of Aqua Metals' AquaRefining technology. Throughout the Relevant Period, the Individual

Defendants purported to have achieved specific milestones when, in reality, Aqua Metals' AquaRefining technology was unproven and had not achieved any of the specified milestones, nor had the technology reached commercial viability.

10. By the start of the Relevant Period, the Individual Defendants caused the Company to falsely represent that Aqua Metals had "successfully tested" its AquaRefining technology at its Oakland and Alameda facilities (the "California Testing Facilities") and that Aqua Metals was on track to produce 80 metric tons of recycled lead each day by the fourth quarter of 2016, which would eventually be increased to 160 tons each day.

11. On May 19, 2016, the Company announced an agreement between Interstate Battery System International, Inc. ("Interstate Batteries") and Aqua Metals (the "Interstate Battery Agreement"), whereby Interstate Battery agreed to supply more than a million automotive and other lead-acid batteries as feedstock for the Company's AquaRefineries and to invest approximately $10 million into Aqua Metals.

12. Analysts reacted favorably to the Company's new partnership. For instance, an Oppenheimer & Co. Inc. ("Oppenheimer") report commenting on the Interstate Batteries partnership stated that the partnership was a "validation of its product quality from the global leader in lead acid batteries."

13. Shortly thereafter, the Individual Defendants announced that the Company had completed the construction of its first "AquaRefinery" at the Tahoe Reno Industrial Complex ("TRIC," or the "Reno Plant") near Reno, Nevada. The Individual Defendants purported that the TRIC facility was "open for business" in August 2016.

14. In November 2016, the Individual Defendants caused the Company to state that the TRIC facility had "produced" 99.99% pure AquaRefined lead, and that the facility would expand

its production of refined lead to 120 tons per day by early 2017, representing a 50% increase over the 80 tons per day figure that had been announced previously. The Individual Defendants reiterated the Company's projected production rate of 160 tons of lead per day by 2018, and they released images depicting ingots of allegedly "ultra-pure" AquaRefined lead.

15.     On November 21, 2016, while the investing public was being actively deceived as to the true state of the Company's AquaRefining technology, the Company enacted a secondary public offering of 2.3 million shares of its common stock, priced at $10.00 per share, for which the Company received gross proceeds of $23 million (the "November 2016 Offering"). The Company issued a press release on November 21, 2016, which stated:

> Aqua Metals intends to use the net proceeds from the offering to accelerate its AquaRefining product development and licensing efforts inclusive of pre-sales and post-sales support staff and infrastructure, enhance processes to further improve operating margins, regulatory activities, working capital and other general corporate purposes.

16.     On February 9, 2017, the Individual Defendants caused the Company to announce a battery recycling technology partnership between Johnson Controls International plc ("JCI," or "Johnson Controls") and Aqua Metals (the "JCI Agreement"), whereby JCI would, among other things, become the first licensee for the AquaRefining technology, acquire just under five (5) percent of the Company's outstanding shares, and purchase AquaRefined metals produced from the Company's facilities.

17.     Oppenheimer commented on this partnership, calling it "transformative," a "demonstration of JCI's belief in the technology," and "a marquee validation of AQMS' technology and business model."

18.     On February 14, 2017, the Individual Defendants announced that the Company had achieved the crucial milestone of moving from the commissioning phase to the operational phase

of the AquaRefining process. Specifically, the Individual Defendants purported that the Company had "successfully built, commissioned and ***beg[un] producing products*** at the world's first AquaRefinery" and that the Company had "deepened our strategic relationships with major players throughout the industry."

19.    Shortly thereafter, the Company publicly invited investors and analysts to one of the Company's facilities to observe the AquaRefining process. The Individual Defendants stated that the invitation was a way to "openly show" investors the "facility in operation" – consistent with Aqua Metals' "belief in transparency." In a May 31, 2017, press release, Defendant Clarke, the Company's Chairman and Chief Executive Officer ("CEO"), explained that the site visit was a "behind-the-scenes look at our process," including the full production process of AquaRefining.

20.    In the wake of the site visit, the Company issued a press release stating that analysts were expected to update their coverage of the Company to reflect observations from the site visit. Indeed, several analysts subsequently issued favorable reports discussing their observations of the AquaRefining process in action.

21.    For instance, an Oppenheimer report discussing a visit to one of the Company's facilities described "seeing the battery breaker, the separation process, sulfurization engaged, and the AquaRefining process all up and operational" and stated that the Company was "tracking [its] estimates well." Additionally, the Oppenheimer report noted that "[w]e observed six semi truckloads of material delivered and taken away during our four-hour visit."

22.    The National Securities Corporation also issued a favorable report on the Company, stating that the site visits were "incrementally positive for transparency" and that the "modules were up and running and producing recycled lead.… [T]he fact that we observed trucks delivering

used batteries for off-loading and recycling, and more importantly, finished recycled lead packaged and ready to be shipped out [is] highly encouraging."

23.     By this point, the Individual Defendants were repeatedly emphasizing to the investing public that the Company's focus was on expansion, by way of adding additional recycling facilities, and by licensing the Company's technology and equipment to third parties. The Company's stated goal during this period was to increase output to 800 tons of refined lead each day, with shipments of the AquaRefining equipment beginning in 2017.

24.     In reality, despite the Individual Defendants' representations to the contrary during the Relevant Period, the Company's AquaRefining process was still in the early stages of development and faced a number of significant roadblocks. Specifically, the AquaRefining technology had yet to be successfully tested in the California Testing Facilities, the TRIC facility was not operational, the modules that made up a critical part of the AquaRefining process could not run for any meaningful length of time, and the Company had not commissioned the AquaRefining process or begun commercially producing AquaRefined lead.

25.     A number of former Aqua Metals employees cited as confidential witnesses in the Securities Class Action corroborate these facts about the AquaRefining process. For instance, one confidential witness revealed that the AquaRefining modules "could not operate for more than about an hour" without breaking down, and were "still in R&D mode." Another confidential witness disclosed that the Company "only ran the machines when investors came to the plant."

26.     On May 9, 2017, after the market closed, Aqua Metals issued a press release entitled "Aqua Metals Provides First Quarter 2017 Corporate Update." Therein, the Company stated that it was "currently in the process of scaling up production of AquaRefined lead to 120 tons/day by

the end of 2017." The Individual Defendants had originally touted 120 tons/day as Aqua Metals' target for early 2017.

27.     Also on May 9, 2017, however, the Company held a conference call discussing its financial results for the fiscal quarter ended March 31, 2017, wherein Defendant Clarke stated that Aqua Metals experienced some "challenges" and "issues" as it ramped up its recycling process, including that "it took longer than we planned to get the breaking and separation up and running," and that it "needed to rethink and rework the input conveyor to the breaker to upgrade it to support the higher feed rates that we want to achieve . . . ."

28.     On this news, the Company's stock price fell $4.34 per share, or 26%, to close at $12.31 per share on May 10, 2017, on unusually heavy trading volume.

29.     On August 9, 2017, after the market closed, Aqua Metals issued a press release entitled "Aqua Metals Provides Second Quarter 2017 Corporate Update." Therein, the Company revealed that it was "currently in the process of scaling up AquaRefining operations to include 16 modules by the end of 2017," but made no mention of "120 tons/day" as it did in its Q1 2017 press release.

30.     On the same date, Aqua Metals held a conference call discussing its financial results for the fiscal second quarter ended June 30, 2017, wherein Defendant Clarke stated that "AquaRefining works. We've got four modules operating now," and that Aqua Metals was considering "operat[ing] the overall facility with an output of less than 120 tons a day" to optimize profitability. During the same call, in contrast to earlier representations that breaking and separation were "up and running," Defendant Clarke noted that Aqua Metals had merely made and installed improvements such that "breaking and separation is now operational," and "breaking and separation is operating reliably."

8

31.     On this news, the Company's stock price fell $2.56 per share, or 23.6%, to close at $8.31 per share on August 10, 2017, on unusually heavy trading volume.

32.     On October 23, 2017, the Company issued a press release entitled "Aqua Metals Provides Update on Plant's Operations." Therein, the Company stated that "[f]our modules are assembled, commissioned and are being used to determine the optimal operating parameters, including electrolyte pH, lead concentration, operating temperature, electrolyte flow rate and free acid levels." However, the Company disclosed that Aqua Metals had only "produced small quantities of AquaRefined lead during the commissioning process" and that "under certain conditions, the operators would need to periodically assist the lead removal." The Company further stated that "Aqua Metals' production process has multiple stages prior to AquaRefining, including battery breaking, separation, desulphurization, and electrolyte production" and disclosed that it was "in the process of synchronizing all of these stages, which is critical to maximizing efficiency, optimizing working procedures and minimizing waste."

33.     On this news, the Company's stock price fell $0.96 per share, or 17.9%, to close at $4.41 per share on October 23, 2017, on unusually heavy trading volume. The stock price continued to decline on the following day, falling $0.40 per share, or 9.1%, to close at $4.01 per share on October 24, 2017, on unusually heavy trading volume.

34.     On November 9, 2017, after the market closed, Aqua Metals issued a press release entitled "Aqua Metals Provides Third Quarter 2017 Corporate Update." Therein, the Company revealed that it "faced . . . many challenges as [it] worked to ramp up production."

35.     On the same day, the Company held a conference call to discuss its Q3 2017 results. On the call, Defendant Clarke revealed that "the four operating modules are being used to . . . accelerate updates aimed at providing a level of robustness suitable for operating by third parties

with non-specialist operators," and to "map out operating parameters and performance over the full range of operating conditions." An analyst asked Clarke about the "utilization rate" of the four modules. Clarke responded by stating that "[w]e're not providing individual tonnage per day, utilization rates or any of that data." Clarke also stated on the call that "the battery breaker is now running consistently seven days a week." An analyst asked "how many tons per day are you guys currently running through the battery breaking system and through the entire process?" Clarke responded: "No. At this time we have provided all the color that we're willing to provide at this point."

36.     On this news, the Company's stock price fell $0.08 per share, or 2.1%, to close at $3.71 per share on November 10, 2017. The stock price continued to decline on the following trading days, falling $0.13 per share (3.5%) on November 13, 2017, and $0.58 per share (16.2%) on November 14, 2017, to close at $3.00 per share on November 14, 2017.

37.     During the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Individual Defendants were aware of and ignoring material unresolved deficiencies with the AquaRefining technology and process that prevented large scale development, including that (a) Aqua Metals' breaking and separating process was not operating efficiently or reliably, (b) the Company's breaking and separating process was facing issues due to AquaRefining's need for a much higher degree of separation than typical in the industry, and (c) the Company's output was negatively impacted by the breaking and separating issues; (2) Aqua Metals' ramp up of its recycling process was

significantly hindered and delayed; (3) execution and operational issues were preventing scaling and production ramp up at its facility; (4) four of Aqua Metals' operating modules were primarily being used for experimentation as opposed to production; (5) module operators were assisting with lead removal; (6) Aqua Metals was unable to generate revenue from its core business and thus remained unprofitable; (7) Aqua Metals was touting the business value of the Interstate Battery Agreement and the JCI Agreement primarily because of the foregoing issues; and (8) the Company failed to maintain internal controls.

38.     As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

39.     After the Relevant Period, there was a major restructuring of the Company's leadership, in part due to the actions of a large group of the Company's shareholders. Significantly, the Board transitioned Defendant Clarke out of his roles as President, CEO and Chairman of the Board, culminating in Clarke's resignation in April 2018, along with the implementation of certain corporate governance enhancements. Defendant Mould also resigned in December 2018. Moreover, Defendant Murphy, the Company's Chief Financial Officer ("CFO"), resigned in August 2017, with his replacement subsequently resigning in March 2018.

40.     The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by willfully engaging in the deceptions alleged herein. In addition, Defendants Mould and Murphy breached their fiduciary duties of loyalty and good faith and were unjustly enriched by selling shares of Company common stock while in possession and control of material adverse non-public information that was a proprietary asset of the Company. The

Individual Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by soliciting Aqua Metals shareholder votes for, *inter alia,* director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings in connection with its AquaRefining system.

41.     In light of the Individual Defendants' misconduct, which has subjected the Company, its CEO, its CFO, and its former CFO to being named as defendants in the Securities Class Action, the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company had and will have to expend many millions of dollars.

42.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's CEO's and current and former CFOs' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Aqua Metals' Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

43.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a)

because the state law claims form part of the same case or controversy. This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

44.    This Court has jurisdiction over each defendant because they reside in this district or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the nominal defendant because it is authorized to do business in this state, has consented to service in this state and is incorporated within this district.

45.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Aqua Metals occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### PLAINTIFFS

46.    Plaintiffs are stockholders of Aqua Metals, were stockholders of Aqua Metals at the time of the wrongdoing alleged herein and have been stockholders of Aqua Metals continuously since that time.

### NOMINAL DEFENDANT AQUA METALS

47.    Nominal Defendant Aqua Metals is a Delaware corporation with its principal executive offices at 1010 Atlantic Avenue, Alameda, California 94501. Aqua Metals' common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "AQMS."

### DEFENDANT CLARKE

48.     Defendant Clarke served as the Company's President, CEO and as Chairman of the Board since the Company's inception in June 2014 until he resigned on April 23, 2018. He is also a co-founder of the Company. From May 2013 to June 2014, Clarke, along with Defendants Mould and Murphy, engaged in research and development that ultimately led to their development of the AquaRefining process. From 2008 to May 2013, Defendant Clarke was employed as the CEO of Applied Intellectual Capital, Ltd. ("Applied Intellectual Capital"), an Isle of Jersey company co-founded by Clarke in 1999 to engage in the business of incubating and developing electro-chemical technologies. Applied Intellectual Capital (delisted - formerly AINC: LN) was publicly traded in the United Kingdom on the AIM exchange (effectively a penny stock exchange in the UK) from 2007 to 2009. Like Aqua Metals, Applied Intellectual Capital was also focused on battery technologies.

49.     According to the Company's Schedule 14A filed with the SEC on April 24, 2017 (the "2017 Proxy Statement," or the "2017 Proxy"), as of March 31, 2017, Defendant Clarke beneficially owned 1,786,115 shares of the Company's common stock, which represented 8.9% of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $19.54, Clarke owned over $34.9 million worth of Aqua Metals stock.

50.     For the fiscal year ended December 31, 2018, Defendant Clarke received $400,000 in compensation from the Company. This included $106,000 in salary and $294,000 in all other compensation.

51.     The Company's 2017 Proxy Statement stated the following about Defendant Clarke:

> *Stephen R. Clarke* is a co-founder of our company and has served as our president, chief executive officer and chairman of our Board since inception in June 2014.

From May 2013 to June 2014, Dr. Clarke, along with Mr. Mould and others, engaged in research and development that ultimately lead to their development of the AquaRefining process. From 2008 to May 2013, Dr. Clarke was employed as the chief executive officer of Applied Intellectual Capital, Ltd., an Isle of Jersey company co-founded by Dr. Clarke in 1999 to engage in the business of incubating and developing electro-chemical technologies. Dr. Clarke holds a Ph.D. in computer simulation and manufacturing management from The University of Aston, UK, a BSc in mechanical engineering from Nottingham Trent University, UK and an MSc/MBA in engineering enterprise management from The University of Warwick, UK.

Dr. Clarke has extensive knowledge of the battery industry and electro-chemical technologies from his senior management position with Applied Intellectual Capital, Ltd. As a result of these and other professional experiences, our Board has concluded that Dr. Clarke is qualified to serve as a director.

**DEFENDANT MURPHY**

52.     Defendant Murphy was the CFO of Aqua Metals until August 10, 2017 and a director until August 30, 2017. He returned to serve as Interim CFO on March 5, 2018 until May 2018. He is a co-founder of Aqua Metals and worked alongside Defendants Clarke and Mould in the development of the AquaRefining process and the Company's current business. From September 2009 to May 2013, Murphy served as CFO of Applied Intellectual Capital.

53.     According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Murphy beneficially owned 787,703 shares of the Company's common stock, which represented 3.9% of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $19.54, Murphy owned over $15.3 million worth of Aqua Metals stock.

54.     For the fiscal year ended December 31, 2016, Defendant Murphy received $499,000 in compensation from the Company. This included $309,000 in salary and a $190,000 bonus.

55.    Defendant Murphy made the following stock sales while in possession of material

inside information that the stock price of Aqua Metals was artificially inflated:

| Insider | Transaction | Type | Value | Date | Shares |
|---|---|---|---|---|---|
| MURPHY THOMAS MICHAEL | Automatic Sale at $17.52 per share. | Direct | 350,400 | May 7, 2017 | 20,000 |

| Insider | Transaction | Type | Value | Date | Shares |
|---|---|---|---|---|---|
| MURPHY THOMAS MICHAEL | Automatic Sale at $17.25 per share. | Direct | 345,000 | Apr 9, 2017 | 20,000 |

| Insider | Transaction | Type | Value | Date | Shares |
|---|---|---|---|---|---|
| MURPHY THOMAS MICHAEL | Sale at $17.24 per share. | Direct | 344,799 | Mar 7, 2017 | 20,000 |

56.    The Company's 2017 Proxy Statement stated the following about Defendant

Murphy:

> *Thomas Murphy* is a co-founder of our company and has served as our chief
> financial officer and a member of our Board since inception in June 2014. From
> May 2013 to June 2014, Mr. Murphy worked alongside Mr. Clarke and Mr. Mould
> in the development of the AquaRefining process and our current business. From
> September 2009 to May 2013, Mr. Murphy served as chief financial officer of
> Applied Intellectual Capital, Ltd. In addition Mr. Murphy has over 30 years'
> experience in senior financial positions working in publishing, construction and
> aviation industries.
>
> Mr. Murphy has extensive knowledge of accounting issues and business operations
> in the markets in which we operate from his experience as chief financial officer of
> Applied Intellectual Capital, Ltd. As a result of these and other professional
> experiences, our Board has concluded that Mr. Murphy is qualified to serve as a
> director.

**DEFENDANT MOULD**

57.     Defendant Mould is a co-founder of the Company and served as Chief Operating Officer ("COO") from June 2014 until he resigned in December 2018. From May 2013 to June 2014, Mould, along with Defendants Clarke and Murphy, engaged in research and development that ultimately lead to their development of our AquaRefining process. On August 30, 2017, Defendant Murphy resigned from the Board. On the same day, the Board, acting on the recommendation of the Board's Nominating and Corporate Governance Committee, appointed Defendant Mould to fill the vacancy on the Board created by Murphy's resignation. Defendant Mould left the Board on May 2, 2018. From 2008 to May 2013, Mould served as COO of Applied Intellectual Capital.

58.     According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Mould beneficially owned 787,703 shares of the Company's common stock, which represented 3.9% of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $19.54, Mould owned over $15.3 million worth of Aqua Metals stock.

59.     For the fiscal year ended December 31, 2018, Defendant Mould received $428,000 in compensation from the Company. This included $391,000 in salary and $38,000 in all other compensation.

60.     Defendant Mould made the following stock sales while in possession of inside information that the stock price of Aqua Metals was artificially inflated:

| Insider | Transaction | Type | Value | Date | Shares |
|---|---|---|---|---|---|
| MOULD SELWYN | Automatic Sale at $16.53 per share. | Direct | 330,600 | Apr 30, 2017 | 20,000 |

| Insider | Transaction | Type | Value | Date | Shares |
|---|---|---|---|---|---|

| MOULD SELWYN | Automatic Sale at $18.92 per share. | Direct | 378,400 | Apr 2, 2017 | 20,000 |

| Insider | Transaction | Type | Value | Date | Shares |
|---------|-------------|------|-------|------|--------|
| MOULD SELWYN | Sale at $17.03 per share. | Direct | 340,600 | Mar 6, 2017 | 20,000 |

61.     The Company's 2017 Proxy Statement stated the following about Defendant

Mould:

> *Selwyn Mould* is a co-founder of our company and has served as our chief operating officer since inception in June 2014. From May 2013 to June 2014, Mr. Mould, along with Mr. Clarke and others, engaged in research and development that ultimately lead to their development of the AquaRefining process. From 2008 to May 2013, Mr. Mould served as chief operating officer of Applied Intellectual Capital, Ltd. From 1999 to 2007, Mr. Mould served as head of supply chain for Group Lotus Plc, the sports car manufacturer and engineering consultant. Prior to that he was head of logistics for Pilkington Plc. In his earlier career, Mr. Mould was a production manager for Chloride Industrial Batteries Ltd. Mr. Mould holds an MA in natural sciences from the University of Cambridge with a major in chemistry.

**DEFENDANT DIVITO**

62.     Defendant DiVito has served as a member of the Company's Board since May

2015. He also serves as Chairperson of the Audit Committee and as a member of the Compensation

Committee and the Nominating and Corporate Governance Committee.

63.     According to the Company's Schedule 14A filed with the SEC on March 4, 2019

(the "2019 Proxy Statement"), as of February 22, 2019, Defendant DiVito beneficially owned

99,586 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on February 22, 2019 was $2.93, DiVito owned

approximately $291,786 worth of Aqua Metals stock.

64.     For the fiscal year ended December 31, 2018, Defendant DiVito received $180,000 worth of compensation from the Company. This included $98,000 in fees earned or cash paid, $63,000 in option awards, and $25,000 in stock awards.

65.     The Company's 2019 Proxy Statement stated the following about Defendant DiVito:

> *Vincent L. DiVito* has served as a member of our Board since May 2015. From April 19, 2018 to May 2, 2018, Mr. DiVito served as non-executive Chairman of the Board. Since April 2010, Mr. DiVito has served as the owner and chief executive officer of Vincent L. DiVito, Inc., a financial and management consulting firm. From January 2008 to April 2010, Mr. DiVito served as president of Lonza America, Inc., a global life sciences chemical business headquartered in Allendale, New Jersey, and also served as chief financial officer and treasurer of Lonza America, Inc. from September 2000 to April 2010. Lonza America, Inc. is part of Lonza Group, whose stock is traded on the Swiss Stock Exchange. From 1990 to September 2000, Mr. DiVito was employed by Algroup Wheaton, a global pharmaceutical and cosmetics packaging company, first as its director of business development and later as its vice president and chief financial officer. Mr. DiVito is a certified public accountant and certified management accountant and is a National Association of Corporate Directors Board Leadership Fellow. He served on the board of directors and chairman of the audit committee of Entertainment Gaming Asia Inc., a Nasdaq listed gaming company, from October 2005 until its acquisition in July 2017, and also served as a member of the board of directors of Riviera Holdings Corporation, formerly an AMEX listed gaming and resort company, from July 2002 until the consummation of a change in control of the corporation in March 2011.

**DEFENDANT SLADE**

66.     Defendant Slade served as a member of the Company's Board from June 2015 until he resigned on January 29, 2019.

67.     According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Slade beneficially owned 45,796 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $19.54, Slade owned over $894,853 worth of Aqua Metals stock.

68.     For the fiscal year ended December 31, 2016, Defendant Slade received $125,000 worth of compensation from the Company. This included $75,000 in fees earned or cash paid and $50,000 in option awards.

69.     The Company's 2017 Proxy Statement stated the following about Defendant Slade:

*Mark Slade* has served as a member of our Board since June 2015. Mr. Slade was the chief executive officer and founder of Marex Financial Ltd, one of Europe's leading independent commodity brokers, from January 2006 to January 2011. Marex was a member of the London Metal Exchange, Intercontinental Exchange, The London International Financial Futures and Options Exchange and Eurex Exchange, with offices in London, Geneva and New York. Since leaving Marex Financial, Mr. Slade has held a number of advisory and executive roles. From December 2011 to December 2012, he was an advisor on international business development to the Hong Kong Mercantile Exchange. From January 2013 to July 2013, Mr. Slade was chief executive officer of London Capital Group. Since January 2015, Mr. Slade has served as an advisor on strategy and business development to Tower Trading Group Ltd. In addition to his corporate roles, Mr. Slade also held a number of board and committee appointments within the commodity futures industry, including being a board member of the London Metal Exchange (1999 - 2006) and the Futures and Options Association (2005-2008).

Mr. Slade has extensive knowledge of the metals and other commodity markets from his experience serving as a senior executive officer and consultant to commodity trading and brokerage firms. As a result of these and other professional experiences, our Board has concluded that Mr. Slade is qualified to serve as a director.

**DEFENDANT STEVENSON**

70.     Defendant Stevenson served as a member of the Company's Board from December 2016 until he resigned on August 5, 2019.

71.     According to the 2019 Proxy Statement, as of February 22, 2019, Defendant Stevenson beneficially owned 58,212 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 22, 2019 was $2.93, Stevenson owned approximately $139,807 worth of Aqua Metals stock.

72.     The Company's 2019 Proxy Statement stated the following about Defendant Stevenson:

*Mark Stevenson* has served as a member of our Board since December 2016. Mr. Stevenson was the technical marketing director - Asia for Ecobat Technologies Ltd., a global company that produces and recycles lead, from March 2010 to April 2016. He currently serves as Technical Director for Global Lead Technologies and is a non-executive director for Metallic Waste Solutions, trading as Metsol Pty Ltd, a start-up company. He also serves as chairman and organizer of the two Asian battery and international secondary lead conferences held biennially across Asia.

Mr. Stevenson has extensive knowledge of the metals and other commodity markets from his experience serving as an executive officer, director and consultant to businesses in the lead industry. As a result of these and other professional experiences, our Board has concluded that Mr. Stevenson is qualified to serve as a director.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

73.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

74.    The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

75.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

76.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Aqua Metals were required to, among other things:

a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b)     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

77.     Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and

administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

78.     In addition, the Company has also adopted a Code of Conduct (the "Code"). The Code states in its preamble:

We Comply with the Law

As employees, officers and directors of a publicly-traded company, each of us must comply with the letter and spirit of every applicable local, state, federal and foreign law or regulation. Violations of these laws can be extremely costly to Aqua Metals, Inc. and its subsidiaries (collectively, the "Company") and can subject us to both civil and criminal penalties. Each of us is responsible for understanding the laws and regulations that relate to our responsibilities.

79.     The Code goes on to state:

We Acknowledge Special Ethical Obligations for Financial Reporting

As a public company, it is of critical importance that the Company's filings with the Securities and Exchange Commission are accurate and timely. Depending on our position with the Company, any of us, whether employees, officers or directors, may be called upon to provide information to assure that the Company's public reports and other public communications are complete, fair and understandable. The Company expects all of us to take this responsibility seriously and to provide prompt and accurate answers to inquiries related to its public disclosure requirements. The Chief Executive Officer and Chief Financial Officer have a special role both to adhere to these principles themselves and also to insure that a culture exists throughout the Company as a whole that insures [sic] the fair and timely reporting of the Company's financial results and condition. The Chief Executive Officer and Chief Financial Officer, in addition to adhering to all other provisions of this Code of Conduct, are responsible for promptly bringing to the attention of the Audit Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings or otherwise assisting the Audit Committee in fulfilling its responsibilities as specified in its Chart.

*** 

Compliance with the Code of Conduct

We all have a responsibility to comply with the letter and spirit, understand and follow the Code of Conduct. In addition, we are all expected to perform our work with honesty and integrity in any areas not specifically addressed by the Code of Conduct. A violation of this Code of Conduct may result in appropriate disciplinary action including the possible termination from employment with the Company, without additional warning.

80.     As noted in the Company's 2017 Proxy Statement:

Our Board has an active role in overseeing our areas of risk. While the full Board has overall responsibility for risk oversight, the Board has assigned certain areas of risk primarily to designated committees, which report back to the full Board.

81.     One such "designated committee" is the Audit Committee. The Audit Committee's

Charter states in pertinent part:

The primary purpose of the Committee is to oversee on behalf of the Board: (i) the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company; (ii) the performance of the internal audit services function (if any); (iii) the annual independent audit of the Company's financial statements, the engagement of the independent auditors and the evaluation of the independent auditors' qualifications, independence and performance; (iv) the compliance by the Company with legal and regulatory requirements, including the Company's disclosure controls and procedures; (v) the evaluation of risk assessment and risk management policies; and (vi) the fulfillment of the other responsibilities set out herein.

*** 

To fulfill its responsibilities, the Committee shall:

With respect to the annual financial statements:

- review and discuss with management, the Company's internal auditor (if any) and the independent auditors, the Company's annual audited financial statements, including specific disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations." This review shall include a discussion of major issues regarding accounting principles and financial statement presentations, including a review of any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the

preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the Company's financial statements. The review shall also include a discussion of the independent auditors' judgments about the quality and appropriateness of the Company's accounting principles and financial disclosure practices, as applied in its financial reporting, including, without limitation, a review of critical accounting policies, estimates, reserves and accruals, judgmental areas, audit adjustments, whether or not recorded, any significant changes in the Company's selection or application of accounting principles, the effects of significant policies in controversial or emerging areas for which there is a lack of authoritative guidance, all material off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities or other persons, that may have a material current or future effect on financial condition, changes in financial condition, results of operations, liquidity, capital resources, capital reserves or significant components of revenues or expenses and such other inquiries as may be appropriate. Based on this review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited financial statements in the Company's annual reports to stockholders, or Annual Reports on Form 10-K, if and when applicable, for filing with the SEC;

- discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, relating to the conduct of the audit and any other material written communications between the independent auditor and management, including but not limited to, the management representation letter and schedule of adjusted differences and a listing of adjustments and reclassifications not recorded, if any;

- prepare the report required, if and when applicable, by the SEC to be included in the Company's annual proxy statement and any other reports of the Committee that may be required by applicable securities laws or the Nasdaq listing requirements or rules; and

- discuss with the independent auditors and internal auditor (if any) whether they are aware of any action by any officer or director, or any other person acting under the direction thereof, that may have violated Rule 13b2-2(b)(1) under the Exchange Act, which prohibits improper influence on the conduct of audits, after the Company registers as a reporting company under the Exchange Act.

With respect to quarterly financial statements:

- review and discuss with management, the internal auditor (if any) and the independent auditors the Company's quarterly financial statements, including specific disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the independent auditors'

review of the quarterly financial statements (including a review of the matters included in paragraph 8 above), prior to submission to shareholders, any governmental body, the Nasdaq or the public. The Chairman of the Committee or any subcommittee of the Committee may represent the entire Committee for the purpose of this review; and

- discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, relating to the conduct of their review.

Discussions with management:

- review and discuss with management the Company's earnings press releases or other written communications with stockholders regarding financial results, including the use, if any, of "pro forma" or "adjusted" non-GAAP financial measures (as defined in Regulation G), as well as any financial information and earnings guidance that may be provided to analysts and rating agencies, and the Company's Current Reports on Form 8-K, if any, or reports of similar substance, that contain historical or pro forma financial statements. Such discussions may be done generally (i.e., discussion of the types of information to be disclosed and the types of presentations to be made). The Chairman of the Committee or any subcommittee of the Committee may represent the entire Committee for the purpose of this review.

82.     The Individual Defendants failed to comply with the standards laid out by both the law and the Company, resulting in, *inter alia,* the breaches of fiduciary duty and the violations of Section 14(a) and Rule 14a-9 described herein.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

83.     Defendants Clarke, Murphy and Mould founded Aqua Metals after their prior joint venture, Applied Intellectual Capital, failed. Aqua Metals was incorporated in 2014.

84.     Aqua Metals was purportedly formed to engage in the business of recycling lead through a novel process called AquaRefining. The Individual Defendants claimed that the Company has focused its efforts on developing and testing the AquaRefining process, developing a business plan, raising working capital, and developing its LAB recycling facility in the Tahoe

Regional Industrial Center, in McCarran, Nevada. As such, the Company's whole business is centered on AquaRefining, and it is the Company's only product.

85.     The Individual Defendants claim that AquaRefining is an alternative to smelting. They claim AquaRefining produces ultra-pure lead at a high yield with a reduced environmental impact and at a lower cost than smelting. The AquaRefining process purportedly begins in a similar fashion to traditional LAB recycling. First, used LABS are crushed, and metallic lead, lead compounds, plastic, and sulfuric acid are separated from the LABs and extracted for recycling. The metallic lead is then cast into ingots and sold.

86.     Subsequently, the AquaRefining process diverges from the traditional LAB recycling model. At this stage, the AquaRefining process uses proprietary machines called "modules" to recycle the remaining lead compounds. Each of these modules contain six electrolyzers, which engage in a process called "electroplating" to continuously remove lead as the modules operate. Purportedly, the process makes use of disk cathodes lightly plated with soft lead, which makes the lead extracted from the LABs easier to gather for recycling. Next, a biodegradable solvent is used to dissolve the extracted lead, after which the lead, now a lead paste, is stripped from the solvent and converted via an electro-chemical process into pure, primary grade lead. The pure lead is then scraped off the electrolyzer disks onto chutes, which deposit the lead onto conveyor belts to be ingoted, and later sold as pure and ultra-pure lead. According to the Company, the AquaRefining process is completely automated, cheaper than traditional smelting methods, and does not generate any toxic or otherwise harmful emissions. The AquaRefining process is also low-temperature and utilizes a water-based approach, meaning the process does not produce lead dust, unlike traditional smelting methods.

87.     Daniel Carlson, the founder of  Tailwinds Research Group, LLC  ("Tailwinds") interviewed Defendant Clarke on the subject of the AquaRefining process on August 15, 2016. During the interview, Defendant Clarke  distinguished the AquaRefining process  from the traditional LAB recycling process as follows:

> The incumbent technology is called smelting and it traces back to about 6,000 years ago. It's a very high temperature thermal process in which lead and lead compounds are heated up to 2200 degrees Fahrenheit and then reacted with a series of chemicals to pull the compounds off the lead and convert lead sulfite, lead oxide back into metallic lead. Our process is a low temperature, water-based approach. It uses a mild acid that is biodegradable and non-toxic. So whereas smelting occurs at very high temperatures, our process occurs at essentially room temperature. Whereas smelting requires the addition of quite nasty reducing agents, our technology is a very simple electro-chemical process. Overall, we use less than half the energy to make the transition from lead compounds to metallic lead.

88.     In July 2015, the Company completed the IPO and its shares began trading publicly on NASDAQ. The Company stated that the proceeds from the IPO would be used to construct a new recycling facility at the Tahoe Reno Industrial Complex in McCarran, Nevada.

89.     On August 17, 2015, construction began on the Company's TRIC facility. On July 28, 2016, approximately one year later, Aqua Metals held an open house at its TRIC facility. The TRIC facility would open for business shortly afterward on August 10, 2016.

90.     Even prior to the Relevant Period, the Company marketed that its AquaRefining process had been tested successfully at the Company's California Testing Facilities. During a conference call held on May 24, 2016 to discuss the Company's earnings for the first quarter of 2016, Defendant Clarke stated that the Company's "full-sized electrolyzed test facility" allowed the Company "to demonstrate our process to third-party license[e]s without having to take [them] into Reno to show the process there".

THE AQUAREFINING PROCESS WAS MALFUNCTIONING AND NOT COMMERCIALLY VIABLE PRIOR TO AND THROUGHOUT THE RELEVANT PERIOD

91.     In reality, the AquaRefining process was far from being commercially viable, and the technology faced a number of serious problems beginning in 2015, and continuing throughout the Relevant Period. These problems were so extensive that the AquaRefining modules barely operated throughout the Relevant Period, contrary to the Individual Defendants' representations.

92.     Specifically, the problems with the AquaRefining process included a "hard lead" issue, whereby lead would become hardened and stick to the modules' disk cathodes, which had to be manually scraped clean, as well as a "sticky lead" issue, whereby lead would stick to the chutes leading to the conveyor belts, which also had to be manually cleaned. These issues were the result of, *inter alia*: (a) the Company not getting the correct chemical ratios so the lead was the wrong consistency – it would not stay soft as the process required, and instead would re-solidify and compact upon itself; (b) design flaws with the modules; and (c) electrical voltage. Additionally, the lead tested at the California Testing Facilities was "laboratory" or "virgin" lead, *i.e.*, not the same type of lead that would be extracted from LABs in the ordinary course of the AquaRefining process.

93.     Given these and other problems, the AquaRefining technology was not ready for commercial production. Despite this, the Individual Defendants prematurely pushed ahead with operations at the TRIC facility, touting to the investing public that operations would commence in no time. Although chemists and engineers at the California Testing Facilities scrambled to come up with solutions to the aforementioned problems before the TRIC facility opened, the problems were not resolved.

94.     Unsurprisingly, the same issues, including the sticky lead and hard lead problems experienced at the California Testing Facilities, also occurred at the TRIC facility. Additional problems were also encountered during each step of the AquaRefining process at the TRIC facility,

including problems with the breakers, used in traditional lead recycling, which repeatedly broke down.

95.    These facts about the AquaRefining process are corroborated by the testimony of a number of former Aqua Metals employees cited as confidential witnesses in the Securities Class Action.

96.    A former engineer employed by the Company from 2015 through 2017, cited in the Securities Class Action as "CW 1," stated that the "sticky lead" and "hard lead" problems were among the most significant issues facing the AquaRefining process, and were present throughout CW 1's employment with the company. CW 1 further stated that the Company tried to solve these problems both while the Reno Plant was being constructed, and after the Reno Plant had opened, at which point the facility became a test bed for testing solutions to the problems with the AquaRefining Process.

97.    A former Environment Systems Supervisor at the Reno Plant from the opening of the plant until Fall 2017, cited in the Securities Class Action as "CW 2," revealed that the AquaRefining modules would only work for approximately an hour before breaking down, and that Defendants Clarke and Mould were aware that the Reno Plant was inoperable as a result of the problems with the AquaRefining process. Importantly, CW 2 described the investor visits the Company hosted at the Reno Plant, and stated that the Company "only ran the machines when investors came to the plant."

98.    A former Production Supervisor at the Reno Plant from 2016 through the end of the Relevant Period, cited in the Securities Class Action as "CW 3," disclosed that the AquaRefining modules would break down during the AquaRefining process, and that the Company was not producing any quantity of AquaRefined lead that could be cast into ingots.

99.     A former Production Manager at the Reno Plant during 2017, cited in the Securities Class Action as "CW 4," revealed that the Company's publicly stated figures for revenue and production were entirely unrealistic, and that the Reno Plant was unable to produce any more than 5 gallons worth of AquaRefined lead over the course of a several-day period. CW 4 also corroborated CW 2's statements about the investor visits, stating that the Company would start running the modules shortly before the investors arrived, so that the machines would run while the investors were present without breaking down.

100.    A former Senior Process Engineer at the Reno Plant, cited in the Securities Class Action as "CW 5," also corroborated facts about the "sticky lead" problem with the AquaRefining modules, and stated that Defendants Clarke and Mould attended meetings at the Reno Plant whenever they came into town, to discuss problems with the machinery at the Reno Plant, among other things.

101.    Despite these consistent and extensive problems, which rendered the AquaRefining process unusable for large-scale commercial lead processing, the Individual Defendants repeatedly touted throughout the Relevant Period that the AquaRefining technology had been successfully tested, and repeatedly insisted that the commercialization of the AquaRefining process was progressing as promised. Additionally, the Individual Defendants invited investors, analysts, potential licensees, and potential strategic partners to visit the Reno Plant and staged "dog and pony show[s]," whereby they would make the process appear to be functional. Similarly, the Individual Defendants displayed pictures on the Company's website of purportedly ultra-pure AquaRefined lead ingots, when, in reality, the ingots were not made of pure AquaRefined lead.

102.    Judge Haywood S. Gilliam, Jr. entered an order on August 14, 2019 denying in part the motion to dismiss filed in the Securities Class Action. Judge Gilliam held that what the

confidential witnesses cited to in the Securities Class Action consolidated class action complaint

described as the "true state of affairs" was a different picture than that painted by the defendants.

Judge Gilliam held, in pertinent part, as follows:

> The Court finds that the alleged misconduct is distinct from and goes beyond the making of the alleged misrepresentations. The purportedly deceptive conduct at issue here is the "orchestrat[ed] on-site visits and demonstrations" that "deliberately concealed problems concerning the commercialization of the Company's AquaRefining process." CCAC ¶ 367. As alleged, Defendants used these invitational site visits to assuage analysts' concerns in response to skepticism in the market about whether the AquaRefining process was viable. *Id.* ¶¶ 224–25 (Defendant Clarke stating: "We believe the best way to address this misinformation is to openly show analysts and investors our facility in operation as we continue to scale it up." (emphasis in original)). However, according to CWs, the modules were not actually able to operate for more than an hour before they broke down. *Id.* ¶¶ 75, 78, 95. Plaintiff alleges that in light of that fact, employees were told not to run the "machines until [the visitors] show up" and would receive a call to start the machines about five minutes before visitors arrived. *Id.* ¶¶ 82, 84; *see also id.* ¶¶ 82 (CW2 claiming they "only ran the machines when investors came to the plant"), 100 ("CW4 said, because the module could not operate for more than about an hour before it would break down, CW4 had to start it at a time where it would run during the investors' visit and not break down."). Defendants Clarke and Mould "ran the show" and would escort visitors around the plant for only five to ten minutes and spend their remaining time in a conference room. *Id.* ¶¶ 90, 100. As alleged, these staged glimpses of the Company's facilities and processes presented a different picture than what the CWs describe as the true state of affairs. Despite Defendants' arguments to the contrary, these acts are sufficiently alleged to have been fraudulent in and of themselves, without depending on the alleged misrepresentations. *See* Reply at 3 n.3.

> Plaintiff also claims that Defendants orchestrated these sham visits with the deliberate aim of artificially inflating the value of Aqua Metals stock. CCAC ¶ 365. According to Plaintiff, after these visits, Defendants issued press releases informing the market that visitors "were able to view the critical processes at the AquaRefinery as they happened," and requested that "analysts who attended the visitor day [ ] update their coverage reports to reflect findings from the site visit." *Id.* ¶¶ 249–51. Defendant Clarke, in an apparent response to an accusation that the AquaRefining process did not work, responded by saying that there have been "about 90 people through the facility watching [the AquaRefining modules] work now at some point, [and] some of those 90 people will start communicating … and explaining actually it does work." *Id.* ¶ 279. These alleged sham visits purportedly led analysts, with the encouragement of Defendants, to disseminate reports containing misleading information about the process, when in truth the visits

concealed "problems" with the viability of the AquaRefining process, such as the inability of the modules to operate for more than an hour. *Id.* ¶ 367.

Plaintiff has sufficiently alleged that Defendants intentionally engaged in a fraudulent scheme to conceal material facts, thereby leading to the dissemination of untrue statements about the commercial viability of the process. This alleged scheme went beyond the making of any alleged misrepresentations and statements. Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiff's Section 10(b) and Rule 10b–5(a) and (c) scheme liability claim.

THE INDIVIDUAL DEFENDANTS' REPRESENTATIONS TO THE MARKET

103.    Even before the Relevant Period began, in a January 25, 2016 press release issued by the Company titled "Aqua Metals Issues Annual Letter to Shareholders" ("January 25, 2016 Press Release"), defendants Clark, Murphy, Mould, DiVito and Slade described Aqua Metals as "commercializing a non-polluting electrochemical lead recycling technology called AquaRefining." Defendants Clark, Murphy, Mould, DiVito and Slade touted that the Company had successfully tested AquaRefining and that the Reno Plant would produce 80 metric tons of lead per day by the end of 2016. Specifically, the January 25, 2016 Press Release stated: "[w]e remain on track to begin lead production in the second quarter of 2016, with plans to increase production to 80 metric tons of lead per day by the fourth quarter of 2016."

104.    On May 19, 2016, the Individual Defendants caused Aqua Metals to issue a press release ("May 2016 Press Release") announcing a partnership between Interstate Battery and Aqua Metals ("Interstate Battery Partnership"). The press release stated in relevant part:

ALAMEDA, Calif., May 19, 2016 (GLOBE NEWSWIRE) -- Aqua Metals, Inc. (NASDAQ: AQMS) (Aqua Metals), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, today announced the signing of definitive agreements with Interstate Batteries. Interstate Batteries is the No. 1 replacement battery brand, the largest independent battery distribution system in North America and the country's leading battery recycler.

Upon the closing of these agreements, Interstate Batteries has agreed to supply more than a million automotive and other lead-acid batteries as feedstock for Aqua Metals' AquaRefineries. This partnership will start with Aqua Metals' first

AquaRefinery, which will be located in Nevada's TahoeReno Industrial Complex (TRIC) and is set to open in July 2016. Interstate Batteries will also make a strategic investment of approximately $10 million into Aqua Metals.

*** 

"Interstate Batteries seeks out innovation, pursues opportunities and invests in the technology we need to succeed not just today, but also tomorrow," said Scott Miller, president and CEO of Interstate Batteries. "Our focus is on the future of our industry and continued growth. Aqua Metals' breakthrough technology is a promising new way for recycling lead-acid batteries."

Aqua Metals' patent-pending AquaRefining process is an environmentally friendly electrochemical process for recycling lead-acid batteries. AquaRefining is a closed-loop, room temperature, water-based recycling method that is fundamentally non-polluting, yet able to yield nearly 100 percent lead recovery.

"With its forward-thinking environmental goals, broad distribution network and strong brand name, Interstate Batteries is an ideal partner for us as we scale our business," said Dr. Stephen Clarke, chairman and CEO of Aqua Metals. "As we grow, we are able to create a more sustainable ecosystem for lead as a power source. We look forward to growing our partnership with Interstate Batteries."

105.    Also, at the market open on May 19, 2016, Aqua Metals filed a Form 10-Q for its first quarter of 2016 ("Q1 2016") ended March 31, 2016 with the SEC ("Q1 2016 Form 10-Q"). Defendants Clark, Murphy, Mould, DiVito and Slade stated that "we have built and operated both a small-scale unit of our AquaRefining process and a full-size production prototype [and that] [t]hrough the operation of such units we have successfully produced 99.99% pure lead on a limited scale." In addition, defendants Clark, Murphy, Mould, DiVito and Slade reported that the "testing of our AquaRefining process has been successful to date."

106.    In the Q1 2016 Form 10-Q, the Company laid out its plan to produce 80 tons of recycled lead per day by Q4 2016 and to ramp that up to 160 tons per day:

As of the date of this report, we believe that interest in our first recycling facility and demand for our recycling capacity is strong. Consequently, we have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day. Our TRIC [Tahoe-Reno Industrial Center] facility is designed and is being constructed

34

in order to accommodate a total of 32 AquaRefining modules and additional battery breaking and component separations equipment sufficient to support expansion to 160 tons of recycled lead per day.

Construction of the TRIC facility began on August 17, 2015 and is progressing with a completion expected in the second quarter of 2016. We expect to install our first AquaRefining modules in approximately the second quarter of 2016 and to install a total of 16 AquaRefining modules to support an initial lead production capacity of 80 tons per day by the close of the third quarter of 2016. In keeping with our modular approach, we intend to commence commercial LAB recycling operations shortly after the first AquaRefining module is delivered.

107.    The Q1 2016 Form 10-Q also reported that the Interstate Batteries Partnership would provide Aqua Metals with "working capital [] sufficient to fund … the completion of [its facility] and attainment of production at a rate of 80 tons of recycled lead per day."

108.    The Q1 2016 Form 10-Q also included certifications signed by defendants Clarke and Murphy, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that the Q1 2016 Form 10-Q did not contain material misstatements or omissions. In this regard, the Q1 2016 Form 10-Q contained a certification signed by Defendant Murphy stating:

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
Section 302 Certification

I, Thomas Murphy, certify that:

1)  I have reviewed this quarterly report on Form 10-Q of Aqua Metals, Inc.;

2)  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3)  Based on my knowledge, the financial statements and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting

(as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

5) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

6) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

7) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

8) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fiscal quarter presented in this report that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

9) The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

10) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial data information; and

11) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 19, 2016

By: /s/ Thomas Murphy
Thomas Murphy, Chief Financial Officer

109.    The Q1 2016 Form 10-Q contained a separate certification signed by Clarke which contained a verbatim reproduction of Murphy's certification statements.

110.    The Q1 Form 10-Q also contained certifications pursuant to 18 U.S.C. Section 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, signed by defendants Clarke and Murphy, which stated:

### CERTIFICATION PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Aqua Metals, Inc. (the "Company") on Form 10-Q for the quarterly period ended March 31, 2016, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), we, Stephen R. Clarke, President and Chief Executive Officer, and Thomas Murphy, Chief Financial Officer, of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

By: /s/ Stephen R. Clarke          Dated: May 19, 2016
   Stephen R. Clarke
Title: President and Chief Executive Officer

By: /s/ Thomas Murphy          Dated: May 19, 2016
   Thomas Murphy
Title: Chief Financial Officer

111.    Following these statements, the price per share of Aqua Metals' stock increased $2.26, or roughly 29%, from a close of $7.80 on May 18, 2016, to a close of $10.06 on May 19, 2016, on heavy trading volume of 895,344 shares.

112.    Analysts reacted extremely positively to the Interstate Batteries Partnership. For example, a May 19, 2016 Oppenheimer report stated that the partnership was a "big step forward" and, as Interstate Batteries is 49% owned by Johnson Controls, a "validation of its product quality from the global leader in lead acid batteries." Oppenheimer further stated that it expects the funding

to provide the capital to "double capacity at the [Reno Plant] to 160 tons/day" and estimated it would generate revenue of $32.5 million in 2017. Likewise, on May 26, 2016, a Northland Capital Markets ("Northland") report stated that "this strategic relationship with a meaningful[] player in battery recycling helps de-risk and validate AQMS' business."

113.    On May 24, 2016, at the market open, Aqua Metals issued a press release titled "Aqua Metals Provides First Quarter 2016 Corporate Update" ("Q1 2016 Press Release") announcing its results for Q1 2016. Murphy was identified as the "Company Contact" on this press release. The Company stated it is "commercializing a non-polluting electrochemical lead recycling technology called AquaRefining," and that the "modular systems allow the lead acid battery industry to simultaneously improve environmental impact and scale production to meet demand." The Company again touted its "strategic relationship" with Interstate Batteries.

114.    In the Q1 2016 Press Release, defendant Clarke told investors that the Interstate Batteries deal "validate[d]" Aqua Metals' technology and would allow the Company to begin production in Q3 2016 and attain production of "80 metric tons of recycled lead per day by the end of 2016":

> Over the last year, we have spent significant time deepening our strategic relationships and advancing discussions with major players throughout the lead industry. These players include lead-acid battery recyclers, distributors, manufacturers and end users. To this end, last week we announced a major strategic partnership with Interstate Batteries, the largest battery distributor and recycler in the U.S., which has agreed to invest $10 million in our Company and agreed to supply more than a million automotive and other lead-acid batteries as feedstock.
>
> We believe this serves as a strong validation of our technology and we continue to see a tremendous amount of interest in our environmentally friendly and economically efficient recycling equipment and processes to supplement, and in some cases, replace conventional recycling and smelting operations altogether. Our goal for the remainder of us to rapidly gain market share after a successful commercial production launch. We also expect to be in a position to license our equipment and processes and related services to qualified third parties, with whom we are already advancing discussions, beginning in 2017.

With the additional capital from Interstate Batteries and other investors, we have decided to make certain enhancements to the AquaRefinery. As a result, we now expect to begin recycling lead-acid batteries early in the third quarter of 2016. Our plan remains to increase production to 80 metric tons of lead per day by the end of 2016. We expect to begin by taking feedstock supply from Battery Systems, Inc., our next-door neighbor in the TRIC, which will allow us to ramp the facility effectively in the commissioning and early growth period. We will then add to that supply with feedstock from Interstate Batteries and other sources, which we expect to begin receiving in the fourth quarter of 2016.

115.   At the market open on May 24, 2016, Aqua Metals issued a press release titled "Aqua Metals Wins Platts Global Metals Rising Star Award for Innovations in Lead Industry" ("May 24, 2016 Press Release") announcing that it won a Platts Global Metals Rising Star Award for innovations in the metals industry. In the May 24, 2016 Press Release, defendant Clarke remarked:

It is an honor to earn the accolades of such a highly respected organization for our work to revolutionize the lead industry. As we enter a "Battery Age," lead-acid technologies can experience continued market dominance with the development of a recycling method that is economically sustainable and environmentally responsible. This distinction affirms that Aqua Metals has developed just that.

116.   On May 24, 2016, while the market was open, Aqua Metals held its Q1 2016 earnings conference call ("Q1 2016 Conference Call") with defendants Clarke and Murphy. During that call, Clarke touted that the Company had started assembling the "first commercial ready AquaRefining module … in January of this year" at the Company's AquaRefining module assembling test facility located at its corporate headquarters. Clarke stated that "[w]hat we've added to that [testing facility] is a new full-sized electrolyzed test facility, which allows us to demonstrate our process to third-party licenses without having to take into Reno [*sic*] to show the process there." Clarke further stated, "[w]e're ready to compete in the global $22 billion lead market. We're generating strong positive interest that's an understatement, we are generating massive interest in the market with supplies and customers as evidence[d] by our recent

39

announcement….” Clarke further stated that the Reno Plant "remain[s] on track to achieve 80

metric tons of lead per day output by the end of 2016 and on track to expand that to 160 metric

tons per day by 2018," and that the Reno Plant "will operate 24 hours a day, seven days a week."

117.    An analyst from Oppenheimer asked, "when do you expect the first startup to

happen in the first test runs?" Defendant Clarke again minimized the risk of AquaRefining:

> [S]ome of them have already been completed. So, there isn't a first test run. It's a
> continuing operation. So, in one sense, we've already done it. In the sense of when
> will the first modules be running in their base in Reno, we're projecting late July,
> maybe early August. The timing of the first run, that's critical, the more critical
> items are getting the much larger scale equipment installed and running
> [indiscernible] the battery breakers and all the various support equipment. There's
> little risk associated with the actual AquaRefinery themselves. The important point
> is just the scale of the operation.

118.    Clarke also touted the Interstate Batteries Partnership as a "pretty significant event

and a pretty good endorsement of our business." In discussing the significance of strategic

partnerships to the growth and expansion of the Company, he further stated:

> I'm going to talk to the recently announced strategic partnership with Interstate
> Batteries and the whole point of this relationship is to accelerate our growth. So
> those of you don't know, Interstate Batteries is the number one replacement battery
> brand in the U.S. It's the largest independent battery distribution system in North
> America and the country's leading battery recycler.
>
> ***
>
> But the important thing is, this provides a path for us in which we can now plan in
> detail along with a high level of surety those additional recycling facilities. And
> one of the big things it does for us is, it removes the sourcing risk that was inherent
> in expanding into an industry that is based on a number of pre-established
> relationships. So, what Interstate brings to us, importantly, is a supply of these
> batteries. And we believe it also brings a huge amounts of credibility to what we're
> trying to build.
>
> ***
>
> With the strategic relationships we have in place, we now believe we can expand
> quickly with relatively low risk whilst we control IP and quality. And in parallel to
> that, we're working to develop our own LME brand for our process. So the scope
> for that is to expand the Tahoe-Reno facility to 160 tons a day during 2017 and

2018. We got the supply to do that now, and then move forward to build multiple additional facilities collocated with our strategic partners…. So right now, we are jointly evaluating multiple locations across the U.S. with our strategic partners. We're not announcing where they are going to be yet, and it will be probably a few months before we do that, but it's a serious ongoing exercise with a great partner.

119.    In response to a question posed by an analyst from Northland regarding the

Interstate Batteries Partnership, defendant Clarke stated:

We've focused on building our additional facilities with Interstate as the strategic partner…. [O]ur focus right now is that we have a strategic partner who is essentially looking towards to expanding rapidly so that they can take advantage of lead produced that isn't subject to a smelter. So that's our entire focus and what it gives us is surety of not only supply of batteries, but of locations, so it allows us to accelerate. And as I said earlier, we talked a lot about our desire to build 10 facilities a year, which is a great statement, but how do you validate and move towards the end, and this relationship provides us the pathway to do that.

120.    During the Q&A portion of the call, defendant Clarke explained what types of lead

the Reno Plant purportedly produces:

[W]e make two types of lead. We make specific grade alloys for specific battery customers and we make also pure lead, which is more typically used as an active material, although some modern batteries use relatively pure lead in one of the plates. The amount of lead that we produce in terms of active material to plate lead will vary somewhat depending on the mix of batteries that come in. But we specifically are making or we plan to make specific alloy grades for specific customers and ultra-pure lead for specific customers and for the auto market. The ultra-pure side of what we are making is equivalent to virgin lead.

121.    On August 2, 2016, Aqua Metals issued a press release announcing the opening of

the Tahoe-Reno Industrial Center ("TRIC") in McCarran, Nevada ("August 2, 2016 Press

Release"). The press release stated in relevant part:

ALAMEDA, Calif., Aug. 02, 2016 (GLOBE NEWSWIRE) -- Aqua Metals, Inc. (NASDAQ:AQMS) (Aqua Metals), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, held an open house at its first AquaRefinery at the Tahoe-Reno Industrial Center (TRIC) in McCarran, Nevada. AquaRefining is the world's first environmentally friendly process to recycle lead-acid batteries (LABs).

***

"The first AquaRefinery at TRIC is an exciting start to a cleaner future for the lead industry," said Stephen Clarke, CEO of Aqua Metals. "Lead-acid batteries are over 99% recyclable, but until now, there has been no way to recycle lead in an environmentally friendly fashion. With this AquaRefinery and more expected to come, Aqua Metals is doing its part to create the most sustainable battery technology the world has ever seen, while also providing economic benefits to recyclers, manufacturers and distributors."

The proprietary AquaRefining technology extracts lead from LABs with a room temperature, closed-loop, water-based process that results in vast reductions of hazardous waste and direct human contact with the lead itself. The process produces lead that is as pure as – or purer than – mined lead, requiring no secondary processing. Battery Systems Inc. has a 200,000 square foot battery distribution and collection facility adjacent to Aqua Metals' TRIC facility. Interstate Batteries, which made a $10 million investment into Aqua Metals, has already committed to provide used LABs to recycle at the facility. Interstate Batteries controls 20 percent of the lead-acid battery recycling market in the United States.

\*\*\*

"This first-ever AquaRefinery has the potential to change our industry, and our planet," said Scott Miller, president and CEO of Interstate Batteries. "While we've been in the battery business for more than six decades, Interstate continues to seek out innovation and invest in technology for today, and tomorrow. Because Aqua Metals' breakthrough technology is so promising, Interstate Batteries is supplying more than a million automotive and other lead-acid batteries to the AquaRefinery over the next year. We feel we're making a smart investment in our future, and in the future of our industry."

122.    Defendants Clark, Murphy, Mould, DiVito and Slade caused the Company to announce in the August 2, 2016 Press Release that the Company is "commercializing" AquaRefining, and further explained the technology: "AquaRefining is the world's first environmentally friendly process to recycle lead-acid batteries (LABs)" and that "[t]he process produces lead that is as pure as – or purer than – mined lead, requiring no secondary processing." Defendants Clark, Murphy, Mould, DiVito and Slade touted that these "modular systems are expected to allow the lead acid battery industry to simultaneously improve environmental impact and scale production to meet rapidly growing demand." Furthermore, Defendants Clark, Murphy,

Mould, DiVito and Slade stated that, in addition to the Company's Reno Plant, Aqua Metals would "sell licenses to partners for AquaRefining technology and equipment, which can be co-located with battery manufacturers and distributors, as well as existing battery recycling facilities globally."

123.    In addition, the August 2, 2016 Press Release once again touted the Company's partnership with Interstate Batteries, which "controls 20 percent of the lead-acid battery recycling market in the United States," and quoted Interstate Batteries' CEO as endorsing the Company: "Because Aqua Metals' breakthrough technology is so promising, Interstate Batteries is supplying more than a million automotive and other lead-acid batteries to the AquaRefinery over the next year. We feel we're making a smart investment in our future, and in the future of our industry."

124.    On August 10, 2016, at the market open, Aqua Metals issued a press release titled "Aqua Metals Provides Second Quarter 2016 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC ("Q2 2016 Press Release") announcing results for the second quarter of 2016 ("Q2 2016"). Murphy was identified as the "Company Contact." Defendants Clark, Murphy, Mould, DiVito and Slade caused the Company to state that the Company was "commercializing" AquaRefining and that "[c]ommissioning and testing for all key equipment [was] to be completed with initial production commencing in October." Defendants Clark, Murphy, Mould, DiVito and Slade also caused the Company to state that "[l]ead production [was] projected to scale quickly during the fourth quarter, reaching 80 metric tons per day by the of 2016."

125.    Defendant Clarke further stated that production was "on track" to reach 80 tons per day by the end of the year:

> Our key focus has remained on commercializing the world's first AquaRefinery, which is now largely complete…. We're quickly approaching a meaningful

inflection as we bring our first facility online and begin producing lead early in the fourth quarter of 2016. Most importantly, we remain on track to reach full scale capacity of 80 metric tons of lead output per day by the end of 2016.

126.    Defendants Clark, Murphy, Mould, DiVito and Slade caused the Company to state in the Q2 2016 Press Release that six AquaRefining modules had been tested, four of which were in place at the Reno Plant, and that AquaRefining module deliveries to third-parties were expected to begin in third quarter of 2017 ("Q3 2017"), and that a second AquaRefinery was in the works:

> The manufacturing facility [in Alameda, California] has already assembled and tested six modules, four of which are in place at the TRIC AquaRefinery. The Company currently has the physical capacity to produce 160 modules annually, or enough to support 10 AquaRefineries the size of the TRIC AquaRefinery. Providing AquaRefining technology and equipment on a fully serviced licensing model is the next stage of the Company's duel (sic) business model, and the first module deliveries to third parties are expected in the third quarter of 2017.

> Aqua Metals is also in advanced planning stages for a second facility, and is working on supply, offtake and financing options. The Company plans to build additional regional AquaRefining facilities that will be strategically located near battery manufacturers and distributors, as well as existing battery recycling facilities globally, thereby significantly reducing logistics costs. Subject to the availability of the required capital, the Company plans to operate facilities that will generate the equivalent of ~800 metric tons of lead output day.

127.    Defendants Clark, Murphy, Mould, DiVito and Slade caused the Company to tout that the Reno Plant "is largely complete and is now moving into the commissioning and testing phase to ensure the facility is able to rapidly and efficiently scale." They went on to state that the Company held "a successful grand opening ceremony at its TRIC AquaRefinery which was attended by over 200 people, including investors, strategic partners, industry participants, key employees and government officials. The tour highlighted the installed equipment and processing lines, while enabling discussions with key personnel about how the production facility and the supply chain will proceed." Defendants Clark, Murphy, Mould, DiVito and Slade went on to state that a "substantial majority of U.S. battery producers have visited our facility and expressed

44

interest in AquaRefining" and the Company was "[g]enerating strong interest from additional potential strategic partners."

128.    Defendant Clarke again touted the Company's strategic partnerships as an endorsement of its business:

> We have also concentrated on deepening our strategic relationships with key partners, such as Wirtz Manufacturing, Interstate Batteries and Battery Systems, Inc., while advancing discussions with other major players throughout the industry who have recognized our potential to revolutionize the $22 billion lead market. These players include lead-acid battery recyclers, distributors, manufacturers and end users that are interested in supplementing, and in some cases, replacing conventional recycling and smelting operations altogether. Taken together, we are well positioned to rapidly gain market share upon the successful launch of our first facility and look forward to driving further value for shareholders.

129.    On August 10, 2016, after the market closed, Aqua Metals filed a Form 10-Q for Q2 2016 ended June 30, 2016 with the SEC ("Q2 2016 Form 10-Q"). The Q2 2016 Form 10-Q contained identical Sarbanes Oxley Section 302 and 906 certifications as those in the Q1 2016 Form 10-Q, signed by defendants Clarke and Murphy. In the filing, Aqua Metals reported that "revenue-producing operations" were expected to commence in Q4 2016. The Q2 2016 Form 10-Q also represented that, although revenue-producing operations and completion of the Reno Plant had been postponed one quarter (as compared to what it stated in its prior 10-Q filing), the Company's expected production rate of 80 tons of recycled lead per day by Q4 2016, and ramping up to 160 tons per day, remained unchanged. The Company also reiterated that the "testing of our AquaRefining process has been successful to date."

130.    The Q2 2016 Form 10-Q further stated:

> As of the date of this report, we believe that interest in our first recycling facility and demand for our recycling capacity is strong. Consequently, we have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day. Our TRIC [Tahoe-Reno Industrial Center] facility is designed and is being constructed in order to accommodate a total of 32 AquaRefining modules and additional battery

breaking and component separations equipment sufficient to support expansion to 160 tons of recycled lead per day.

Construction of the TRIC facility began on August 17, 2015 and is progressing with a completion expected in the third quarter of 2016. We began installing our first AquaRefining modules in June 2016 and expect to install a total of 16 AquaRefining modules to support an initial lead production capacity of 80 tons per day by the close of the fourth quarter of 2016.

131.    On August 10, 2016, while the market was open, Aqua Metals also hosted its Q2

2016 earnings conference call ("Q2 2016 Conference Call") with defendants Clarke and Murphy.

During this call, Aqua Metals referred to the following commissioning and ramp up schedule,

which was attached as Exhibit 99.2 to the Form 8-K filed with the SEC on August 10, 2016, and

Clarke discussed this commissioning and ramp up schedule:[1]



And so, in terms of the time line, we broke it out to August, September, October through the end of the year.

                                        ***

The managers are on site. We've got a pretty extensive staff and subcontractors that help with the commissioning work, and we're recruiting dayshift supervisors and having them start in early September. We'll bring our dayshift operators on site and train them up in early October. So, by the beginning of November, we're targeting to be at somewhere around 20 tons a day of lead production, while the beginning of December to be at 40 tons a day of lead production and by the end of the year at

---

[1] Murphy was identified as the "Aqua Metals Contact" in the presentation materials.

80 tons of lead production. And essentially, what we're doing is scaling by adding shifts. The facility will be a 24-hour day, 7 day a week, 52 weeks of the year operation running in four shifts, rotating. So, the scale [ph] of this about getting the process up and running and then adding shifts.

132.    When asked by an analyst, "to get up and running, which piece are you guys most concerned about or pieces that, as you turn on, this equipment may have some hiccups along the way?" Clarke reassured investors and analysts that "everything that we think we might have a problem with, we've got contingency plans in place for. So, I don't have a single thing that we're worried about. It's really about the commissioning process itself."

133.    Another query posed to Clarke during the Q2 2016 Conference Call was whether there was "any concern that the modules will encounter problems when employed on a mass scale." Defendant Clarke responded, "we have been operating a single full scale electrolyzer for 12 months now. That was preproduction prototype. Then, nearly four months ago now, we took a single electrolyzer off the production line and installed [it] in our full scale test facility and have been operating that ever since. And we don't anticipate any issues operating at full scale. Full scale is just essentially 96 of the same thing."

134.    During the Q2 2016 Conference Call, defendant Clarke reiterated the Reno Plant was producing ultra-pure lead:

> [I]f we're selling lead, we'll be selling it at a premium because we're producing ultra pure lead. LME spot price is for secondary lead, which is kind of a mongrel lead that's – that needs a pure – ultra pure lead or a specific alloy. So, secondary lead produced by smelters needs to be further refined and alloyed into usable product. So, it is typically the lowest cost lead. So, we're actually going to be selling at premium.

135.    On the Q2 2016 Conference Call, defendant Clarke explained that the Company's open house was strategically timed in advance of commissioning the Reno Plant, and that a "vast

majority of the North American lead-acid battery industry has been on site" and had not found any "problems":

> So, we held an open day on July 28, and we chose to do this because this is the latest week we could do it before we start commissioning. And when you're commissioning a large chemical facility, which essentially what an AquaRefining facility is, there are all kinds of operations going on that you don't really want to have people wandering around you.
>
> ***
>
> It seemed what we've got the overwhelming response is wow, you guys really thought this through. Yet, yet – and we ticked all the boxes and even some companies have visited the site, wanting to find a problem and went away smiling and shaking our hands. So, basically, there is a real [audio gap] alternative to smelting.

136.    Defendant Clarke stated that the Company was "already pursuing debt financing options for our next facility, and we have in fact the potential to pre-sell similar all of its capacity before we even break ground. We've got massively strong demand for AquaRefining modules and support equipment."

137.    Clarke also touted the Company's "strategic relationships":

> [S]ince we started with building strategic relationships and we talked before about strength of our relationship with Wirtz Manufacturing who supply the battery breaking systems and supplied rather the battery breaking, ingoting and sort of water treatment facilities. Our ongoing and strong relationship with Battery Systems Inc., second largest distributor and collector of batteries in North America, they became our second strategic investor in our IPO in 2015.
>
> And then, not coincidentally, they operate a 200,000 square foot warehouse, less than a 100 yards from our facility from which they can supply dead batteries to us. And then, I just need to speak to the fact that we brought on board Interstate Battery in May of this year. They are the largest distributor and collector of batteries in the U.S. Their initial [audio gap] to provide a million batteries a year to help with our scale up, and they became our first strategic investor with a fairly significant $10 million investment structured as straight equity and convertible in May of this year.
>
> What I can say is that what's happened since then is that – and I think down to the commitment of Battery Systems and, in particular, Interstate Batteries has driven a phenomenal level of credibility and interest in our technology. So, we're now in pretty significant discussions with multiple additional strategic partners.

138.    Defendant Clarke stated that "[w]e don't see a major challenge in building, expanding the first facility and building the next one…. We're absolutely serious about a global rollout …." Clarke went on to say that the Company's "objective is to expand our own capacity to 800 tons a day from four to five facilities":

> And the idea behind that is 800 tons a day, we'd be at about 2% of global lead. And we think that gives us pretty serious commercial validation and credibility. That also gives us distributed training facilities to support our licensing model. In that, we plan to expand the Tahoe Reno facility to 160 tons a day by 2018,...

> Providing AquaRefining equipment on a fully serviced licensing model [ph] is stage and that's going to run in parallel. We're not planning to wait until we've built out all of our four to five facilities. Initially, I thought we would have to just to gain the credibility. But what we're finding is this massive support for an alternative to smelting. So, we're at a point now where a substantial majority of North American battery manufacturers and lead smelters have [ph] visited the facility, and I mean a substantial majority. And what the feedback we're getting is, as Selwyn said it loud, cost quality and environmental permits and advantaged is not lost on anybody, and we're getting really serious interest. So, we've been approached by interested parties in not only America, but also in Europe, South America, China and India.

> * * *

> So, on that basis, with both the U.S. and non-U.S. licensing rollout, what we said to the interested parties is that we're not going to – we don't plan to ship any modules until quarter three of 2017 not because we can't, but we just think it's prudent to have got six to seven months of operating experience under our belt before we do that. Right now, we have indicative interest. That's equivalent to about two years of module production at full scale. So, we've currently got the capacity to make 160 modules a year. We've got indicative interest for about 320 modules and which we think is pretty fantastic considering the early stage that we're at.

139.    Analysts reacted positively to the statements. For example, in an August 10, 2016 report, Oppenheimer raised its estimated revenue for Aqua Metals for 2017 to $37.8 million stating "[w]e expect strategic relationships with Wirtz Manufacturing, Battery Systems Inc., and Interstate Batteries to prove beneficial, as AQMS pursues discussions with other potential partners."

Northland noted in an August 11, 2016 report that "AQMS provided a positive operational update that indicates to us that its longer-term business plans are progressing well. The Company reiterated key production capacity targets of 80 tons per day by year-end 2016 and 160 tons per day by 2018 and also noted it is in advanced planning stages for its second facility."

140.    On November 1, 2016, at the opening of the market, Aqua Metals issued a press release titled "Aqua Metals Produces First AquaRefined Lead at World's First AquaRefinery," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close ("November 1, 2016 Press Release"), announcing production of the "first-ever AquaRefined lead" at its Reno Plant. In the November 1, 2016 Press Release, Clarke stated, "[t]his is the most critical step in the commissioning process of the Nevada AquaRefinery."

141.    The November 1, 2016 Press Release included photographs (which were used repeatedly by the Individual Defendants thereafter throughout the Relevant Period) with captions of the AquaRefining process "continuously producing AquaRefined pure lead, flowing like a waterfall of lead infused electrolytes" "conveyer belt carries pure lead to ingot casting area" and "the first casted ingot".

142.    Defendants Clark, Murphy, Mould, DiVito and Slade caused the Company to describe the Company's process in the November 1, 2016 Press Release:

> AquaRefining uses an entirely reusable water-based technology to produce ingots of ultrapure lead. Through its own on-site assay, Aqua Metals has verified that the lead produced in the AquaRefining module is over 99.99 percent pure. The Company will send its initial production samples to several U.S. battery manufacturing companies— which collectively represent over 50 percent of U.S. battery production—to allow them to conduct their own assays.

> Aqua Metals previously demonstrated the effectiveness of its technology at bench scale, pilot scale and with a single, full-size electrolyzer. The Company has now produced high-quality AquaRefined lead with a commercial-scale AquaRefining module at its facility in the Tahoe-Reno Industrial Center in Nevada.

143.    Defendants Clark, Murphy, Mould, DiVito and Slade caused the Company to tout that Aqua Metals has "built and delivered a total of five modules to its Nevada AquaRefinery thus far and currently plans to install and commission a total of 16 modules for initial production capacity of 80 metric tons of lead per day. The Company anticipates that the Nevada AquaRefinery will reach its initial production capacity within the coming months."

144.    Defendants Clark, Murphy, Mould, DiVito and Slade also caused the Company to reiterate Aqua Metals "strategic partnerships" with Interstate Batteries and Battery Systems Inc. and stated that the Company "is in discussions with nearly every major U.S. based battery manufacturer and recycler, as well as data center operators and household internet brands (which use lead-acid batteries for backup power)."

145.    Before the market open on November 7, 2016, Aqua Metals filed a Form 10-Q for Q3 2016 ended September 30, 2016, with the SEC ("Q3 2016 Form 10-Q"). The Q3 2016 Form 10-Q contained identical Sarbanes Oxley Section 302 and 906 certifications as those in the Q1 2016 Form 10-Q and Q2 2016 Form 10-Q, signed by defendants Clarke and Murphy. In the filing, Defendants Clark, Murphy, Mould, DiVito and Slade again caused the Company to report that "the testing of our AquaRefining process has been successful to date." Defendants Clark, Murphy, Mould, DiVito and Slade also caused the Company to state that:

> On October 28, 2016, we commenced limited lead-producing operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module. Through our own on-site assay, the Company has verified that the lead produced in the AquaRefining module is over 99.99 percent pure. We expect to commence earning revenue through the commercial-scale recycling of LABs at our TRIC facility during the fourth quarter of 2016. Additionally, we have implemented process and other improvements which have increased the capacity of the TRIC facility to 120 tonnes per day. We expect to achieve a production rate of 120 tonnes per day early in 2017.

146.    Although the Company had not even come close to reaching the 80 ton per day production it had been touting since earlier in the year, the Company reported that its "plan of operations for the 12-month period following the date of this report [was] to expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day" and "expand [its] business with additional recycling facilities and licensing of our recycling technology and equipment to third parties." The Company claimed that, by 2018, it could expand production to 160 tons of lead per day: "[o]ur TRIC facility is designed to accommodate additional AquaRefining modules and has battery breaking and component separations equipment sufficient to support expansion to 160 tonnes of recycled lead per day," and "[o]ur goal is to increase our production of lead at our TRIC facility to 160 tonnes per day by 2018."

147.    Also, at the market open on November 7, 2016, Aqua Metals issued a press release titled "Aqua Metals Provides Third Quarter 2016 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close ("Q3 2016 Press Release"), announcing results for Q3 2016. Murphy was again identified as the "Company Contact." The Company touted that it was "commercializing" AquaRefining and expects its modular systems to "increase production to meet rapidly growing demand." The Company stated that it had, among other things:

- Produced the first-ever AquaRefined lead at its AquaRefinery in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC) and confirmed more than 99.99% purity

- Commissioning activities at TRIC transitioning into lead production and first sales planned for Q4 2016

- Determined that when fully commissioned, the TRIC facility will have the capacity to produce 120 metric tons per day (T/day) of lead; a 50% improvement over the previously announced 80 T/day capacity

- Furthered discussions with interested parties regarding expansion opportunities, both for licensing and future facilities

- Hosted a successful grand opening ceremony at its TRIC AquaRefinery, which was attended by over 200 people, including investors, strategic partners, industry participants, key employees and government official

- Made initial sales of lead in the Q42016

- Expanding planned to provide AquaRefining technology and equipment on a serviced licensing model, which was expected to commence in 2017.

148.    Defendant Clarke stated in the Q3 2016 Press Release that the Company had produced AquaRefined lead at TRIC and that they were transitioning into commercial lead production for sales to begin in Q4 2016:

> The primary focus throughout the third quarter has been on testing of essential systems and equipment to begin commercial lead production at the world's first AquaRefinery. To that end, earlier this month we announced the first-ever AquaRefined lead produced at the facility after commissioning the first production module. This is a major milestone and the most critical step in the commissioning process. We are working to complete the integration of front-end battery-breaking and other supporting systems and are transitioning into commercial lead production. We expect to begin selling lead in the fourth quarter of 2016.
>
> While working to bring the AquaRefinery online, we incorporated several process and other improvements, and consequently, we now expect to ramp to a capacity of 120 T/day in early 2017, which will provide greater revenue and earnings potential.
>
> We have also accelerated discussions with US based lead-acid battery manufacturers and distributors, who collectively represent a substantial majority of the US battery industry. Most have already visited our facility and expressed interest in our products and technology. We are now sending our initial production samples to these companies, to allow them to conduct their own assays.
>
> With the progress that we have made and with unprecedented interest in our revolutionary technology, we are positioned to ramp revenue in the coming year, which ultimately, will contribute meaningfully to growing shareholder value.

149.    Defendants Clark, Murphy, Mould, DiVito and Slade caused the Company to state the "successful production of AquaRefined lead at the TRIC facility that is over 99.99% pure … confirms the Company's ability to produce premium lead."

150.    Defendants Clark, Murphy, Mould, DiVito and Slade further caused the Company to state that "Aqua Metals will begin selling lead in the fourth quarter of 2016…. [T]he Company expects to reach initial capacity of 120T/day in early 2017, representing a 50% increase to the previously announced capacity of 80 T/day of lead output. Aqua Metals plans to expand to 160 metric tons of lead per day at the TRIC AquaRefinery in 2018."

151.    Defendants Clark, Murphy, Mould, DiVito and Slade caused the Company to state that the Company was expanding to provide its AquaRefining technology and equipment on a serviced licensing model, which would commence in 2017:

> Providing AquaRefining technology and equipment on a fully serviced licensing model is the next stage of the Company's business strategy. The first module deliveries to third parties are expected in 2017. To expedite this roll out, the Company has already successfully tested 3rd party feed stocks from potential licensees in North America and expects to test others in the coming months. Aqua Metals has engaged in substantive discussions with highly credible potential partners and developed a "master license" approach for China and other large markets.

> In addition to licensing, the Company touted that it had the capacity to produce 160 modules annually and that it intends to build additional regional AquaRefining facilities: "Aqua Metals is pursuing non-equity financing options for four to five facilities throughout North America which would bring lead output to ~800T/day and is currently evaluating sites for a second and third facility …."

152.    The Company filed a slide presentation with the SEC after the market close on November 7, 2016 (attached as Exhibit 99.2 to a Form 8-K filed with the SEC) ("November 7, 2016 Slide Presentation") in advance of the Q3 2016 earnings conference call and used it during the call. Statements made on the earnings conference call (described below) were also made in the slide presentation. The presentation also included images of commissioning module 1, which the

Company touted as having "self cleaning rotating cathodes" that "produce lead without heat which is recovered continuously and compressed into blocks of ultra pure lead."

153.   Shortly after the market close on November 7, 2016, Aqua Metals held its earnings conference call ("Q3 2016 Conference Call") with defendants Clarke and Murphy, to provide a Q3 2016 update. Defendant Clarke stated the Company was "transitioning into commercial operations now" and that "first lead samples assayed at 99%, and potential customers and licensees have recognized this as a massive achievement." Clarke confirmed on the call that "[w]e plan to sell pure lead AquaRefined lead in quarter four."

154.   On the Q3 2016 Conference Call, defendant Clarke stated that "we've made lead now at first of what would be several AquaRefining facilities" and that "[i]t's been a huge milestone for us to be able to make AquaRefined lead …. We built our first lab scale AquaRefining test nearly three years ago. More than two years ago, we had a large scale pilot and then a single electrolyzer operating. So we all knew it works, but it doesn't mean anything until you put into a commercial operation and make some lead and sell it, and we've been able to get to that point and it's hugely thrilling."

155.   Clarke stated that the Reno Plant has "a single six electrolyzer module installed and commissioned, five more are being commissioned and, in total, we'll have 16 AquaRefining modules on site" and is "now transitioning into production has the capacity to produce 120 tonnes of lead per day, not the 80 tonnes a day that we initially gave guidance on them." Defendant Clarke also stated that the Company would "expand our capacity to 120 tonnes a day in early 2017." Clarke touted "I think we've more than compensated [for its delay] with about 50% uplift in the capacity of the facility."

156. Defendant Clarke further stated that the Company planned to increase its lead production by building other facilities, "we want to build up to 800 tonnes a day of our own lead recycling capacity and with 120 under our belt, we're looking to expand into the remainder."

157. On the Q3 2016 Conference Call, Clarke showed a video and explained the process:

[W]hat that video showed was a single module of six electrolyzers, each electrolyzer has a series of large rotating disk cathodes. They rotate during the plating process and are continuously scraped.

What we plate is a very, very high surface area foam of lead that consists primarily of nano-structures of lead, very, very, very high surface area. The cathodes are continuously stripped, the lead comes off, drops on to a conveyor, then it's taken off to a machine that we call [ph] applicator, that compresses that soft lead. What it actually does is, it consolidates the lead into solid metallic lead at room temperature and it's quite a remarkable process. Then we – we've taken the decision to then put that into an ingot machine and make a standard ingot of lead for sale.

158. Defendant Clarke also stated, "[w]e figured out how to operate the facility in a more flexible way than we'd originally considered. And we've developed some intermediate products, which allow us to accelerate revenue ramp up and accelerate into positive cash flow":

[T]he front-end where we break a battery and then we separate out the plastics and the metallics and what is referred to as lead paste. And then there is a stream of production in which the lead paste is what's called desulphurized before its AquaRefined and then turn into ingots of high purity primary lead.

And there's a parallel stream that comes from the breaker in which the metallic lead that's the lead alloys that are used to make the lead grids is a separate stream, and that goes into an ingoting process and is sold either as secondary lead or as lead alloys. And the most of our timing in building and planning this business, we viewed the process of commissioning is to be one in which we would have to get every single one of those processes fully commissioned in synchronization before we could turn on. And we came to realize that quite so obviously maintaining that ideal situation is difficult and unrealistic in the real world of operating large scale plant that's going to consume hundreds of tonnes of batteries a day and produce hundreds of tonnes of lead a day.

So we put a lot of work into looking how we can de-link those processes from each other. So, for example, running larger or lower quantities of metallic lead through the ingoting site and larger or lower quantities of lead paste through the

desulfurization and ultimately into AquaRefining. And what we'd been able to do is actually achieve the ability to delink those processes. That's given us a large degree of flexibility in how we operate the plant. And it allows us to actually release additional capacity that gets us to that 120 tonnes a day. In that process, there are a number of products that we can actually sell and sell into battery companies for direct use in battery production.

159.    Regarding licensing, defendant Clarke stated that:

[W]e're generating very strong interest in licensing to third parties. It's been our stated goal that we would expand this business through a fully serviced license business model in which we will provide equipment to third parties and we'll maintain it and provide spare parts and continue maintenance to third parties on the licensing base as well. We have taken those conservations [sic] to the point that we have now tested feed stocks from third parties and already successfully taken in feed stocks from third who parties who have expressed interest in licensing on equipment and we've made lead from them.

160.    Clarke also stated that "we expect to start shipping licensed AquaRefining equipment during 2017. What we want to do before that is actually operate our own facility, make sure we've learnt everything we can, and absolutely not falling to the trap of having our licensees be our beta testers. We're not a software company, we're an equipment company, and we live or breathe on the reliability of the equipment and services that we provide through that."

161.    Regarding revenue, Clarke stated on the call that 160 tons of lead a day, with 32 AquaRefining modules, could generate "revenue between $100 million and $120 million a year of that scale." Five AquaRefineries totaling 800 tons a day, with 160 modules, "would give us somewhere in the region of $500 million to $600 million a year in revenue."

162.    During the Q&A portion of the Q3 2016 Conference Call, defendant Clarke was asked about the move from 80 tons to 120 tons. Clarke responded that the Company "wanted to make sure we could do it, before we told anybody. It is a theme here of make sure you can do it before you tell anybody is kind of key within the company …. Is there an opportunity to expand

beyond that, never say never, but we think 120 tonne to 160 tonne is optimal for that particular site."

163.    Again, analysts reacted positively to the announcements. A November 8, 2016 Northland report stated "AQMS has reached several important near-term milestones including first lead production" and the Company "provided a positive surprise with an expansion in the near-term capacity at its first AquaRefinery from 80 tons per day to 120 tons per day. … AQMS is also making positive progress with follow-on AquaRefineries and 3rd party licensing potential." Likewise, on November 8, 2016, Oppenheimer issued a report stating the Company announced a "50% output improvement" at the Reno Plant which is "expected to be fully ramped in early 2017 … AQMS says better than expected flexibility in the NV facility will allow it to ramp to 120 tons a day, up from the 80 tons originally forecast. It now targets 160 tons/day by 2018 in NV." The report concluded, "AQMS is uniquely positioned to take share in the … lead recycling market …."

164.    On November 21, 2016, the Company completed the November 2016 Offering, a public offering of 2.3 million shares of common stock for $10.00 per share, for gross proceeds of $23 million and net proceeds of $21.5 million. In connection with the November 2016 Offering, on September 2, 2016, Aqua Metals filed with the SEC a Registration Statement on Form S-3 for a proposed offering of shares of its common stock, which was subsequently amended on September 16 and 21, 2016 (collectively, the "Registration Statement"). The Registration Statement stated that the Company is "engaged in the business of recycling lead through a novel, proprietary patent-pending process that we developed and named 'AquaRefining'" which "uses an aqueous solvent and a novel electro-chemical process to produce pure lead (*i.e.*, higher than 99.99% purity)." The Individual Defendants also touted in the Registration Statement that the "modular nature of AquaRefining makes it possible to start LAB recycling at a much smaller scale

than is possible with smelters, thereby significantly reducing the investment risk associated with building a lead production facility."

165.    Also, on November 15, 2016, Aqua Metals filed a preliminary prospectus on Form 424B5 ("November 15, 2016 Prospectus") with the SEC, and on November 17, 2016, Aqua Metals filed a Form 424B5 Prospectus Supplement with the SEC (collectively with the preliminary prospectus, "Prospectus"). The Prospectus reiterated verbatim all of the same statements made in the Registration Statement (quoted in this paragraph, *supra*) regarding commercialization, lead purity, and the modules making it possible to start LAB recycling at a much smaller scale and reducing investment risk.

166.    In the Prospectus, Defendants Clark, Murphy, Mould, DiVito and Slade caused the Company to assure investors that the production process was successful to date, stating, "the testing of our AquaRefining process has been successful to date" and "on October 28, 2016, we commenced limited operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module."

167.    The Prospectus similarly repeated that "[w]e have tested our AquaRefining process on a small scale, and on October 28, 2016 we commenced limited production of recycled lead at our TRIC facility."

168.    The Prospectus represented that the funds from the offering would be used to accelerate the production process of AquaRefining:

> We expect to use the net proceeds from this offering for working capital and general corporate purposes, including the acceleration of our AquaRefining product development and licensing efforts inclusive of pre-sales and post-sales support staff and infrastructure, enhancement of processes to further improve our operating margins and regulatory activities.

169.    The Prospectus further explained that since the Company had the necessary capital,

the AquaRefining process was ready and capable of producing 120 tons of recycled lead per day:

> As of the date of this prospectus supplement, we believe that we have working
> capital sufficient to fund our current business plan over the next 12 months,
> including attainment of production at the rate of 120 tons of recycled lead per day.

170.    The Prospectus repeated that commercial production was imminent:

> We expect to commence the commercial recycling of used LABs during the fourth
> quarter of 2016 and increase our production of lead to 120 tonnes per day in early
> 2017.

171.    During a December 22, 2016 interview with Tailwinds, defendant Clarke discussed

production volumes at the Reno Plant. Clarke stated, "[w]e announced [on] the earnings call that

we are able to get better use out of the equipment on site so that we are not starting at 80 tons a

day. We are starting actually starting at 120 tons and we are expecting to be able to quickly take

that to 160 tons a day in the second half of next year." Clarke also stated that "we remain on track

to be producing 800 tons a day from our own facilities" in five years.

172.    Defendant Clarke further stated during the interview that "we're confident that

we'll be announcing some licensing deals within quarter 1 of next year and planning a very

accelerated roll out."

173.    Before the market open on February 9, 2017, Aqua Metals issued a press release

titled "Johnson Controls and Aqua Metals Sign Break-through Battery Recycling Technology

Partnership," which was incorporated into a Form 8-K filed with the SEC on February 13, 2017

("February 9, 2017 Press Release"). The February 9, 2017 Press Release announced a "battery

recycling technology" partnership between the world's largest manufacturer of automotive

batteries, Johnson Controls, and Aqua Metals ("Johnson Controls Partnership") covering North

America, China and Europe. Clarke touted that "[o]ur partnership with Johnson Controls is a

tremendous step forward and is an opportunity for us to work with the global leader in automotive battery manufacturing and responsible recycling. We will build on this exciting relationship in order to enable clean and efficient battery recycling around the world."

174.    The Company stated that:

We entered into an Equipment Supply Agreement dated February 7, 2017 with Johnson Controls pursuant to which we agreed to collaborate on the development of a program for the installation of new greenfield builds and conversion of existing Johnson Controls' and certain strategic partners of Johnson Controls existing lead smelters to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know how and services. We have agreed with Johnson Controls to develop an appropriate program blueprint, and enter into a definitive development program agreement reflecting that blueprint, pursuant to which we will provide to Johnson Controls and certain strategic partners of Johnson Controls, by way of licensing or sale, the following products and services in the regions of North America, Europe and China:

- AquaRefining technology and the related equipment, engineering and systems integration support sufficient to convert or retrofit existing smelter-based operations and/or the construction of new Johnson Controls and Johnson Controls strategic partners battery recycling facilities based on our AquaRefining technology;

- Training, evaluation and certification of Johnson Controls' operations personnel sufficient for such personnel to competently operate our AquaRefining technology and equipment; and

- Ongoing technical support, maintenance services and warranties.

175.    The Company touted that "[u]nder the agreement Johnson Controls will also":

- Become the first licensee for AquaRefining technology

- Supply Aqua Metals with batteries to recycle as a service, as part of the Johnson Controls closed-loop network

- Purchase AquaRefined metals produced from Aqua Metals' facilities

- Acquire just under 5 percent of Aqua Metals outstanding shares

176.    On February 9, 2017, before the market close, *Bloomberg News* issued an article titled "Aqua Metals CEO Says JCI Deal Is 'Massive Vote of Credibility'" ("February 9, 2017 Bloomberg News Article") reporting on a 2017 phone interview with defendant Clarke. The reporter quoted Clarke as stating that the new partnership with Johnson Controls is a "massive vote of credibility" in the Company's technology. The article further quoted defendant Clarke as stating that he expects to see a "dramatic transformation" in revenue in the next two or three years, and that the Company "can make a much better quality product with less capital equipment and so it is purely an economic driver for us." Clarke also stated that Aqua Metals may directly employ 800 people in the next four to five years, a ten-fold increase.

177.    Following the February 9, 2017 Press Release and in response to this purported positive news, the price per share of Aqua Metals increased $4.75, or approximately 41.6%, from a close of $11.41 per share on February 8, 2017, to a close of $16.16 per share on February 9, 2017, on highly unusual trading volume of roughly 3.5 million shares. *Bloomberg News* also reported that "[s]hares of Aqua Metals jumped as much as 44 percent after Johnson Controls signed an agreement on battery recycling technology and took an almost 5 percent stake in the company."

178.    Analysts also reacted extremely positively to the Johnson Controls Partnership. For example, a February 9, 2017 Oppenheimer report called the agreement "transformative" and a "demonstration of JCI's belief in the technology." The report further stated, "we believe the purchase commitment from JCI is enough to support three new facilities for AQMS, the non-exclusive licensing of AQMS' technology, and the strategic investment in AQMS are a marquee validation of AQMS' technology and business model." A February 10, 2017 report by Euro Pacific Capital noted that "[t]he deal with Johnson Controls puts AQMS on the map …. For a multi-billion

dollar company such as JCI to sign a partnership agreement with AQMS for its battery recycling technology should further strengthen investor confidence …."

179.    Similarly, Tailwinds issued a report on February 9, 2017, reacting to this "incredibly exciting news" and noting that it reflects "an independent voice sounding off on the success of [the AquaRefining] technology."

180.    The next day, on February 10, 2017, in an article titled "Aqua Metals Gets Major Battery Company Backing," defendant Mould further touted the agreement with Johnson Controls. In the article, Mould is quoted as saying, "Johnson Controls backing us is a great statement to the industry and the world that aqua refining is the future …. It is major for this facility. It allows us to build out the facility to its full capacity."[2]

181.    At the market open on February 14, 2017, Aqua Metals issued a press release titled "Aqua Metals Provides Fourth Quarter and Year End Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC on the same day ("FY 2016 Press Release"), announcing the Company's financial and operating result for Q4 2016 and year ended December 31, 2016. Defendant Murphy was once again identified as the "Company Contact." The FY 2016 Press Release stated that Aqua Metals was "commercializing" its AquaRefining process and had "successfully commissioned and in the process of scaling up production of AquaRefined lead at AquaRefinery 1 in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC)."

182.    In the FY 2016 Press Release, defendant Clarke also touted that 2016 was a pivotal year for the Company:

> [W]e successfully built, commissioned and began producing products at the world's first AquaRefinery and deepened our strategic relationships with major

---

[2]    *See* Colin Lygren, Aqua Metals Gets Major Battery Company Backing, KOLO TV (Feb. 10, 2017), http://www.kolotv.com/content/news/Aqua-Metals-gets-major-battery-company-backing-413473933.html ("February 10, 2017 KOLO News Article").

players throughout the industry. Our partnerships, most recently with Johnson Controls—the global leader in automotive battery manufacturing and responsible recycling— and Interstate Batteries— the largest independent battery distribution system in North America and the country's leading battery recycler. — and Battery Systems Inc. – one of the largest independent battery distributors in the U.S. effectively rounds out a sustainable ecosystem for the automotive lead acid battery industry and provides a level of supply and off-take to support our expansion of AquaRefinery 1 and the construction of additional facilities.

As we move through 2017, we will continue the expansion of AquaRefinery 1, look to build additional AquaRefineries and build out our licensing program.

183.    A slide presentation was filed and distributed on February 14, 2017 (attached as Exhibit 99.2 to a Form 8-K filed with the SEC) ("February 14, 2017 Slide Presentation") in advance of the Company's financial and operating results for Q4 2016 and year ended December 31, 2016 ("FY 2016 Conference Call") and used during the call. In this presentation, Defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson reiterated that "our first facility is running from breaker to AquaRefining," touting that it had, among other things:

- Expanded potential capacity to 120T/day
- Produced and validated 99.99% pure lead – working on 99.999% pure
- Had added second shift and scaling up to four shifts

184.    Defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson caused the Company to further state in the presentation that, in light of the Johnson Controls Partnership and the "relationships with Interstate Batteries and Battery Systems, Inc., we believe we have secured sufficient supply and off-take to underpin our growth from 160 to 800T/day in North America."

185.    The Company also held its FY 2016 Conference Call on February 14, 2017. On the call, defendant Clarke stated that "[o]ne of the headlines today is that the first-ever AquaRefinery located at Tahoe-Reno Industrial Center, has moved from commissioning to operational. That means that we are breaking batteries and making lead from the batteries that we've broken, both

64

from – both metallic lead and Aqua-refined lead. It's continuing to ramp-up." Clarke stated the "first-ever AquaRefinery [is] up and running," and "we have product ready to ship."

186.     Defendant Clarke reiterated on the FY 2016 Conference Call, "let's talk about the Tahoe-Reno facility … it's now running. We've transitioned out of a mostly start-up phase into a – and commissioning phase into an operational phase …." Defendant Murphy also stated on the call that "we're starting to – beginning commercial operations."

187.     Clarke stated that the Company was expanding the AquaRefinery's capacity from producing 120 tons per day to 160 tons: "We've mentioned in the last earnings call that we have expanded that potential capacity from 80 tonnes to 120 tonnes a day. And we're now looking at expanding from 120 tonnes to 160 tonnes a day. We're producing validated 99.99% pure lead."

188.     Defendant Clarke further stated that additional shifts were being added at the Reno Plant, "[a]nd we've moved from a single shift production to second shift. And now, we're scaling up to four shifts."

189.     While he was touting the Company's increased capacity to produce 160 tons of lead per day and adding shifts to the Reno Plant, Clarke outlined – for the first time – certain challenges that the Company had faced, but assured investors that these challenges had been resolved. He noted that, although the Company had "been able to run the AquaRefining systems because it's modular for several years now," the process faced "challenges" and "surprises." These challenges included (a) jams on the conveyor belt leading up to the breaker; (b) pumps and materials issues transporting lead paste from the breaker through desulfurization; and (c) capacity problems with the desulfurization process. In assuring investors that these issues had been resolved, Clarke stated that "the big news is that we've got that dialed in now and it's operating. That means we can provide feedstock to the AquaRefiners and make AquaRefined lead."

190.    During the Q&A session of the FY 2016 Conference Call, an analyst from Oppenheimer specifically asked about current operations at the Reno Plant, including the number of shifts and the output per shift. Clarke's answer was evasive, "what we're saying is that we're making lead from batteries that we've broken. We're currently operating a single shift. We got a stockpile of raw materials ready to ship. We've got – not raw materials – products ready to ship. As I said, we're operating on a single shift. We brought on us a second shift."

191.    Analyst Bhakti Pavani from Euro-Pacific Capital, Inc. inquired about whether the Reno Plant was currently producing 120 tons of lead per day. Clarke stated that "we figured out how to expand that to 120 tonnes a day with the equipment we had onsite."

192.    Defendant Clarke stated that the Johnson Controls Partnership would allow the Company to move forward with additional AquaRefineries as well as licensing: "it provides the feed and off take for the additional facilities that we've been talking about for the past two years. It fills AquaRefinery long term capacity and it moves us forward in the additional AquaRefineries that we want to build on and upgrade ourselves. But more importantly, it transitions us to the start of a really exciting new phase of the company, which is licensing." Clarke stated that Johnson Controls "has agreed to purchase pretty much all of the lead output from Aqua Metals…."

193.    During that call, defendant Clarke stated that the supply, demand and off-take provided by the Company's "strategic relationships" would allow it to scale from 160 tons to 800 tons a day:

> Well, we have been working on this agreement with JCI for a number of months now. And looking at the tolling/lead purchase agreement, I alluded to this a moment ago, it pretty much gives us all the supply. If you take what we've got with Interstate Batteries and Battery Systems, Inc., and then layer on top the demand and supply and off-take with JCI, it gives us everything that we need scale from 160 tonnes to 800 tonnes a day.

194.    Defendant Clarke stated that with the announcement of the Johnson Controls Partnership, "we're contemplating a very significant roll out of AquaRefining equipment," and that the Reno Plant "is going to have two roles now. It's going to be running as an operational facility, but it's also going to be the cornerstone of where we[] test things and test improvements and implement improvements … of AquaRefining before we finalize the blueprint and start rolling out equipment to third parties…. [W]e've been talking since inception about building a single AquaRefinery and then building a total of 800 tonnes a day of capacity, and then rolling out with the licensing model":

> So, AquaRefinery, number one at Tahoe-Reno Industrial Complex is starting out with a plant capacity of 120 tonnes of lead per day. And we're expecting to expand that to 160 tonnes a day. To do that will require 32 AquaRefining modules. And when it's at full scale at 160 tonnes a day, that will represent just 0.2% of global lead production and generate revenue potential in the region of $100 million to $120 million a year.

> We chose and we believe it's important to grow the company to 800 tonnes a day. We believe that 800 tonnes a day is a credible global supplier of lead or represents a credible global supplier of lead, and we started out thinking maybe we do that, we tend – the current thinking is we'll do that with a total of five AquaRefineries, about 800 tonnes a day. That would require 160 AquaRefining modules. And when constructed, that would be just 2.1% of global lead production, representing $500 million to $600 million a year in revenue.

195.    Defendant Clarke touted the Company's three front expansion plan on the call: (a) "build additional facilities in North America … to get to 800 tonnes a day"; (b) "start providing AquaRefining equipment to third parties on a service license basis"; and (c) "move to higher value products and markets."

196.    After the market close on February 15, 2017, National Securities Corporation issued a report initiating coverage of the Company. In this report, it estimated that the facility would generate $46 million in 2017 revenue and stated that it believed that Aqua Metals' "revenue projections … are sufficiently conservative." The report further stated, "[w]e believe that this

facility has begun to produce lead for commercial sales as of January 2017. The facility has just been completed and has no operating history but we believe that the equipment has been successfully tested." National Securities Corporation also stated: "Aqua Metals has two strategic stake holders Johnson Controls and Interstate Battery, each owning 5% of the shares outstanding. We believe that these two leading battery companies' investment in Aqua Metals not only validates Aqua Metals' revolutionary technology but also creates a vested and integral part of the battery recycling supply chain for the company."

197.    Following the February 15, 2017 National Securities Corporation' report, Aqua Metals per share price increased $1.17, or approximately 6.9%, from a close of $16.94 per share on February 15, 2017, to a close of $18.11 per share on February 16, 2017, on 469,819 shares traded.

198.    On March 2, 2017, Aqua Metals filed its 2016 Form 10-K with the SEC reporting the Company's financial and operating results for Q4 2016 and year ended December 31, 2016.[3] The 2016 Form 10-K contained nearly identical certifications to those cited in ¶ 108 above and those filed with the Q1 2016 Form 10-Q, Q2 2016 Form 10-Q, and Q3 2016 Form 10-Q and were signed by defendants Murphy and Clarke.

199.    Further, both defendants Murphy and Clarke signed a certification pursuant to Section 906 of the Sarbanes-Oxley Act that was nearly identical to those filed to those cited in ¶ 110 above and those filed with the Q1 2016 Form 10-Q, Q2 2016 Form 10-Q, and Q3 2016 Form 10-Q.

---

[3] The 2016 Form 10-K was signed by defendants Clarke, Murphy, DiVito, Slade and Stevenson.

200.     Defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson caused the
Company to reiterate in the filing that "testing of our AquaRefining process has been successful
to date" and that:

> We produced our first AquaRefined lead in October 2016 and we verified that the
> lead produced by AquaRefining is over 99.99 percent pure. During late 2016, we
> implemented upgrades to the facility that have resulted in an initial production
> capacity of 120 metric tons per day of lead based products. Our facility is designed
> to accommodate additional AquaRefining modules to support expansion to 160
> tonnes of lead products per day.
>
> We commenced initial battery breaking during December 2016 and progressed to
> regular single shift operation of the battery breaker in January 2017.

201.     Defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson caused the
Company to state in the filing that AquaRefining "is deployed as a factory built modular system
which allows the lead-acid battery industry to simultaneously improve impact and scale production
to meet rapidly growing demand.… We believe that our proprietary AquaRefining process will
provide for the recycling of LABs and the production of a pure grade lead with a significantly
lower cost of production, and with fewer environmental and regulatory issues, than conventional
methods of lead production." The 2016 Form 10-K also stated the Company's plan of operations:

> Our plan of operations for the 12-month period following the date of this report is
> to expand operations at our first recycling facility at TRIC to 120 tonnes of lead
> production per day. In the longer term, our goal is to increase our production of
> lead at our TRIC facility to 160 tonnes per day. Our 12-month plan of operations
> also includes our collaboration with Johnson Controls for the development of a
> program for the installation of new greenfield builds and conversion of Johnson
> Controls and certain strategic partners of Johnson Controls' existing lead smelters
> throughout North America, China and Europe to a lead recycling process utilizing
> our proprietary and patent-pending AquaRefining technology and equipment,
> know-how and services. Finally, our 12- month plan of operations includes our
> continued pursuit of the expansion of our business with additional recycling
> facilities and licensing of our recycling technology and equipment to third parties.

202.     The 2016 Form 10-K also stated, "We commenced the commercial scale production
of recycled lead at our TRIC facility during January 2017."

203. Further, in the 2016 Form 10-K, Defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson caused the Company to tout that, "[t]hrough our relationships with Battery Systems Inc., Interstate Batteries System International, Inc., and Johnson Controls, we believe we are now able to pursue our expansion of our directly-owned recycling facilities in the U.S. subject to our receipt of necessary funding." Regarding the agreements with Johnson Controls:

> [W]e agreed to work with Johnson Controls on the development of a program for the installation of new greenfield builds and conversion of Johnson Controls and certain strategic partners of Johnson Controls' existing lead smelters throughout North America, China and Europe to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know-how and services.

204. On April 19, 2017, before the market close, *Bloomberg First Word* issued an article titled "Aqua Metals is 'Just Getting Started' on Partnerships, CEO Says." The article reported on a telephone interview with Clarke in which he stated that "we might do some acquisitions, but what we're pursing more aggressively is strategic relationships" and that more industry partnerships will help with scale. The article also stated that "Johnson Controls signed agreement with Aqua Metals on battery-recycling technology and took almost 5% stake."

205. On April 20, 2017, a short seller issued a report on *SeekingAlpha* titled "Aqua Metals: As Toxic As The Lead It Claims To Recycle."[4] The report asserted that:

> Aqua Metals claims to be in the business of designing and licensing the "technology" for lead recycling facilities that are more efficient and more environmentally friendly than the current process used to recycle lead known as smelting. However, given management's background with a little-known UK penny stock called Applied Intellectual Capital, and AQMS's capital raising ties to former principals of the infamous MDB Capital, we believe that the company is actually in the business of telling tall tales…. AQMS is unlikely to ever be commercially viable....

---

[4] *See* Aqua Metals: As Toxic As The Lead It Claims To Recycle, Seeking Alpha (Apr. 20, 2017), https://seekingalpha.com/article/4063485-aqua-metals-toxic-lead-claims-recycle.

The real exuberance in AQMS stock emerged after the company announced an investment and collaboration with Johnson Controls (NYSE:JCI) a few months ago. After announcing this to the market, AQMS stock went parabolic, with investors jumping for joy that AQMS was able to strike a partnership with a company of JCI's clout.

To investors who are excited about the AQMS/JCI partnership, we regretfully inform you that this is not the first time that Stephen Clarke has gotten investors excited about a brand name collaboration.

206.    In response, the Company announced in an April 24, 2017 press release titled "Aqua Metals Announces 'Visitor Days' Beginning in May" ("April 24, 2017 Press Release"), that it would arrange on-site visits for analysts and investors to see the AquaRefining operations at the Reno Plant. In the April 24, 2017 Press Release, defendant Clarke stated: "We believe the best way to address this misinformation is to openly show analysts and investors our facility in operation as we continue to scale it up." He reiterated that the Company "remains focused on our primary goal – to scale commercial operations at the first AquaRefinery to 120 metric tons per day by the end of the year, and to expand operations through our strategic relationships."

207.    As discussed in ¶¶ 224-231, below, the Company was successful in dispelling the negative short-seller report though its analyst visitor days.

208.    On May 9, 2017, after the market closed, Aqua Metals issued a press release titled "Aqua Metals Provides First Quarter 2017 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC on the same day after the market close ("Q1 2017 Press Release"), announcing results for the first quarter of 2017 ("Q1 2017"). Defendant Murphy was identified as the "Company Contact." In the Q1 2017 Press Release, defendant Clarke stated that the AquaRefinery is "now in commercial operation and generating revenue, we are aggressively scaling up operations and ramping our capacity to reach 120 metric tonnes per day by the end of 2017."

209.    As part of this purported ramp up, defendant Clarke asserted shifts were being added to operations: "[w]e currently have shifts A and B completely staffed, and plan to complete our recruitment efforts for shifts C and D in the next month … which would allow us to rapidly expand our innovative lead recycling technology and deliver better quality solutions to our partners and the market as a whole."

210.    Clarke also continued to tout "the support provided by strategic partnerships with some of the largest players in the battery industry, we are taking the opportunity to implement the lessons learned during commissioning of AquaRefinery 1 which will accelerate our roll-out of additional facilities. These improvements and our ongoing work with our strategic partners is creating a blueprint for future facilities – both for our own and for our partners. Our goal is to roll-out facilities in the rest of North America, China, the European Union and elsewhere, based upon this blueprint."

211.    Defendant Clarke summarized by stating, "[f]or the remainder of 2017, we plan to ramp up production at AquaRefinery 1 and to prepare for accelerated build-out of additional facilities, while concurrently moving forward with our plans for additional AquaRefineries, securing non-dilutive financing to accommodate our growth and finalizing our plan to retrofit a to-be-named recycling facility with our strategic partner in 2018."

212.    Yet, having touted that AquaRefining was "commerical[ly] operation[al]" and "scaling up," defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson faced a dilemma when they had to report the Company's results for Q1 2017, which again showed that Aqua Metals had not yet generated any revenue.

213.    Accordingly, at the Q1 2017 earnings conference call after the close of the market on May 9, 2017 ("Q1 2017 Conference Call"), attended by defendants Clarke and Murphy,

defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson disclosed a series of "issues" and "challenges" at the Reno Plant. Some of these issues were the same as those defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson claimed the Company had previously resolved in February 2017, including issues with (a) breaking and separating the batteries; and (b) the input conveyor. Others had not been previously disclosed, including issues with (a) the holding tanks; (b) Aqua Preparation (described by Aqua Metals as where they take the lead compound and convert it to electrolyte that they then feed into the AquaRefining systems); (c) commissioning more than one AquaRefining module; and (d) commissioning the ingot casting process. However, defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson touted that Aqua Metals had overcome or was overcoming these issues and challenges:

> And what we can say is it took longer than we planned to get the breaking and separation up and running, but actually considerably shorter than industry norms. One of the challenges that was unique to us that we faced is that, because we don't have a smelter, we don't have a furnace, we needed to achieve much higher degree of separation than is normal in this industry. What I mean by that is, our plastic had to be clean plastic with no lead oxide, no lead dust on it. Our metallic lead had to be metallic lead with no plastic and no lead oxide, no lead sulfate on it. Our lead compounds had to be lead oxide, lead sulfate and other lead compounds with no plastic and no metallic lead in it. That's a really tough order and we achieved it.

> And we worked very closely with Wirtz Engineering, who have been tremendous in this operation. We asked them to do things that no other battery breaking company has ever been asked to do. It took us a while to get there, but we achieved it and we developed and implemented numerous, far too numerous to mention, upgrades to support what is essentially an industry-leading level of separation. And we think that's something that we are working actually on developing to knowhow and maybe even some IP down the line. But when we talk about breaking and separation, we are operating at levels of separation that we don't know of anybody else in the industry even close to.

> One of the other things that we have or a couple of other things that we have done in the breaking and separation areas, we figured out fairly early on that to be able to operate over 24 hours and match timing and phasing between breaking and the next stages down the line, we needed to improve and upgrade our holding tanks, which we are doing, with higher capacity holding tanks with better mixing.

One of the other issues that we faced is, we needed to rethink and rework the input conveyor to the breaker to upgrade it, to support the higher feed rates that we want to achieve to manage 160 tonnes a day of lead production. Initially, we undersized that, because we planned for 80 tonnes a day, and rather than stop when we are at scale we thought would upgrade it sooner rather than later.

Looking at the Aqua Preparation, which is where we make the electrolyte, we were [ph] a bit later, quite a bit later and slower in being able to bring this online, initially because of intermittent supply from the breaker, without consistent high quality lead compounds from the breaker is very difficult to commission the processes that turn that and turn it into electrolyte.

We weren't idle though, whilst we had this spare time and capacity, we actually used that to switch to an improved and lower cost chemistry for our desulfurization and [ph] separization technology which is a real big benefit down the line. And we've learned some [ph] tough lessons on tank mixing and filtration, which needed to be changed and upgraded to improve reliability, but the Aqua Preparation now is up and running.

Similarly with AquaRefining, those of you who followed us knew that we had a module online in October and we were struggling with intermittent supply from both Aqua Preparation, which was struggling with intermittent supply from the breaker, to get sufficient electrolyte up and running to commission all of the modules.

So we were limited to only [Technical Difficulty] of electrolyte to run a single module. Until that opportunity, again to learn, to improve and to implement, so we used that delay in commissioning the additional AquaRefining modules to test and implement numerous upgrades that have improved potential liability, lifetime, reduced cost and improved consistency of operation.

And last but not least, again, same theme here, we were struggling to commission the ingot casting process, because, again, of intermittent supply of processed lead that that – we've now got all of that and the ingot commissioning is underway.

214.    Further, while defendant Clarke reiterated that the Reno Plant continued to be "on track to be at 120 metric tons a day by the end of the year," he conceded for the first time that Aqua Metals would be producing only "40 tonnes a day of [AquaRefined lead]" while the remaining 80 tons would be "lead alloys and metallics from the breaker" – contrary to defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson repeated prior representations that the makeup would be 50% lead alloys and 50% AquaRefined lead.

215.    In a slide presentation attached as Exhibit 99.2 to the Company's May 9, 2017 Form 8-K filed with the SEC in advance of the Q1 2017 Conference Call ("May 9, 2017 Slide Presentation"), and referred to during the call, defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson stated that "AquaRefinery 1 (McCarran, NV) [is] operating and in revenue":



## Strategic relationships helped de-risk our start-up…….

- AquaRefinery 1 (McCarran, NV) operating and in revenue
  - Began production in Q1 – truckloads of feedstock crushed
  - Sales to strategic partner in Q2 – truckloads of product shipped
  - Ramping production to >120mT/day of lead by the end of 2017
  - Validating our economic projections and incorporating lessons learned
- Now planning AquaRefineries 2-5 and learning from chemical industry and datacenter operators
  - Moving away from opportunistic build-out of small stand-alone facilities and evaluating "clusters" centered on logistics nodes
- Equipment licensing has started
  - Working with JCI to plan the retrofit of an existing facility, as the blueprint for others
- Acquisition of Ebonex should accelerate development of higher value products

….and provide the stability to optimize our business expansion

NASDAQ: AQMS      3

AQUAMETALS

## Strategic partners brought scale and urgency

| Opportunity delivered through strategic relationships | Lead Capacity (mT/day) | AquaRefining Modules needed | Potential annual revenue | Start Date |
|---|---|---|---|---|
| AquaRefinery 1 | 120-160 | 16-32 | $100-120M/year | Operational |
| AquaRefinery 1-5 | ~800 | ~160 | $500-600M/year | 2017 |
| Licensing (JCI and beyond) | >8,000 | >1,600 | TBD | 2018 |

- The scale and demand for additional facilities and licensing means that we cannot wait until Facility 2 to start implementing advances and lessons learned
- Facility 1 is being used both for revenue generation, continuous improvement and to validate process upgrades
- Built a talent acquisition function, recruiting from role models and complementary industries

NASDAQ: AQMS    5    

## AquaRefinery 1 is running and we are scaling output

- Started production in Q1 and sales in Q2
- Status
  - Breaking and separation: commissioned and operating
  - Aqua Preparation: process operating – adding capacity and streamlining operations
  - Aqua Refining: Module 1 operational, Modules 2-4 in-start-up, Modules 5-16 being updated to latest specification
  - Ingot production: being commissioned
    - Metallic lead being shipped pre-ingot
  - Plant staffing
    - A & B shifts: fully staffed, C & D shifts: recruiting to full complement in next month
- The focus of process development has moved from Alameda to Reno
- Implementing next year's improvements now

NASDAQ: AQMS    6    

216.    During the Q1 2017 Conference Call, defendant Clarke stated, "every single one of the processes that we need to operate is operating" and "we've proven that the process overall

works." Clarke reassured investors that "[e]verything that we have done so far has validated our

business model…"

217.    Clarke also stated that:

Sales to a strategic partner commenced in quarter two using materials that were
made in both quarter one and quarter two. And again, we're into the situation of
truckloads of feedstock crushed and shipped now. For remainder of this year, we're
going to do ramping production to 120 metric tonnes a day of lead which we aim
to achieve by the end of 2017 or sooner….

* * *

[W]e look at AquaRefinery 1, we're planning on having a production capacity of
120 metric tonnes a day by the end of the year, and then expanding it to 160 metric
tonnes a day in 2018. And that essentially means that we will have 16 AquaRefining
modules onsite and operational at 120 tonnes a day and 32 modules on-site and
operational 160 tonnes a day. For the mathematicians among you that doesn't add
up ....
But in terms of what does that mean, 120 tonnes to 160 tonnes a day of lead
produced, that represents about $100 million to $120 million a year of revenue, and
it is operational. And we've been talking about [ph] a rollout to 800 tonnes a day
for more than a year now, and initially that was going to be 10 to 15 smaller
facilities.

Now, we're thinking, we can achieve that with 1-5 AquaRefineries, if we stop at
800 tonnes a day, and there is really no reason why we should specifically stop at
800 tonnes a day. But at 800 tonnes a day, that would mean, we have deployed 160
AquaRefining modules and we will be looking at a combined potential annual
revenue of $500 million to $600 million a year and we're starting that process this
year, that is we are starting that rollout this year.

* * *

The headline is its running and we are scaling output. We started production in Q1
and we have started actually moving those into sales in Q2…. [T]he breaking and
separation is commissioned and operating. The Aqua Preparation is the next step
… so that process is now operating. We are adding capacity to it and streamlining
operations. AquaRefining itself, module 1 is operating, modules 2 to 4 are on-site
and in startup mode and modules 5 to 16 are being updated to latest specifications
and will be installed over the coming weeks and months.

218.    Defendant Clarke stated that "AquaRefinery 1 is commissioned in revenue and on

track. It continues to be our primary focus and we are using it to prepare for accelerated growth."

Regarding "strategic partners," Clarke stated that "they de-risked our ramp up" and "provided stability for efficient scale up."

219.    Clarke touted the Company's "invitational site visits":

[W]e announced earlier on that we actually are doing some invitational site visits. So we have arranged an invitational for sell-side analysts in May that will take place in May. We have been asked not to give out when that date is. I believe the analysts want some time to prepare and publish. Similarly, we are arranging invitationals of buy-side analysts and investors which will occur in June and beyond.

220.    In response to analyst's question about whether the Company's ability to finance additional facilities would be hampered by the fact the Reno Plant was not producing 120 tons of lead a day, defendant Clarke responded: "if we got the battery-breaking working, and we've got the ingot line running, and we'll be making electrolyte and we are producing electrolyte into lead, and they can see modules operating effectively, that's pretty much enough of a de-risk from the perspective of the people we're talking to."

221.    After this May 9, 2017 news, Aqua Metals' stock price declined $4.34 from a close of $16.65 per share on May 9, 2017, to a close of $12.31 per share on May 10, 2017, a drop of approximately 26%, on unusually heavy trading of 1,781,561 shares.

222.    Just after the market close on May 10, 2017, the Company filed a Form 10-Q for Q1 2017 with the SEC ("Q1 2017 Form 10-Q") reporting the Company's financial and operating results for the period ended March 31, 2017. The Q1 2017 Form 10-Q contained identical Sarbanes Oxley Section 302 and 906 certifications as those in the Q1 2016 Form 10-Q, Q2 2016 Form 10-Q, and Q3 2016 Form 10-Q, signed by defendants Clarke and Murphy. In that filing, defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson caused the Company, while confirming what had been disclosed the day before – that the Company had sold only lead compounds and plastics rather than AquaRefined lead ("Lead compounds and plastic produced in the quarter were not

shipped as details were still being worked out for delivery to customers. Shipments began in April 2017."), the Company further stated, "[w]e expect TRIC to achieve a production rate of 120 metric tons of recycled lead per day by the end of 2017."

223. Defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson caused the Company to reiterate the same stated plan of operations in the Q1 2017 Form 10-Q as previously reported in the 2016 Form 10-K, including "[o]ur plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day by the end of 2017" and "[i]n the longer term, our goal is to increase our production of lead at our TRIC facility to 160 tonnes per day." The Company's 12-month plan of "operations also includes our collaboration with Johnson Controls for the development of a program for the installation of new greenfield builds and conversion of Johnson Controls and certain strategic partners of Johnson Controls' existing lead smelters throughout North America, China and Europe to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know-how and services," and the Company's "continued pursuit of the expansion of our business with additional recycling facilities and licensing of our recycling technology and equipment to third parties."

224. On May 31, 2017, after the market close, the Company issued a press release titled "Aqua Metals Hosts First Analyst Visitor Day" ("May 31, 2017 Press Release") announcing that it had hosted analysts at its Reno Plant. Aqua Metals expressly touted that:

> The analysts were given a tour of AquaRefinery 1, located in the Tahoe-Reno Industrial Complex (TRIC), led by Aqua Metals' executive management team. Analysts were able to view the critical processes at the AquaRefinery as they happened, including: battery feedstock deliveries; battery breaking and separation; desulfurization and pre-AquaRefining digestion processes; AquaRefining on simultaneously running AquaRefining modules; and shipments of lead products to customers.

225.    Clarke stated in the May 31, 2017 Press Release:

It has been a busy few months for our team as we continue to pursue our production milestones and step ever closer to full output of AquaRefined lead at TRIC. We aim to be as transparent as possible while protecting our IP, as we expand our operations and collaborate with new partners. This was a valuable opportunity to open our doors to the analyst community, providing a behind-the-scenes look at our process.

226.    The May 31, 2017 Press Release further stated that the "Company expects all the analysts who attended the visitor day to update their coverage reports to reflect findings from the site visit in the coming days. AquaRefinery 1 is ramping towards a total production output of 120 metric tonnes of lead products per day by the end of 2017. Aqua Metals is currently also working on plans to build a second AquaRefinery and integrating AquaRefining into a to-be-named existing lead smelter with its strategic partner, Johnson Controls."

227.    In response to the on-site visits at the Reno Plant and at the direct invitation of the Company to report on them, several analysts issued reports after their visits.

228.    Indeed, on June 1, 2017, Oppenheimer reported ("June 1, 2017 Oppenheimer Report") a favorable site visit stating:

- "We visited AQMS's Reno facility yesterday, seeing the battery breaker, the separation process, sulfurization engaged, and the AquaRefining process all up and operational. We believe the biggest issue facing AQMS shares is fundamentally whether the process can be balanced to deliver the cost numbers management has guided to. Our visit suggests the company is tracking those estimates well. We expect there is a significant amount of additional margin for higher purity lead and believe mix could drive upside to our expectations."

- "We observed six semi truckloads of material delivered and taken away during our four-hour visit. We saw spent batteries loaded into the recycling line and being processed with fully recycled lead coming out of the end of the process flow. There appeared to be a week or more of spent batteries as inputs and finished goods inventory."

- "We remain constructive on shares as we believe the company will systematically counter lingering short arguments over the course of the year."

229.    Similarly, on June 1, 2017, National Securities Corporation issued a report ("June 1, 2017 National Securities Corporation Report") after its site visit stating:

- We came away seeing the progress that the company has made in the ramp up of the facility and a clearer picture of the expansion plans. We believe that management plans to hold similar events in the coming months which we view as incrementally positive for transparency and for the sentiment on the shares.

- The Reno facility is ramping up, on track for 120 tonnes by year end On our facility tour we observed that 3 Aqua refining modules were up and running and producing recycled lead. There was work being done assembling the fourth module and also equipment ready for the next set of modules to be built. Improvements have already been made in the Aqua refining process that has been learned from the working of the first module and is being implemented in the fourth module from the start. We believe that the company is on track for all sixteen modules to be up and running by the end of 2017.

- Lead is being produced and revenues are being generated Given that Aqua Metals did not report any revenues in the March quarter, we view that fact that we observed trucks delivering used batteries for off-loading and recycling, and more importantly, finished recycled lead packaged and ready to be shipped out as highly encouraging. Given the amount of lead produced and our belief of what has already been sold, coupled with the throughput of the current modules for the month of June, we believe that our revenue estimate for the June quarter of $2 million is achievable.

230.    On June 1, 2017, before the market close, *Bloomberg News* issued an article titled "Aqua Metals CEO Says New Plant May be Announced This Summer" ("June 1, 2017 Bloomberg News Article"). According to the article, Clarke stated, during a phone interview, that the Company was getting ready to announce its "next one, maybe two" facilities over the summer or even sooner and that there was a "reasonable chance" that the Company would reach 120 metric tons of capacity before the end of 2017.

231.    On June 5, 2017, Euro Pacific Capital issued a report ("June 5, 2017 Euro Pacific Capital Report") after visiting the Reno Plant stating:

On May 31, 2017, we attended the Analyst Day hosted by Aqua Metals where we had an opportunity to see the facility and operations and meet with the management and operational team. During our visit, we saw the entire process of lead production

starting from the feedstock/ lead acid batteries being loaded on the conveyor belt moving into the battery breaker system to the AquaRefining preparation process (desulphurization process) and to the AquaRefining modules, where the end product (AquaRefined lead) comes out at the end of the process. The key takeaway from the site visit was as the Company fixes the minor issues/modification to the equipment/process over the next few weeks, it should be able to produce guided quantities of lead by the end of this year…. We noted that the key bottleneck of the operation is the battery breaking system/equipment, which is having issues to appropriately separate/filter components from the bigger load of the feedstock. We believe with minor modifications that are expected to be implemented over the next few weeks, the Company should be able to resolve the issue and process targeted levels of feedstock.

232.    On June 1, 2017, before market close, *Bloomberg First Word* issued an article titled "Aqua Metals CEO says New Plant May Be Announced this Summer," which stated that "[p]lans for additional facilities will be announced this summer as lead acid battery recycler looks to expand." The article quotes defendant Clarke as stating that the Company is "getting ready" to announce "next one, maybe next two" facilities.

233.    Also in June 2017, defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson caused the Company to deliver a "Corporate Presentation" entitled "'Lead Reinvented' Facilitating a revolution in the lead acid battery industry," ("June 2017 Corporate Presentation") which stated that "[t]he World's first AquaRefinery is now in commercial production" and that "[w]e are ramping revenues, planning additional facilities of our own":



### AquaRefinery 1: On Track for 120mT/Day by Dec 2017

- Modules 5-16 being assembled to latest engineering standard
- Ingoting being commissioned
- Samples of pure lead delivered for testing
- Ramp-up timing and retro-fits built into our cashflow planning
- Expansion to 160mT/day in 2018 being evaluated
- Improvements captured and forming potentially new IP

NASDAQ: AQMS    10

AQUAMETALS

### Key Takeaways

- Preparation for large scale roll-out is our priority
- AquaRefinery 1, commissioned, in revenue and on track for 120mT/day
  - Continues to be our primary focus
  - Using it to prepare for accelerated growth
- Strategic partners brought scale and urgency
  - De-risked our ramp-up
  - Provided stability for efficient scale-up
  - Allows for more aggressive build-out
- Beginning early stage work on higher value products and services
  - Positioned to leverage existing and future strategic partners





NASDAQ: AQMS    20

AQUAMETALS

234.    On July 25, 2017, at the market open, Aqua Metals issued a press release titled "Aqua Metals Announces Preliminary Q2 2017 Revenues" ("July 25, 2017 Press Release")

announcing that the Company "expects total revenues for the second quarter of 2017 to be $603,000, which represents the commencement of commercial revenues." Murphy was listed as a "Company Contact." Defendant Clarke remarked in the July 25, 2017 Press Release that "[m]oving into revenue generation is another significant milestone of growth" and shows that "[w]hat we have accomplished to-date is truly unprecedented and represents [a] level of progress not generally seen in advanced materials technologies." Clarke further explained that the Company had "worked hard to bring the front-end of our process into consistent operation and are now working to install the balance of our AquaRefining modules as we work towards our goal of achieving 120 metric tonnes per day of capacity by year end."

235.   Defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson caused the Company to tout that "[w]e are working to expand the reach and scope of our technology with additional facilities of our own, the commencement of equipment licensing and the expansion of our product offerings to include advanced materials and methods to advance the capabilities of lead acid batteries."

236.   On August 2, 2017, when the market opened, the Company issued a press release titled "Aqua Metals Successfully Hosts First Investor Day" ("August 2, 2017 Press Release"), announcing that it had hosted institutional and accredited investors at its Reno Plant led by Aqua Metals' executive management team. The August 2, 2017 Press Release stated that "[i]nvestors were able to view the full production process at the AquaRefinery as it happened, including battery breaking and separation, desulfurization, electrolyte production, and AquaRefining on four simultaneously running AquaRefining modules."

237.    Defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson also caused the

Company to adopt an institutional investor's statement in its August 2, 2017 Press Release where

it quoted Brett Conrad of Longboard Capital Advisors:

> Our Aqua Metals plant tour was a real eye opener. The team has put in countless
> hours and expertise perfecting the first closed loop non-polluting lead refining
> process. This is my third time visiting the plant and I'm very impressed with the
> accelerating progress in the commissioning process.

238.    Defendant Clarke touted the Company's purported belief in transparency:

> With the world's first clean lead recycling facility now in commercial operation,
> we have continued to scale our operations. This investor day speaks to our belief in
> transparency while still protecting our IP, an important value for a company
> working with a technology as disruptive as AquaRefining.

239.    The August 2, 2017 Press Release also represented that the Company was working

on plans to build a second AquaRefinery and "integrating AquaRefining into a to-be-named

existing lead smelter with strategic partner, Johnson Controls."

240.    On August 14, 2017, H.C. Wainwright & Co. issued a report ("August 14, 2017

H.C. Wainwright & Co. Report") after its site visit stating:

- We visited AQMS' TRIC facility on August 8, 2017, and were given a tour of
  the operations by the company's COO, Selwyn Mould. We observed: 1)
  infrastructure to recycle lead batteries using the company's proprietary process
  is in place; 2) four modules were operational, producing recycled lead paste; 3)
  room to deploy 12 additional modules has been carved out in the setup; 4) there
  is adjacent available space to add another line of 16 modules; 5) the operational
  crew appears to be scaling the learning curve; 6) facilities were quite clean for
  a place where lead is recycled; and 7) technology and infrastructure deployed
  were fairly straightforward and should be easy to bolt on to, or lined up with,
  licensee infrastructure.

- We believe volatility in the stock has been driven by high initial expectations
  set by management that have not been delivered in a timely manner.
  Management's ambitions to put in place a larger facility than originally
  planned, fueled by investor interest, has caused a one year delay in achieving
  production goals, understandably creating skeptics. However, after our site
  visit, we believe the solvent based lead recycling process can be scaled up and
  the company should be closer to full utilization levels beginning in 1Q18.

241.    After the market close on August 9, 2017, Aqua Metals issued a press release titled

"Aqua Metals Provides Second Quarter 2017 Corporate Update," which was attached as Exhibit

99.1 to a Form 8-K filed with the SEC after the market close on the same day ("Q2 2017 Press

Release"), announcing the Company's financial and operating result for the second quarter ended

June 30, 2017 ("Q2 2017"). The Q2 2017 Press Release stated:

> As of July, the Company had four AquaRefining modules commissioned and in operation. The Company is currently in the process of scaling up AquaRefining operations to include 16 modules by the end of 2017.… [Aqua Metals] [s]uccessfully hosted several invitational investor and analyst days at AquaRefinery 1 in late May and early August. These events showcased the production process at the AquaRefinery, including battery feedstock deliveries, battery breaking and separation, desulfurization and pre-AquaRefining digestion processes and AquaRefining on four running AquaRefining modules.

242.    After the market close on August 9, 2017, Aqua Metals held the Q2 2017 earnings

conference call ("Q2 2017 Conference Call") with defendants Clarke and Murphy. During that

call, although it had been nearly a year since the Company announced that the first module had

supposedly produced the first AquaRefined lead, Clarke disclosed that, in fact, the modules were

not operational, "Modules 1 to 4 are being used to validate operating parameters right now, and

we plan to have modules 5 to 16 installed during October and then operational by the end of the

year."

243.    Defendants Clark, Murphy, Mould, DiVito, Slade and Stevenson further caused the

Company to reveal that the lead compounds that accounted for much of the Company's small

$603,000 Q2 2017 revenue were derived from low value lead compounds and that its facility might

run at less than 120 tons per day:

> [T]he lead compounds have a low value in the less established market than lead alloys. And moving forward, our focus is really about the AquaRefined products and the licensing of AquaRefining equipment.

So it's all about AquaRefining but optimal product mix and profitability. We're focused on running all of our AquaRefining modules to the maximum benefit. And that means that we may choose to operate the overall facility with an output of less than 120 tons a day, but with maximized AquaRefining. And we're looking to change our product mix to a higher level of AquaRefining product.

244.    Defendant Clarke stated: "And we have the option of producing and selling lead components from AquaRefining feedstock, and we've done this. And as Tom will say shortly, that's where much of our revenue for the second quarter came from."

245.    Clarke further discussed the problems the Reno Plant was having and had been having for quite some time, including issues with (a) breaking and separating, (b) commissioning and scaling Aqua Preparation, and (c) commissioning modules 1-4.

246.    During the Q2 2017 Conference Call, defendant Clarke assured investors, once again, that "AquaRefining works in capital letters with a lot of exclamation points. We are now AquaRefining lead." He stated that the Company had "four modules operating" and expected to have 16 operating by the end of 2017 and that the facility was currently running "two shifts of ten hours each." Defendant Murphy elaborated that the shifts were running "for four days a week."

247.    During the Q&A portion of the call, in response to a question about Q3 revenues, Clarke stated "[o]ur expectation is quite modest for quarter three that will be largely flat in revenue but we're expecting to see a big growth in revenue until the backend of quarter four as we ramp the final modules and we really start cranking on them."

248.    On the call, Murphy stated:

The additional licensees coming from battery companies and lead companies, we see it as – the level of interest on multiple site visits and observing processes in operation and thinking around how they would integrate into their existing facilities where they have their own in-house recycling, or whether they are – if they are lead company or how would they go about building a facility if they are currently outsourcing to a third-party for battery recycling, and discussions around do they want to start off with a standalone AquaRefining facility or do they we want to go a hybrid route.

87

249.    Responding to a question about the short seller report, Clarke stated on the call:

One of the other strands was that AquaRefining just doesn't work. Well we had –
it was about 90 people through the facility watching it work now at some point,
some of those 90 people will start communicating to the guys who are holding []
short positions and explaining actually it does work.

We've shown videos of it working and I don't know, maybe the shorts are so upside
down and buried in their own bubble of misbelie[f] they just can't get out now, I
don't know. It makes no sense to me at all. I would point out that there are probably
one or two entities in this world who would be very upset if smelting was to go
away and be replaced by something else.

*** 

And as Tom said earlier it worked the first time we turned it on. I mean you got to
recognize that we actually – we put our second mortgages 401(k) and kids
education for instance found in this business if this is a get rich quick scheme, please
show me where I got rich. I haven't monetized anything from this, I have not sold
a single share.

And the reason we were happy to look our spouses in the eye and say, I am going
to write another $100,000 check tomorrow darling because when we turned
AquaRefining modules on they worked and they still do.

250.    Defendant Murphy also added to defendant Clarke's statement regarding the short

seller report, "just summarizing what Steve words said, the reason the search will eventually go

away and it may not be overnight unfortunately as this works. And why I am comfort level and we

never leave because this works."

251.    Also, on August 9, 2017, the Company filed a Form 10-Q for Q2 2017 with the

SEC ("Q2 2017 Form 10-Q") reporting the Company's financial and operating result for the Q2

2017. The Q2 2017 Form 10-Q contained identical Sarbanes Oxley Section 302 and 906

certifications as those in the Q1 2016 Form 10-Q, Q2 2016 Form 10-Q, Q3 2016 Form 10-Q, and

Q1 2017 Form 10-Q, signed by defendants Clarke and Murphy. The Company reported in that

filing:

We have implemented numerous process improvements and expect to be capable of producing significantly more than 120 metric tonnes of recycled lead per day by the end of 2017. This is more battery processing capacity than we can utilize with 16 AquaRefining modules. As such, until we have increased our AquaRefining capacity, we will have the option of producing lead compounds from unused AquaRefining feedstock. The lead compounds have a less established market and some demand uncertainty. For this reason, following the commission of all 16 modules, we may choose to run TRIC at less than 120 tonnes per day, should this provide for a more optimal product mix.

252.     The Q2 2017 Form 10-Q continued to tout the Company' strategic partnerships and stated that the Company's plan of operations remained largely unchanged from its prior 10-Q filing:

Our plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to include 16 AquaRefining modules by the end of 2017. In the longer term, our goal is to increase the number of AquaRefining modules and to move our product range to be more focused on AquaRefined lead. Our 12-month plan of operations also includes our collaboration with Johnson Controls for the development of a program for the installation of new greenfield builds and conversion of Johnson Controls and certain strategic partners of Johnson Controls' existing lead smelters throughout North America, China and Europe to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know-how and services. Finally, our 12-month plan of operations includes our continued pursuit of the expansion of our business with additional recycling facilities and licensing of our recycling technology and equipment to third parties. Additional funding will be required to increase the production of AquaRefined lead at TRIC beyond that provided by the first 16 modules and to work with Johnson Controls on equipment integration and licensing to third parties.

253.     On August 9, 2017, after market close, *Seeking Alpha* issued an online post entitled "Aqua Metals misses by $.22, misses on revenue," which explained that "Aqua Metals (NASDAQ: AQMS) Q2 EPS of -$.42 misses by $.22" and that "Revenue of $0.6M misses by $0.63M."

254.     On the release of the news, Aqua Metals' stock price declined $2.56 from a close of $10.87 per share on August 9, 2017, to a close of $8.31 per share on August 10, 2017, a drop of approximately 23.6%, on heavy volume of 658,303 shares traded.

255.    Before the market open on September 28, 2017, Aqua Metals filed a Form 8-K with the SEC announcing that the Company was progressing in its agreement with Johnson Controls ("September 28, 2017 Form 8-K"). The Form 8-K stated in relevant part:

On September 15, 2017, Johnson Controls delivered to us written notice of the first Johnson Controls facility designated by it, on a preliminary basis, for conversion or retrofit. On September 25, 2017, we delivered to Johnson Controls written notice our readiness to commence discussions to convert or retrofit a Johnson Controls facility to be capable of using AquaRefining to produce lead.

During the week of September 25, 2017, we commenced meetings with Johnson Controls for purposes of furthering the discussions concerning the conversion or retrofit of the initial Johnson Controls facility and the negotiation of the definitive Development Program Agreement pursuant to which we will provide to Johnson Controls, and certain strategic partners of Johnson Controls, by way of licensing or sale, AquaRefining technology and the related equipment, engineering and systems integration support sufficient to convert or retrofit existing smelter-based operations. Johnson Controls has reserved the right to definitively designate the initial facility upon the parties' execution of the definitive Development Program Agreement.

256.    Also, on September 28, 2017, before market open, the website thefly.com ("TheFly") made an online post entitled "Aqua Metals commences talks with Johnson Controls over retrofit of facility," amplifying the statement Aqua Metals made in its 8-K from the following day that in which it "commenced meetings with Johnson Controls (JCI) for purposes of furthering the discussions concerning the conversion or retrofit of the initial Johnson Controls facility and the negotiation of the definitive Development Program Agreement pursuant to which we will provide to Johnson Controls, and certain strategic partners of Johnson Controls, by way of licensing or sale, AquaRefining technology and the related equipment, engineering and systems integration support sufficient to convert or retrofit existing smelter-based operations." On September 15, Johnson Controls gave "written notice to Aqua Metals of the first Johnson Controls' facility designated by it, on a preliminary basis, for conversion or retrofit." On September 25, Aqua Metals delivered to Johnson Controls written notice of its "'readiness to commence discussions to

convert or retrofit a Johnson Controls facility to be capable of using AquaRefining to produce lead.'" TheFly reported that "[s]hares of Aqua Metals are up 29%, or $1.75, to $7.80."

257.    Following this September 28, 2017 news, Aqua Metals per share price increased $1.10, approximately 18%, from a close of $6.05 on September 27, 2017, to a close of $7.15 on September 28, 2017, on 2,094,755 shares traded.

## THE TRUTH BEGINS TO EMERGE

258.    On October 23, 2017, at the market open, Aqua Metals issued a press release titled "Aqua Metals Provides Update On Plant's Operations" ("October 23, 2017 Press Release"). In the October 23, 2017 Press Release, the Individual Defendants admitted that the Company had only "produced small quantities of AquaRefined lead."

259.    The Individual Defendants further disclosed that Aqua Metals was still attempting "to determine the optimal operating parameters, including electrolyte pH, lead concentration, operating temperature, electrolyte flow rate and free acid levels" and contrary to statements made starting in February 2017, it was still trying to commission AquaRefining:

> [A]n important part of the commissioning process is to operate the modules consistently at progressively higher electrical currents to determine the appropriate control parameters and operating procedures. Once completed these parameters and procedures can be replicated across all modules. During model commissioning, the Company also found that under certain conditions, the operators would need to periodically assist the lead removal. Several solutions have now been tested and the Company is evaluating which options are best for long term use.

260.    The Individual Defendants further revealed that Aqua Metals was still "in the process of synchronizing all of the[] stages" of its production process and was far from selling AquaRefined lead, despite the Individual Defendants repeated statements otherwise:

> For over six months, Aqua Metals has been breaking batteries and selling lead compounds. Aqua Metals is currently in the process of taking the next major step by transitioning to the production of lead ingots that are produced from battery grids and a small amount of AquaRefined lead. These lead ingots will be sold as lead

"bullion." The next step will be to produce and sell ingots of lead alloy, and the last step will be to produce and sell ingots of AquaRefined lead.

261.    On the release of the news, Aqua Metals' stock price declined $.96 per share, or 17.9%, from a close of $5.37 per share on October 20, 2017, to a close of $4.41 per share on October 23, 2017, on heavy trading of 647,901 shares. The stock fell another 9.07% the next trading day on heavy trading of 735,301 shares.

## **THE TRUTH EMERGES**

262.    On November 9, 2017, after the market closed, Aqua Metals issued a press release titled "Aqua Metals Provides Third Quarter 2017 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close on the same day ("Q3 2017 Press Release"), announcing the Company's financial and operating result for the third quarter of 2017 ("Q3 2017") ended September 30, 2017 and disclosing that it had only generated revenue of $600,000 for Q3 2017 (the same amount that it had generated in Q2 2017).

263.    Also, after the market closed on November 9, 2017, the Company filed a Form 10-Q for Q3 2017 with the SEC ("Q3 2017 Form 10-Q"), in which the Individual Defendants admitted that AquaRefining technology is "unproven technology." Further, the Individual Defendants admitted that:

> While we have been successful in producing AquaRefined lead in small volumes, there can be no assurance that we will be able to replicate the process, along with all of the expected economic advantages, on a commercial scale. As of the date of this report, our commercial operations have involved the production of lead compounds and plastics from recycled LABs and we have not commenced the commercial production of AquaRefined lead."

264.    Defendant Clarke stated, "we still anticipate having all 16 AquaRefinery modules installed and operational by the end of the year and from there will transition them to continuous operation. Ramp up of AquaRefined lead production is expected to continue through the fourth

quarter of 2017 and into 2018 as modules are brought on-line and shifts are added. We faced and overcame multiple challenges during the quarter, and should expect more as we work to scale production."

265.    Moreover, the Q3 2017 Form 10-Q also disclosed that the Company did not have any strategic alliances, contrary to the Individual Defendants repeatedly touting their "strategic partnerships" with Interstate Batteries and Johnson Controls throughout the Relevant Period. Specifically, a risk factor was revised to disclose the following underlined language which was not present in the prior versions of the risk factor throughout the Relevant Period:

> Our business strategy includes licensing arrangements and entering into joint ventures and strategic alliances, however as of the date of this report we have no such agreements in place and there can be no assurance we will be able to do so. Failure to successfully integrate such licensing arrangements, joint ventures, or strategic alliances into our operations could adversely affect our business. We propose to commercially exploit our AquaRefining process, in part, by licensing our technology to third parties and entering into joint ventures and strategic relationships with parties involved in the manufacture and recycling of LABs, including Johnson Controls, among others. However, as of the date of this report, we have not entered into any such licensing, joint venture or strategic alliance agreements, apart from our equipment supply agreement with Johnson Controls, and there can be no assurance that we will be able to do so on terms that benefit us, if at all.

266.    To date, this remains true.

267.    After the market close on November 9, 2017, Aqua Metals also held its earnings conference call for the Q3 2017 ("Q3 2017 Conference Call") with defendant Clarke and then-CFO Mark Weinswig ("Weinswig"). During the call, Clarke admitted that "one of the key challenges we face" is a "sticky lead" issue, meaning that, in the AquaRefinery, the lead "plated and was easily removed from the rotating discs, but it slid more slowly [in] the exit shoot, and in some cases, needed manual assistance." Clarke also admitted that a solution to the issue would need to be applied to all of the modules. Further, in response to several analyst questions, the

Company refused to provide information as to (a) "how many tons per day [Aqua Metals was] currently running through the battery breaking system and through the entire process"; (b) the "utilization rates with regards to those four modules" that were being used to test operational parameters, and (c) "how much time … it will take to go … to full AquaRefined lead."

268.    In response to the disclosures, the Company's stock price fell \$.08 per share, or 2.1%, to close at \$3.71 per share on November 10, 2017. On Monday, November 13, the Company's stock fell \$.13 per share, or 3.5%, to close at \$3.58 per share. By Tuesday, November 14, the Company's stock fell \$.58 per share, or 16.2%, to close at \$3.00 per share. Over the course of these three trading days, the stock price declined \$0.79 from a close of \$3.79 per share on November 9, 2017, to a close of \$3.00 per share on November 14, 2017, a drop of approximately 20.8%.

**THE INDIVIDUAL DEFENDANTS' SUBSEQUENT STATEMENTS EFFECTIVELY CONFIRMED THAT THE AQUAREFINING PROCESS HAD NOT BEEN FUNCTIONING PROPERLY**

269.    After the end of the Relevant Period, the Company made a series of disclosures that effectively admit that its AquaRefining process had ***not*** been operational, as previously touted. For example:

(a)    As previously noted, on November 9, 2017, the Company admitted that it was facing a "sticky lead issue."

(b)    In the Company's December 1, 2017 press release titled "Aqua Metals Provides Business Update," the Individual Defendants further admitted that the AquaRefining modules could not operate continuously and announced that it had investigated possible solutions to address the sticky lead issue and was going to test one which, if successful, would have to be applied to all 16 modules with the modules expected to continuously operate starting in January 2018.

(c)     Two months later, the Company was still testing this proposed fix. On February 12, 2018, the Company issued a press release titled "Retro-Fit Package Successfully Installed on One Full Module; In Process of Implementing Retro-fit to Remaining Modules," where the Individual Defendants announced the Company had completed testing of the solution on *one* module and had approved the fix for production which would then be applied to all 16 modules.

(d)     Then, on March 5, 2018, the Individual Defendants advised that Aqua Metals had just completed the "*first* 24 hour run of continuous operation of an AquaRefining module," thereby conceding that such a run had not been effectuated before. The Company was still in the process of retrofitting the other modules

(e)     In the Company's 2017 annual report on Form 10-K for the year ended December 31, 2017 filed with the SEC on March 15, 2018 ("2017 Form 10-K), the Individual Defendants stated that "we most recently had to develop special processes and equipment to deal with an unexpected development in the form of 'sticky lead,' whereby the AquaRefined lead produced by our electrolyzers sticks to the AquaRefining modules' exit chute and fails to exit without manual intervention. We believe we have developed a process that will allow for the exit of the AquaRefined lead without manual intervention, however, *this additional process will require a certain amount of retrofitting of our modules that will delay our planned commercial operation of all 16 modules*." In other words, the Company was not yet commercializing its AquaRefining process.[5]

---

[5] The 2017 Form 10-K was signed by defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson and contained Sarbanes-Oxley Certifications signed by defendants Clarke and Murphy.

(f)      In the 2017 Form 10-K the Individual Defendants further stated that, "*we have only recently completed, and have not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale….*" Indeed, the 2017 Form 10-K confirmed that all revenue the Company reported was derived from the sale of lead compounds and plastics, not AquaRefined lead.

(g)      Over a month later on April 24, 2018, the Company announced in a press release titled "Aqua Metals (AQMS) Reports Operational Progress" that three AquaRefining modules had been transferred into production, "where they are running consistently on a single shift." Yet again confirming that these modules had neither been in production nor operating continuously prior to this announcement.

(h)      During the first quarter of 2018 ("Q1 2018") earnings conference call held on May 9, 2018 ("Q1 2018 Conference Call"), defendant Mould acknowledged that it wasn't until April or May 2018 that "we brought our first four modules online and transferred them one by one from the control of the technical team into production" and they were "running on a single shift." The Company had yet to achieve 24-hour operations with those four modules, let alone bringing all 16 modules online. Mould stated that the Company was "being realistic in knowing there will continue to be challenges in scaling up…."

(i)      On June 11, 2018, the Company announced in a press release titled "High Grade AquaRefined Lead Now in Production" that, on June 7, 2018, Aqua Metals cast its first block of AquaRefined lead meeting the soft lead grade of 99.985%. This confirms the Individual Defendants' prior statement that Aqua Metals had produced 99.99% pure AquaRefined lead, with images of lead ingots, beginning in November 2016 was false.

(j)      On August 8, 2018, the Company announced in a press release regarding its Q2 2018 results: "***During the quarter, we took the first step to move beyond "proof of concept" and transitioned into commercialization*** of what we believe is truly a revolutionary and greener way to recycle lead…. We have also seen progress in the production of high purity AquaRefined lead and, during the quarter, we made initial shipments of this material to Johnson Controls." This confirms the Individual Defendants' Relevant Period statements regarding the commercialization of the process were false.

(k)      In an October 12, 2018 press release, the Company stated, "We have also made considerable progress increasing the daily utilization and hourly production rate of our AquaRefining process to near steady state levels while delivering what we believe to be the purest lead produced in America. ***We have achieved production levels*** of 100 kg per hour on individual modules operating 20+ hours per day, ***resulting in daily production of 2+ metric tons of AquaRefined lead per day*** on those individual modules…. We are ***currently operating one module at a time***." This confirms the Individual Defendants' Relevant Period statements regarding the modules continually running and the production of AquaRefined lead were false.

(l)      On April 29, 2019, the Company announced in a press release titled "Aqua Metals Achieves 24/7 Production on Modules One through Four and Weekly Production Records as Scaling Process Continues" that Aqua Metals completed an "electrical power upgrade that included installation of an additional transformer and electrical infrastructure to ensure all the equipment installed in both phases of the electrolyte recovery projects have the necessary power for operation," thereby corroborating that Aqua Metals could not

calibrate the correct voltage necessary for the Reno Plant to operate during the Relevant Period.

**INVESTORS EXPRESS SERIOUS DOUBTS ABOUT THE COMPANY'S STATEMENTS AND LEADERSHIP**

270.    Following the Individual Defendants' end of Relevant Period disclosures, investors lost confidence in Aqua Metals' management, with some even expressing concerns about being misled.

271.    On October 24, 2017, Tailwinds, which had been an early supporter of Aqua Metals, noted, "I know several people who bought this on the IPO, and continually added to their positions, who are now selling shares. They believe that they have been deceived (lied to?) by management and don't want to stick around any longer." Tailwinds further stated, "[b]asically, everything [Aqua Metals] ha[s] said has been erroneous for various reasons" and that "Clarke is the 'boy who cried wolf', saying that things are on track for the umpteenth time, yet pushing back guidance simultaneously and giving investors zero confidence that anything he says will come to fruition." The author further noted that "I can understand delays in building a facility. I can't however, understand how a facility can be built based upon a process that is still undetermined. Wouldn't you think that the optimal operational parameters would be discovered in a lab prior to installation? And, how can you have 'certain conditions' in a controlled warehouse environment? I see this and get very scared."

272.    On November 10, 2017, H.C. Wainwright & Co., who had previously reported "after our site visit, we believe the solvent based lead recycling process can be scaled up and the company should be closer to full utilization levels beginning in 1Q18," issued a report "pushing out our assumptions and all related expectations by a period of 12-18 months" and significantly lowering their price target by 64%. The report noted delays in setting up and scaling operations, a

"lack of visibility on cadence of capacity utilization at the facility" and a "lack of clarity" about when the Company would start selling AquaRefined lead ingots as no timeline was given. The report further noted the "severe decline in the stock over the last 12 months due to heightened expectations put in place around scaling and utilization levels at the outset."

273.    On December 11, 2017, Tailwinds lamented that "the days of excitement around AQMS are clearly over" and shared its skepticism "of the Company's ability to execute in a timely manner, as well as the veracity of the CEO …." Tailwinds stated that the "questions now center around whether or not the technology will ever work."

**KEY MANAGEMENT "RESIGNATIONS"**

274.    Since the end of the Relevant Period, Aqua Metals has undergone substantial changes to its management, including the abrupt "resignation" of its co-founder Clarke, the replacement of Murphy as CFO, the resignation of Mould, and the expansion of the Board. Several of these changes occurred after a series of efforts by Kanen Wealth Management, LLC ("Kanen") to obtain changes to Aqua Metals' corporate governance practices, management and the Board.[6]

275.    On March 5, 2018, the Company issued a press release titled, "Aqua Metals Announces Change to Executive Management Team," announcing that Weinswig had resigned as CFO.

276.    According to an April 11, 2018 preliminary proxy statement, on March 6, 2018, Kanen purportedly reached out to Aqua Metals' CEO Clarke and CFO Murphy to discuss transitioning CEO Clarke out of this role as CEO. It further states that "Mr. Kanen mentioned

---

[6]    On February 22, 2018, Kanen filed an initial statement on Schedule 13D with the SEC disclosing that Kanen and its affiliates had a beneficial ownership of approximately 6.5% of the Company's outstanding shares and that it intended to weigh in on Aqua Metals' operations, strategy, management and Board to maximize shareholder value. Since then, Kanen has filed additional Schedule 13Ds regarding changes in its beneficial ownership.

Steve Cotton, the Company's former Chief Commercial Officer, as a potential successor to Dr. Clarke, and Dr. Clarke abruptly hung up on Mr. Kanen."

277.    The preliminary proxy statement filed on April 3, 2018 (the "Proxy") described additional discussions Mr. Kanen had with Aqua Metals in March 2018 regarding the Company's Board and management:

> On March 7 and 8, 2018, Mr. Kanen telephoned Vincent L. DiVito, one of our independent directors, to introduce himself and describe his views regarding the composition of the Board and of the Company's management team. Mr. Kanen offered his beliefs, among other things, (i) that Mr. Clarke should not continue in his current capacity as the Company's President, Chief Executive Officer and Chairman, (ii) Mr. Kanen's views concerning a successor Chief Executive Officer and Mr. Kanen should be involved in a formal search process to identify Mr. Clarke's successor, and (iii) that the compensation of the Company's directors should be reduced. Mr. Kanen also threatened that he was intending to nominate and seek the election of three insurgent directors to obtain control of the Board at the Annual Meeting.

> On March 22, 2018, Mr. DiVito and Mark Slade, another of our independent directors, had a telephone conversation with Mr. Kanen, during which they discussed matters related to Kanen's threatened director nominations, including Kanen's views regarding the composition and compensation of the Board and the Company's management team. During that conversation, Messrs. DiVito and Slade discussed with Mr. Kanen the financial and operational challenges facing the Company and inquired whether Kanen had any specific views on how to accelerate the commercialization of the Company's AquaRefining™ technology, achieve full-scale operation and maximize profitability. Mr. Kanen indicated that he was not prepared to discuss any specific business plan for the Company at that time, other than the plan to seek to take control of the Board and make changes to the senior management team.

> On March 23, 2018, Kanen delivered to the Company a formal notice nominating its four insurgent director candidates for election to the Board at the Annual Meeting in opposition to the Board's director nominees.[7] The Company's outside counsel acknowledged in a communication to Kanen's outside counsel receipt of such notice of nomination on behalf of the Company. On the same day, Kanen filed with the SEC an amendment to its Schedule 13D, on behalf of Kanen, certain of its affiliates and its four insurgent director nominees as a "group" for the purposes of

---

[7]    According to Kanen, "The Reporting Persons believe that substantial change is required to the composition of the Issuer's Board to ensure that the best interests of shareholders are paramount in the board room."

Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (which we refer to as the "Exchange Act"), disclosing the delivery of its notice of nomination to the Company.

278.   On March 26, 2018, Kanen issued a press release titled, "Kanen Nominates Slate of 4 Highly Qualified Director Candidates for Election at Aqua Metals' 2018 Annual Meeting," explaining that "[w]e are incredibly disappointed by the prolonged and severe underperformance that has plagued Aqua Metals. The Company's stock price has precipitously declined by more than 85% in the past year alone.… Forty percent of the Company's Board is composed of non-independent, management co-founders. We have lost confidence in their ability to enhance or maximize stockholder value." Ultimately, a drawn out proxy fight was avoided when, on May 2, 2018, Kanen and Aqua Metals reached an agreement to expand the Board to six.

279.   On March 27, 2018, Aqua Metals issued a press release titled "Aqua Metals Inc. Announces Plans for CEO Succession and Process for Board Refreshment," announcing its plans to transition CEO Clarke from his current position as President, CEO and Chairman of the Board. According to the press release, these plans had been in the works since late 2017, unbeknownst to investors. At that time, Aqua Metals purportedly engaged an "executive search firm and corporate governance consultant for advice and assistance on Board compositional matters and corporate governance best practices. In February 2018, Aqua Metals authorized such firm to conduct a comprehensive search for a successor CEO …." In a Form 8-K filed with the SEC on April 2, 2018, the Company announced that on March 27 and 28, 2018, Clarke and Mould, respectively, informed the Company that they declined to stand for re-election as directors at the 2018 Annual Meeting of stockholders.

280.   On April 12, 2018, the Company announced in a press release titled "Aqua Metals Announces Changes to Executive Management Team" that interim-CFO Murphy would be

replaced by Frank Knuettel II ("Knuettel"), which would take effect on April 16, 2018. Knuettel would assume CFO responsibilities after the Form 10-Q for second quarter of 2018 ("Q2 2018") with the SEC ("Q2 2018 Form 10-Q") was filed. Knuettel would only serve as CFO for a few months until leaving the Company in August 2018 and was eventually replaced by Judd Merrill on November 6, 2018.

281.    On April 23, 2018, the Company announced in a press release titled "Aqua Metals Announces Executive Management Succession and Board Enhancement" that enhancements to the structure of its corporate governance and the resignation of CEO Clarke. On June 26, 2018, the Company announced in a press release titled "Aqua Metals Issues Letter from Board" that it had decided to defer the search for a new CEO and has asked Steve Cotton to lead the Company for the time being. On January 7, 2019, the Company announced that Cotton was formally appointed CEO.

282.    On June 28, 2018, the Company announced in a Form 8-K filed with the SEC that Interstate Batteries had agreed to waive all payments under the key-man provisions in its prior agreements with Aqua Metals with respect to the resignation of CEO Clarke.

283.    On December 6, 2018, the Company announced that COO Mould resigned from the Company.

**THE "STRATEGIC PARTNERSHIP" WITH JOHNSON CONTROLS IS STALLED PENDING DEVELOPMENT OF THE AQUAREFINING PROCESS**

284.    The Individual Defendants have also not been able deliver on any of the promises they made to Johnson Controls because the Company's AquaRefining modules and technology do not work. During the Relevant Period, the Individual Defendants' touted Aqua Metals' relationship with Johnson Controls as a "tremendous step forward," which would allow Aqua Metals to license its AquaRefining technology to a global leader in the industry and build additional AquaRefineries.

In April 2017, the Individual Defendants announced that Aqua Metals, through its deal with Johnson Controls, planned to install AquaRefining in a to-be-named smelter site in 2018. Several months later, in September 2017, the Individual Defendants continued to make it appear that progress was being made with Johnson Controls regarding retrofitting a Johnson Controls' facility with AquaRefining technology and entering into a licensing agreement.

285.    However, by April 2018, Aqua Metals and Johnson Controls were no closer to rolling out a licensing program or retrofitting a facility with AquaRefining technology than they had been seven months before. In an April 26, 2018 Press Release, the Company disclosed that Aqua Metals and Johnson Controls needed to postpone the deadline to conclude discussions and enter into a development program agreement regarding these agreements for another year, giving the parties until 2019. In the April 26, 2018 Press Release, defendant Mould stated that "[w]e appreciate Johnson Control's flexibility in this matter," indicating that it was Aqua Metals, and not Johnson Controls, that needed the additional time.

286.    In June 2019, having still not entered into an agreement regarding these items, Aqua Metals and Johnson Controls further pushed out the deadline to no later than the 90th day following Aqua Metals' "satisfaction of certain performance criteria." The parties further agreed that the equipment supply agreement (the "partnership" Aqua Metals highly touted that the parties announced on February 7, 2017) may be terminated by either party upon 60 days' prior written notice if the parties have not entered into the development program agreement by June 30, 2021.

287.    To date, Aqua Metals and Johnson Controls have still not entered into a development program agreement. Indeed, until Aqua Metals can commercially produce AquaRefined lead, its purported partnership with Johnson Controls is meaningless.

## THE INDIVIDUAL DEFENDANTS' MATERIAL MISREPRESENTATIONS

288.    Throughout the Relevant Period, the Individual Defendants coupled their sham "dog and pony" shows with false and misleading statements regarding purported milestones achieved, and to be achieved, by the Company. Moreover, the Individual Defendants made false and misleading statements regarding the significance of these dog and pony shows, the meaning of certain "strategic partnerships" and the status of Aqua Metals' licensing, expansion and lead production rates.

289.    The Individual Defendants were prolific in terms of both the volume and the scope of their misrepresentations during the Relevant Period, issuing false and misleading statements about present facts as well as utterly unsupportable forecasts that were both embedded within statements of fact and constituted projections that the Individuals Defendants knew were unattainable.

### THE INDIVIDUAL DEFENDANTS ISSUED FALSE AND MISLEADING STATEMENTS THAT AQUA METALS HAD ACHIEVED CERTAIN SPECIFIC KEY MILESTONES

#### The Individual Defendants Misled Investors with Affirmative Statements that AquaRefining had Been Successfully Tested and Proven

290.    Throughout the Relevant Period, the Individual Defendants touted that AquaRefining had achieved certain milestones because it had been both successfully tested and proven through all stages of the commissioning process and into commercial production.

291.    The following are a series of false and misleading statements that Aqua Metals had successfully tested and proven that the technology worked at the California Testing Facilities and during the commissioning stage at the Reno Plant and could produce 99.99% pure lead:[8]

---

[8]    Bolded quoted statements are alleged to be false and misleading, while other statements are provided for context. Unsupportable projections of upcoming milestones were also interlaced throughout the Individual Defendants' statements.

- Between May 19, 2016 and November 2016 (and beyond), defendants Clarke, Murphy, Mould, DiVito and Slade routinely reported that: "**the testing of our AquaRefining process has been successful to date**…. As of the date of this report, we have built and operated both a smallscale unit of our AquaRefining process and a full size production prototype."[9]

- With respect to the type of testing accomplished between May and August 2016, defendants Clarke, Murphy, Mould, DiVito and Slade also stated that, "[t]hrough the operations of such units [the smallscale unit and the full size production type], **we have successfully produced 99.99% pure lead on a limited scale…. [W]e believe that our development and testing to date has proven the concept of our AquaRefining process**...."[10]

- Then, in the Q3 2016 Form 10-Q and the Prospectus, defendants Clarke, Murphy, Mould, DiVito and Slade touted that the Company's success stemmed from the additional milestone of having successfully tested a full-sized AquaRefining module at the Reno facility: "**the testing of our AquaRefining process has been successful to date**, ... As of the date of this report, we have built and operated both a small-scale unit of our AquaRefining process and a [full size/full-size] production prototype. **In addition, on October 28, 2016, we commenced limited operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module.…. [W]e believe that our development, testing and limited production to date has proven the concept of our AquaRefining process**…."[11]

- In Aqua Metals' Q3 2016 Form 10-Q, defendants Clarke, Murphy, Mould, DiVito and Slade confirmed: "**On October 28, 2016, we commenced limited lead-producing operations at our TRIC facility through the processing of recycled lead through a single AquaRefining Module. Through our own on-site assay, the Company has verified that the lead produced in the AquaRefining module is over 99.99 percent pure**."[12]

---

[9]     May 19, 2016 Q1 2016 Form 10-Q; August 10, 2016 Q2 2016 Form 10-Q; March 2, 2017 Form 10-K. Each Form 10-Q was signed by defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy. The Form 10-K was signed by defendants Clarke, Murphy, DiVito, Slade and Stevenson and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[10]     May 19, 2016 Q1 2016 Form 10-Q; August 10, 2016 Q2 2016 Form 10-Q.

[11]     November 15, 2016 Prospectus; November 7, 2016 Q3 2016 Form 10-Q. The November 7, 2016 Q3 2016 Form 10-Q was signed by defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[12]     November 7, 2016 Q3 2016 Form 10-Q.

- In the Prospectus, defendants Clarke, Murphy, Mould, DiVito and Slade also repeated that: "**We have tested our AquaRefining process on a small scale, and on October 28, 2016 we commenced limited production of recycled lead at our TRIC facility**…."[13]

292.    The bolded statements in ¶ 291, that the Company had successfully tested and proven that the AquaRefining process worked at these phases at the California Testing Facilities and during the commissioning process at the Reno Plant and was commencing limited lead production, were materially false and misleading when made because AquaRefining had not been successfully tested or proven at any stage during the Relevant Period.

293.    The truth that the Individual Defendants had never successfully tested or proven that the AquaRefining process worked at these stages is demonstrated by the Company's own later admissions, which concede the very problems that existed prior to and throughout the Relevant Period:

(i)    the admission at the end of and after the Relevant Period that the AquaRefining process was plagued with the on-going sticky lead problems and that the Company needed to find a solution to such problems and then test the solution. Indeed, in March 15, 2018, it announced that it needed to retrofit its modules to solve the problems (¶¶ 259, 267, 269); and

(ii)    the admissions at the end of and after the Relevant Period that the AquaRefining process was "unproven technology" (¶¶ 263, 269).

294.    Significantly, when questioned as to whether there were any problems that might impede the success of AquaRefining as operations ramp up in May and August 2016, the Individual Defendants denied the existence of any existing problems:

- Colin Rusch, Analyst from Oppenheimer: "Okay. And when do you expect the first startup to happen in the first test runs?" Defendant Clarke: "Well, some of them have already been completed. So, there isn't a first test run. It's a continuing operation. So, in one sense, we've already done it. In the sense of

---

[13]    November 15, 2016 Prospectus.

when will the first modules be running in their base in Reno, we're projecting late July, maybe early August. .... **There's little risk associated with the actual AquaRefinery themselves**. The important point is just the scale of the operation."[14]

- Colin Rusch, Analyst from Oppenheimer: "Yeah. That sounds great. And then, just in terms of the [] – that's to do as to get up and running, which piece are you guys most concerned about or pieces that, as you turn on, this equipment may have some hiccups along the way?" Defendant Clarke: "So, if I – everything that we think we might have a problem with, we've got contingency plans in place for. **So, I don't have a single thing that we're worried about.** It's really about the commissioning process itself."[15]

- Defendant Clarke repeating Analyst Question: "Then, the final question, is there any concern that the modules will encounter problems when employed on a mass scale? Have you done any testing?" Defendant Clarke: "But we have been operating a single full scale electrolyzer for 12 months now. That was pre-production prototype. Then, nearly four months ago now, we took a single electrolyzer off the production line and installed in our full scale test facility and have been operating that ever since. **And we don't anticipate any issues operating at full scale**. Full scale is just essentially 96 of the same thing."[16]

295.    The bolded statements in ¶ 294 representing that there were no existing problems in Aqua Metals' testing and operations and, thus, the Individual Defendants had no concerns about scaling up were materially false and misleading when made because the AquaRefining process was plagued with problems, including issues with chemical ratios, hard lead, sticky lead, the routine breaking down of the breaker and the failure of the modules to operate for more than a few hours at best before breaking down.

296.    The truth that these problems existed during this time period is corroborated by the fact that the Company admitted to these same problems at the end of the Relevant Period:

---

[14]    May 24, 2016 Q1 2016 Conference Call. Defendants Clarke and Murphy were participants on this call.

[15]    August 10, 2016 Q2 2016 Conference Call. Defendants Clarke and Murphy were participants on this call.

[16] August 10, 2016 Q2 2016 Conference Call.

(i)     the admission at the end of and after the Relevant Period that the
        AquaRefining process was plagued with the on-going sticky lead problems
        and that the Company needed to find a solution to such problems and then
        test the solution, including its March 15, 2018 announcement that it needed
        to retrofit its modules to solve the problems (¶¶ 259, 267, 269);

(ii)    the end of Relevant Period admission that the Company had not yet solved
        the problem that operators needed to assist the lead removal during the
        commission process (¶¶ 259, 267); and

(iii)   the admission at end of and after the Relevant Period that the AquaRefining
        process was "unproven technology" (¶¶ 263, 269).

**Starting in November 2016, the Individual Defendants Made False and Misleading
Statements that the Company's AquaRefining Technology was Producing Ultra-Pure
Lead at the Reno Plant that was "Flowing Like A Waterfall" and that the Company
Had Completed the Commissioning Phase and was Commencing the Transition to
Commercial Operations**

297.    In November 2016, Aqua Metals announced having achieved another key
milestone - its commissioning activities at the Reno Plant had transitioned into lead production
with its "first-ever AquaRefined Lead" that was "flowing like a waterfall" and being cast into
ingots. Aqua Metals provided photographs allegedly capturing this achievement, several of which
images the Individual Defendants continued to tout throughout the Relevant Period.

298.    The following are Individual Defendants' false and misleading statements as well
as visual misrepresentations that Aqua Metals had achieved the critical milestone of producing
99.99% pure lead through the AquaRefining process and that AquaRefined lead was "flowing like
a waterfall" at the Reno Plant, which Aqua Metals used for "its first casted ingot" during the
commissioning phase, and that Aqua Metals was transitioning to commercial production:

- In the Company's November 1, 2016 Press Release, defendants Clarke,
  Murphy, Mould, DiVito and Slade touted: "Aqua Metals (NASDAQ:AQMS)

today announced that **it has produced the first-ever AquaRefined lead at its flagship AquaRefinery in McCarran, Nevada**."[17]

- Defendants Clarke, Murphy, Mould, DiVito and Slade provided photos purporting to capture this, including photos with the titles "AquaRefining module with six electrolyzer units **continuously producing AquaRefined pure lead, flowing like a waterfall of lead infused electrolytes**," "**first casted ingot**" and "Close up of **first casted ingot**:"[18]



AquaRefining module with six electrolyzer units

continuously producing AquaRefined pure lead, flowing

like a waterfall of lead infused electrolytes

---

[17]      November 1, 2016 Press Release, Exhibit 99.1 to Form 8-K. The Form 8-K was signed by defendant Clarke.

[18]      November 1, 2016 Press Release, *available at* Aqua Metals' website, https://ir.aquametals.com   /press-releases/detail/70/aqua-metals-produces-first-aquarefined-lead-atworlds    and    Global    News    Wire's    website, https://www.globenewswire.com/newsrelease/2016/11/01/885160/0/en/Aqua-Metals-Produces-First-AquaRefined-Lead-at-World-s-First-AquaRefinery.html. Some of these, and similar, images also appeared in the November 7, 2016 Slide Presentation (Ex. 99.2 to Form 8-K, defendant Clarke signed the Form 8-K) and the February 14, 2017 Slide Presentation (Ex. 99.2 to Form 8-K, defendant Clarke signed the Form 8-K); the June 2017 Corporate Presentation. *See also* November 7, 2016 Q3 2016 Conference Call (defendants Clarke and Murphy participated on the call); February 14, 2017 FY 2016 Conference Call (defendants Clarke and Murphy were participants on the call).



Conveyer belt carries pure lead to ingot

casting area



The first casted ingot



Closeup of the first casted ingot

- Defendant Clarke expressly described this achievement of "producing the first-ever AquaRefined lead at its flagship AquaRefinery" as: "**This is a major milestone - not just for our company, but for the entire industry.**". . . **I am extremely proud of our entire team for making this dream a reality**."[19]

- The Press release continued: "AquaRefining uses an entirely reusable water-based technology to **produce ingots of ultrapure lead**. Through its own on-site assay, **Aqua Metals has verified that the lead produced in the AquaRefining module is over 99.99 percent pure**."[20]

- The Press release continued: "**Aqua Metals previously demonstrated the effectiveness of its technology at bench scale, pilot scale and with a single, full-size electrolyzer. The Company has now produced high quality AquaRefined lead with a commercial-scale AquaRefining module at its facility in the Tahoe-Reno Industrial Center in Nevada**."[21]

- Defendant Clarke described this as: "**the most critical step in the commissioning process of the Nevada AquaRefinery** … Over the coming weeks we plan to fully integrate the front-end battery-breaking portion of the facility."[22]

---

[19] November 1, 2016 Press Release.

[20] November 1, 2016 Press Release.

[21] November 1, 2016 Press Release.

[22] November 1, 2016 Press Release.

- In the November 7, 2016 Press Release, defendant Clarke reiterated: "The primary focus throughout the third quarter has been on testing of essential systems and equipment to begin commercial lead production at the world's first AquaRefinery. **To that end, earlier this month we announced the first-ever AquaRefined lead produced at the facility after commissioning the first production module**. **This is a major milestone and the most critical step in the commissioning process**. We are working to complete the integration of front-end battery-breaking and other supporting systems and are transitioning into commercial lead production. We expect to begin selling lead in the fourth quarter of 2016."[23]

- Aqua Metals: "**Produced the first-ever AquaRefined lead at its AquaRefinery in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC) and confirmed more than 99.99% purity**."[24]

- Aqua Metals: "Construction of the recycling facility, located on 11.7 acres in the [Reno Plant] TRIC in McCarran, Nevada, is now complete **and transitioning into production.**"[25]

- Aqua Metals: "**Commissioning activities at TRIC transitioning into lead production and first sales planned for Q4**."[26]

- Aqua Metals: "In early November, the Company announced the successful production of AquaRefined lead at the TRIC facility that is over 99.99% pure. **This confirms the Company's ability to produce premium lead**."[27]

- During the Company's Q3 2016 Conference Call, held November 7, 2016, defendant Clarke reiterated: "And the headline is that **we've now moved into or we're transitioning into commercial operations now**."[28]

---

[23] November 7, 2016 Q3 2016 Press Release. Defendant Murphy was identified as the "Company Contact" in the press release.

[24] November 7, 2016 Q3 2016 Press Release.

[25] November 7, 2016 Q3 2016 Press Release.

[26] November 7, 2016 Q3 2016 Press Release.

[27] November 7, 2016 Q3 2016 Press Release.

[28] November 7, 2016 Q3 2016 Conference Call, Exhibit 99.2 to Form 8-K. Defendants Clarke and Murphy were participants on the call. Defendant Clarke signed the Form 8-K.

- Defendant Clarke also walked through a slide presentation (which was also attached to the November 7, 2016 Press Release) purportedly showing how AquaRefining had accomplished this: "**Commissioning Module 1**… Self cleaning rotating cathodes… **produce lead without heat… which is recovered continuously… and compressed into blocks... of ultra pure lead.**[29]





---

[29] November 7, 2016 Q3 2016 Conference Call; November 7, 2016 Slide Presentation.











- Defendant Clarke: "And part of that is an update that the facility that we've built and are now transitioning into production has the capacity to produce 120 tonnes of lead per day, not the 80 tonnes a day that we initially gave guidance on them, and I'll say a little bit about that. **Where we are right now is we have a single six electrolyzer module installed and commissioned**, five more are being commissioned and, in total, we'll have 16 AquaRefining modules on site."[31]

- Defendant Clarke: "**It's been a huge milestone for us to be able to make AquaRefined lead**. For me personally, it's been hugely exciting, and I think I speak for all of the management team."[32]

- Defendant Clarke: "So, I'm just going to wrap up now with key takeaways. So, the first one is that after 18 months, and I need to say that again, after just 18 months and what was a 12-acre patch of dirt in the Nevada desert is now the world's first recycling facility or AquaRefining facility and **it's transitioned**

---

[30]     November 7, 2016 Q3 2016 Conference Call.

[31]     November 7, 2016 Q3 2016 Conference Call.

[32]     November 7, 2016 Q3 2016 Conference Call.

into commercial operations. As I mentioned before, **it's got 120 tonnes a day of installed capacity**."[33]

- Defendant Clarke: "We built our first lab scale AquaRefining test system nearly three years ago. More than two years ago, we had a large scale pilot and then a single electrolyzer operating. **So we all knew it works, but it doesn't mean anything until you put into a commercial operation and make some lead and sell it, and we've been able to get to that point and it's hugely thrilling**."[34]

- Later in the Relevant Period, Aqua Metals reiterated that they had hit these milestones: "**In addition, in connection with the commissioning of our TRIC facility, we conducted limited operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module, and through our own on-site assay, we verified that the lead produced in the AquaRefining module is over 99.99 percent pure**."[35]

- Aqua Metals: "The [TRIC] building phase was completed by August 2016 at which time, we started commissioning activities. **We produced our first AquaRefined lead in October 2016 and we verified that the lead produced by AquaRefining is over 99.99 percent pure**."[36]

299.   The bolded statements in ¶ 298 of key milestones achieved were materially false and misleading when made because Aqua Metals (a) had not achieved the critical milestone of "producing" ultra pure or 99.99% pure or AquaRefined lead "flowing like a waterfall" at the Reno Plant; (b) had not produced ingots of pure AquaRefined lead at the Reno Plant; and (c) had not commissioned AquaRefining such that it could transition to commercial production.

300.   The truth regarding the fact that the Company had not achieved these critical milestones are demonstrated by the Individual Defendants' own later admissions:

    (i)    the admission at the end of and after the Relevant Period that the AquaRefining process was plagued with the on-going sticky lead problems

---

[33]    November 7, 2016 Q3 2016 Conference Call.

[34] November 7, 2016 Q3 2016 Conference Call.

[35] March 2, 2017 2016 Form 10-K.

[36] March 2, 2017 2016 Form 10-K.

and that the Company need to find a solution to such problems and then test the solution, including its March 15, 2018 announcement that it needed to retrofit its modules to solve the problems (¶¶ 259, 267, 269).

(ii)      the admissions at end of and after the Relevant Period that the AquaRefining process was "unproven technology" (¶¶ 263, 269);

(iii)    the admission at end of the Relevant Period that the Company had only ever "produced small quantities of AquaRefined lead." (¶ 258); and the Company had "not commenced the commercial production of AquaRefined lead" (¶ 263);

(iv)    the admission at end of and after the Relevant Period that the Company had not started commercial production of AquaRefining during the Relevant Period, including (a) its October 2017 statement that it was still in the commissioning process even in Fall 2017 (¶¶ 259, 267); (b) its November 9, 2017 admission that, "[a]s of the date of this report, our commercial operations have involved the production of lead compounds and plastics from recycled LABs and we have not commenced the commercial production of AquaRefined lead" (¶ 263); and (c) its statement in its 2017 Form 10-K filed on March 15, 2018 that "we have only recently completed, and have not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale…." (¶269(f));

(v)     the admission after the Relevant Period that the Company was still testing the modules (¶ 269);

(vi)    the March 5, 2018 admission that the Company was only just then that Aqua Metals had ran its "first 24 hour run of continuous operation" (¶ 269(d));

(vii)   the June 11, 2018 announcement that the Company had only just cast its first block of AquaRefined lead that month (¶ 269(i)); and

(viii)  the August 8, 2018 admission that the Company was only "[d]uring the quarter [Q2 2018], we took the first step to move beyond 'proof of concept' and transitioned into commercialization" in Q2 2018" (¶ 269(j)).

**In 2017, the Individual Defendants Misled Investors with Affirmative Statements that Aqua Metals had Transitioned Into Full Commercial Operations**

301.    After announcing that the Reno Plant had produced AquaRefined lead "flowing like a waterfall" in November 2016, the Individual Defendants represented that testing and commissioning had been completed and Aqua Metals was now transitioning to commercial operations, including the production of lead. Indeed, in February of 2017, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson represented that the transition was complete – that AquaRefining was in commercial operations and that it was producing products. Then, in June of 2017, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson represented the Reno Plant was now in full commercial production, thereby confirming that Aqua Metals had achieved the next important milestone.

302.    The following bolded statements are a series of false and misleading statements between February 2017 and March 2017 all stating that the Company had achieved the key milestone of completing the transition to commercial operations producing AquaRefined lead from breaker to AquaRefinery:

- Company highlights in 2017 FY Press Release: "**Successfully commissioned and in the process of scaling up production of AquaRefined lead at AquaRefinery 1 in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC).**"[37]

- Defendant Clarke stated: "2016 was a pivotal year for the company, as **we successfully built, commissioned and began producing products at the world's first AquaRefinery**…."[38]

- During the FY 2016 Conference Call, defendant Clarke highlighted the newest achievement: "**One of the headlines today is that the first ever**

---

[37] February 14, 2017 FY 2016 Press Release. Defendant Murphy was identified as the "Company Contact" in the press release.

[38] February 14, 2017 FY 2016 Press Release.

**AquaRefinery located at the Tahoe-Reno Industrial Center has moved from commissioning to operational. That means that we are breaking batteries and making lead from the batteries that we've broken both from – both metallic lead and AquaRefined lead**.

<center>***</center>

So, moving on. So, let's talk about the Tahoe-Reno facility. As I mentioned at the start, **it's now running. We've transitioned out of a mostly start-up phase into a – and commissioning phase, into an operational phase**."[39]

- Defendant Murphy: "But now that **we're starting to – beginning commercial operations, that should go down**. . . ."[40]

- Defendant Clarke: "**We're producing validated 99.99% pure lead**. By validated, that means [indiscernible] (17:18) the battery companies. We assay everything before it leaves our facility. **We knew that we produced 99.99%, but that doesn't count until the battery company says, wow, you really did, and that happened. And as I mentioned, we're working on 99.999% pure** which has a real interest in very high lifecycle lead-acid batteries and some of the higher value applications."[41]

- Aqua Metals' slide presentation reprinting the same false image of the "AQMS" bar and image similar to the image above that was titled "six electrolyzers continuously producing AquaRefined pure lead, flowing like a waterfall": "**Our first facility is running from breaker to AquaRefining**. . . ."[42]

- Aqua Metals: "**We commenced initial battery breaking during December 2016 and progressed to regular single shift operation of the battery breaker in January 2017**."[43]

- Aqua Metals: 2016 Form 10-K reiterated the standard language about the successful testing of the AquaRefining process and added that this testing was based on the next step testing: "**In addition, in connection with the commissioning of our TRIC facility, we conducted limited operations at our TRIC facility through the processing of recycled lead through a single**

[39] February 14, 2017 FY 2016 Conference Call. Defendants Clarke and Murphy were participants on the call.

[40] February 14, 2017 FY 2016 Conference Call.

[41] February 14, 2017 FY 2016 Conference Call.

[42] February 14, 2017 Slide Presentation.

[43] March 2, 2017 2016 Form 10-K.

<center>120</center>

**AquaRefining module, and through our own on-site assay, we verified that the lead produced in the AquaRefining module is over 99.99 percent pure. During January 2017, we commenced the commercial scale production of recycled lead at our TRIC facility…. [W]e believe that our development, testing and limited production to date has proven the concept of our AquaRefining process**…."[44]

303.   The following are false and misleading statements in Spring of 2017 confirming that Aqua Metals had achieved the key milestone of having completed the transition to commercial operations producing AquaRefined lead and specific steps purportedly taken:

- At the Q1 2017 Conference call, defendant Clarke reiterated: "**the world's first AquaRefining facility located in McCarran, Nevada is now operating** and in revenue."[45]

- In the Q1 2017 Press Release, defendant Clarke reiterated: "**With the world's first AquaRefinery now in commercial operation** and generating revenue, we are aggressively scaling up operations and ramping our capacity to reach 120 metric tonnes per day by the end of 2017."[46]

- Defendant Clarke: "**So the breaking and separation is commissioned and operating**."[47]

- Defendant Clarke: "**The Aqua Preparation is the next step…. So that process is now operating. We are adding capacity to it and streamlining operations. AquaRefining itself, module 1 is operating, modules 2 to 4 are on-site and in startup mode and modules 5 to 16 are being updated to latest specifications and will be installed over the coming weeks and months**…."[48]

---

[44]   March 2, 2017 2016 Form 10-K.

[45]   May 9, 2017 Q1 2017 Press Release. Defendant Murphy was identified as the "Company Contact."

[46]   May 9, 2017 Q1 2017 Conference Call. Defendants Clarke and Murphy were participants on the call.

[47]   May 9, 2017 Q1 2017 Conference Call. *See also* May 9, 2017 Slide Presentation (Exhibit 99.2 to Form 8-K). The Form 8-K was signed by defendant Clarke.

[48]   May 9, 2017 Q1 2017 Conference Call. *See also* May 9, 2017 Slide Presentation (Exhibit 99.2 to Form 8-K). The Form 8-K was signed by defendant Clarke.

- Defendant Clarke: "But essentially [ph] where we are at now (28:03) is modules 5 to 16 are being assembled to the latest engineering standard, ingoting is being commissioned, **samples of pure lead from AquaRefining are being delivered** for acceptance testing to customers, ramp up and timing and retrofits of the delays and additional work have all been built into our cash flow planning, and we still contemplate to expand to 160 metric tonnes a day in 2018 and we're evaluating methods for doing that.…"[49]

- Aqua Metals' Q1 2017 and Q2 Forms 10-Q highlighted: "**We have completed the development of our [initial/first] LAB recycling facility at TRIC and commenced the commercial scale production of recycled lead during January 2017**."[50]

- Then in June 2017, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson highlighted that the Company is focused on commercial production as noted in its Company Presentation: "**samples of pure lead delivered for testing.**"[51]

- Company Presentation reprinting the same false image of the "AQMS" bar and image similar to the image above showing "six electrolyzers continuously producing AquaRefined pure lead, flowing like a waterfall": "**The World's first AquaRefinery is now in commercial production.**"[52]

- Aqua Metals: "**As of July, the Company had four AquaRefining modules commissioned and in operation.** The Company is currently in the process of scaling up AquaRefining operations to include 16 modules by the end of 2017."[53]

304. The bolded statements in ¶¶ 302-303, that the Company had completed the transition to commercial operations and produced AquaRefined lead from breaker to

---

49 May 9, 2017 Q1 2017 Conference Call.

50 May 10, 2017 Q1 2017 Form 10-Q. *See also* August 9, 2017 Q2 2017 Form 10-Q. Both the Q1 2017 Form 10-Q and Q2 2017 Form 10-Q were signed by defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

51 June 2017 Corporate Presentation at 10.

52 June 2017 Corporate Presentation at 4, 8, 20.

53 August 9, 2017 Q2 2017 Press Release. *See also* August 9, 2017 Q2 Conference Call. Defendants Clarke and Murphy were participants on the Q2 Conference Call.

AquaRefinery, were materially false and misleading when made because Aqua Metals (a) had not completed the commissioning of AquaRefining process; (b) had not started the commercialization of AquaRefining; (c) had not commenced commercial production of AquaRefined lead; and (d) was not producing pure lead from breaker to AquaRefining.

305.   The truth that the Company had not achieved these critical milestones is demonstrated by the Individual Defendants' own later admissions:

(i)     the admission at the end of and after the Relevant Period that the AquaRefining process was plagued with the on-going sticky lead problems and that the Company needed to find a solution to such problems and then test the solution, including its March 15, 2018 announcement that it needed to retrofit its modules to solve the problems (¶¶ 259, 267, 269).

(ii)    the admissions at the end of and after the Relevant Period that the AquaRefining process was "unproven technology" (¶¶ 263, 269);

(iii)   the admissions at the end of and after the Relevant Period that the Company had only ever "produced small quantities of AquaRefined lead" (¶ 258); and the Company had "not commenced the commercial production of AquaRefined lead" (¶ 263);

(iv)    the admission at the end of and after the Relevant Period that the Company had not started commercial production of AquaRefining during the Relevant Period, including (a) its October 2017 statement that it was still in the commissioning process even in Fall 2017 (¶¶ 259, 263); (b) the November 9, 2017 admission that, "[a]s of the date of this report, our commercial operations have involved the production of lead compounds and plastics from recycled LABs and we have not commenced the commercial production of AquaRefined lead" (¶ 263); and (c) the statement in the Company's 2017 Form 10-K filed on March 15, 2018 that "we have only recently completed, and have not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale…." (¶269(f));

(v)     the end of Relevant Period admission that the Company had not yet solved the problem that operators needed to assist the lead removal during the commission process (¶¶ 259, 267);

(vi)    the admission after the Relevant Period that the Company was still testing the modules (¶ 269);

(vii)    the March 5, 2018 admission that it was only just then that Aqua Metals had run its "first 24 hour run of continuous operation" (¶ 269(d));

(viii)   the June 11, 2018 announcement that the Company had only just cast its first block of AquaRefined lead that month (¶ 269(i)); and

(ix)     the August 8, 2018 admission that it was only "[d]uring the quarter [Q2 2018], we took the first step to move beyond 'proof of concept' and transitioned into commercialization" in Q2 2018" (¶ 269(j)).

**The Individual Defendants Issued False And Misleading Statements In May 2017 To Justify The Company's Failure To Generate Revenues**

306.    As highlighted in ¶¶208-223 above, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson admitted to *some* past operational problems in May 2017, presumably to justify why the Company had not produced or sold any AquaRefined Lead as projected that quarter. However, they falsely stated that these problems were resolved and maintained that the AquaRefining process was successful and proven to date. The following are the false and misleading statements that the Company had resolved these problems:

- Defendant Clarke: "So I'm just going to up now with some key takeaways. So I think you've got the theme now that preparation for large scale rollout is our priority. We believe that we have broken the back of the commissioning process. We have got some kinks to iron out, but **every single one of the processes that we need to operate is operating. Improvements that need to be in place are simple engineering improvements. We have proven that the process overall works**."[54]

- Defendant Clarke: "**The headline is its running and we are scaling output**. We started production in Q1 and we have started actually moving those into sales in Q2…. **[T]he breaking and separation is commissioned and operating.** The Aqua Preparation is the next step … so that process is now operating. We are adding capacity to it and streamlining operations. AquaRefining itself, module 1 is operating, modules 2 to 4 are on-site and in startup mode and modules 5 to 16 are being updated to latest specifications and will be installed over the coming weeks and months."[55]

---

[54] May 9, 2017 Q1 2017 Conference Call.

[55] May 9, 2017 Q1 2017 Conference Call

- During the Q2 2017 Conference call, defendant Clarke responded to a question about the short seller report: "And **as Tom said earlier it worked the first time we turn it on.** I mean you got to recognize that we actually - we put our second mortgages 401(k) and kids education for instance found in this business if this is a get rich quick scheme, please show me where I got rich. I haven't monetized anything from this, I have not sold a single share. And the reason we were happy to look our spouses in the eye and say, I am going to write another $100,000check tomorrow darling **because when we turned AquaRefining modules on they worked and they still do.**"[56]

- Defendant Clarke: "Going back to that point I made earlier, **AquaRefining works**. We've **got four modules operating** now. We expect to have 16 operating by the end of 2017. And before I go on, I want to just talk about that point that **we are now AquaRefining lead**…."[57]

- Defendant Clarke: "Then moving on last but certainly not least, **we now have AquaRefineries or four AquaRefining modules in operation**. And I think actually a better title for this slide would be **AquaRefining works in capital letters with a lot of exclamation marks. We are now AquaRefining lead. It's a first for our facility and it's a first for the world.**"[58]

- Defendant Murphy [in response to question asking why the short seller article doubting AquaRefining was "wrong"]: "Adding on to that Ben is, and just summarizing what Steve words said, **the reason the search will eventually go away and it may not be overnight unfortunately as this works. And why I am comfort level and we never leave because this works.**"[59]

307.    The bolded statements in ¶ 308 that, despite some issues disclosed in May 2017, they had resolved the issues and the AquaRefining process works and had worked from the time they turned the modules on, and that the breaking and separation process is operating, were materially false and misleading because neither the AquaRefining process nor the breaking and separation process worked and the problems identified above were not resolved.

---

[56] August 9, 2017 Q2 2017 Conference Call.

[57] August 9, 2017 Q2 2017 Conference Call.

[58] August 9, 2017 Q2 2017 Conference Call.

[59] August 9, 2017 Q2 2017 Conference Call.

308.    In truth, these problems persisted, which is further demonstrated by the Individual

Defendants' own later admissions:

(i)     the admission at the end of and after the Relevant Period that the
        AquaRefining process was plagued with the on-going sticky lead problems
        and that the Company needed to find a solution to such problems and then
        test the solution, including its March 15, 2018 announcement that it needed
        to retrofit its modules to solve the problems (¶¶ 259, 267, 269);

(ii)    the admissions at the end of and after the Relevant Period that the
        AquaRefining process was "unproven technology" (¶¶ 263, 269);

(iii)   the admissions at the end of and after the Relevant Period that the Company
        had only ever "produced small quantities of AquaRefined lead" (¶ 258); and
        the Company had "not commenced the commercial production of
        AquaRefined lead" (¶ 263);

(iv)    the admission at the end of and after the Relevant Period that the Company
        had not started commercial production of AquaRefining during the
        Relevant Period, including (a) its October 2017 statement that it was still in
        the commissioning process even in Fall 2017 (¶¶ 259, 263); (b) its
        November 9, 2017 admission that, "[a]s of the date of this report, our
        commercial operations have involved the production of lead compounds
        and plastics from recycled LABs and we have not commenced the
        commercial production of AquaRefined lead" (¶ 263); and (c) its statement
        in its 2017 Form 10-K filed on March 15, 2018 that "we have only recently
        completed, and have not put into operation, the processes that we believe
        will support the production of AquaRefined lead on a commercial scale…."
        (¶269(f));

(v)     the end of Relevant Period admission that the Company had not yet solved
        the problem that operators needed to assist the lead removal during the
        commission process (¶¶ 259, 267);

(vi)    the admission after the Relevant Period that the Company was still testing
        the modules. ¶269);

(vii)   the March 5, 2018 admission that it was only just then that Aqua Metals had
        run its "first 24 hour run of continuous operation" (¶ 269(d));

(viii)  the June 11, 2018 announcement that the Company had only just cast its
        first block of AquaRefined lead that month (¶ 269(i)); and

(ix)     the August 8, 2018 admission that it was only "[d]uring the quarter [Q2 2018], we took the first step to move beyond 'proof of concept' and transitioned into commercialization" in Q2 2018" (¶ 269(j)).

## THE INDIVIDUAL DEFENDANTS ISSUED FALSE AND MISLEADING STATEMENTS REGARDING SITE VISITS

### The Individual Defendants Made False and Misleading Statements Regarding Analyst and Investor Visits

309.    As noted above, after the April 20, 2017 short seller report, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson denounced the report and publicly invited investors and analysts to the Reno Plant to purportedly show them a behind-the-scenes look at the full production process of AquaRefining and thereby dispel the concerns raised in the short seller report. Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson also encouraged analysts and investors to report on their site visits. Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson also issued numerous false and misleading statements stating that they were providing transparent and open visits to allow analysts and investors to view the AquaRefining process and the Reno Plant in operation:

- Defendant Clarke: "We believe the best way to address this misinformation is to **openly show analysts and investors our facility in operation as we continue to scale it up**."[60]

- Aqua Metals: "The analysts were given a tour of AquaRefinery 1, located in the Tahoe-Reno Industrial Complex (TRIC), led by Aqua Metals' executive management team. **Analysts were able to view the critical processes at the AquaRefinery as they happened, including: battery feedstock deliveries; battery breaking and separation; desulfurization and pre-AquaRefining digestion processes; AquaRefining on simultaneously running AquaRefining modules; and shipments of lead products to customers**."[61]

---

[60] April 24, 2017 Press Release.

[61] May 31, 2017 Press Release.

- Defendant Clarke: "**We aim to be as transparent** as possible while protecting our IP, as we expand our operations and collaborate with new partners. **This was a valuable opportunity to open our doors to the analyst community, providing a behind-the-scenes look at our process**."[62]

- Aqua Metals: "The investors in attendance were given a tour of AquaRefinery 1, located in the Tahoe Reno Industrial Complex (TRIC), led by Aqua Metals' executive management team. **Investors were able to view the full production process at the AquaRefinery as it happened, including battery breaking and separation, desulfurization, electrolyte production, and AquaRefining on four simultaneously running AquaRefining modules**."[63]

- Defendant Clarke: "**This investor day speaks to our belief in transparency….**"[64]

- Aqua Metals: "**[Aqua Metals] [s]uccessfully hosted several invitational investor and analyst days at AquaRefinery 1** in late May and early August. **These events showcased the production process at the AquaRefinery, including battery feedstock deliveries, battery breaking and separation, desulfurization and pre-AquaRefining digestion processes and AquaRefining on four running AquaRefining modules**."[65]

- Defendant Clarke (in response to a question regarding the short-seller article): "**One of the other strands was that AquaRefining just doesn't work. Well we had – it was about 90 people through the facility watching it work now at some point, some of those 90 people will start communicating to the guys who are holding [] short positions and explaining actually it does work. We've shown videos of it working and I don't know, maybe the shorts are so upside down and buried in their own bubble of misbelieve they just can't get out now, I don't know. It makes no sense to me at all**."[66]

310.   The bolded statements in ¶ 309 were materially false and misleading when made

because the Individual Defendants were not showing visitors what was actually going on with

---

[62]   May 31, 2017 Press Release.

[63]   August 2, 2017 Press Release.

[64]   August 2, 2017 Press Release.

[65]   August 9, 2017 Q2 2017 Press Release.

[66]   August 9, 2017 Q2 2017 Conference Call. Defendants Clarke and Murphy participated on the call.

AquaRefining or at the Reno Plant because the AquaRefining process was malfunctioning and not operational and the site visits were carefully orchestrated demonstrations to conceal these pervasive problems.

311.   The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is demonstrated by:

(i)     The Individual Defendants' end of and post-Relevant Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 259, 267, 269); and

(ii)    The Individual Defendants' end of and post-Relevant Period admissions that the AquaRefining process was "unproven technology" (¶¶ 263, 269).

312.   In fact, rather than what defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson deceptively portrayed during the sham site visits, Aqua Metals had barely produced any pure lead. This fact is evidenced by:

(i)     the disclosures beginning on May 9, 2017, including that the Company had only "produced small quantities of AquaRefined lead" (¶ 258); and the Company had "not commenced the commercial production of AquaRefined lead" (¶ 263); and

(ii)    the admissions that, as of October 2017, the Company was still in the commissioning process (¶¶ 259, 263); as of March, 2017, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 269(f)); that it was not until June 11, 2018, well after the end of the Relevant Period, that the Company cast its first block of AquaRefined lead (¶ 269(i)); and it was not until August 8, 2018 that the Individual Defendants admitted they "took the first step to move beyond (i) 'proof of concept' and transitioned into commercialization" (¶269(j)).

**The Individual Defendants Endorsed and Adopted Affirmative Material Misrepresentations by Analysts and Investors**

313.   After attending the sham site visits and being encouraged by defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson to publicly report on them, analysts and investors issued the following affirmative statements which, because they were based on the sham dog and

pony shows orchestrated by defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson, were false and misleading:

- Aqua Metals, quoting Brett Conrad of Longboard Capital Advisors LLC: "**Our Aqua Metals plant tour was a real eye opener. The team has put in countless hours and expertise perfecting the first closed loop non-polluting leadrefining process. This is my third time visiting the plant and I'm very impressed with the accelerating progress in the commissioning process.**"[67]

- Oppenheimer: "We visited AQMS's Reno facility yesterday, **seeing the battery breaker, the separation process, sulfurization engaged, and the AquaRefining process all up and operational….We observed six semi truckloads of material delivered and taken away during our four-hour visit. We saw spent batteries loaded into the recycling line and being processed with fully recycled lead coming out of the end of the process flow. There appeared to be a week or more of spent batteries as inputs and finished goods inventory**."[68]

- National Securities Corporation: "**We came away seeing the progress that the company has made in the ramp up of the facility** and a clearer picture of the expansion plans. We believe that management plans to hold similar events in the coming months which we view as **incrementally positive for transparency** and for the sentiment on the shares.
**The Reno facility is ramping up, on track for 120 tonnes by year end.**

  **On our facility tour we observed that 3 Aqua refining modules were up and running and producing recycled lead. There was work being done assembling the fourth module and also equipment ready for the next set of modules to be built.** Improvements have already been made in the Aqua refining process that has been learned from the working of the first module and is being implemented in the fourth module from the start. **We believe that the company is on track for all sixteen modules to be up and running by the end of 2017**.

  **Lead is being produced and revenues are being generated**

  Given that Aqua Metals did not report any revenues in the March quarter, **we view that fact that we observed trucks delivering used batteries for offloading and recycling, and more importantly, finished recycled lead packaged and ready to be shipped out as highly encouraging. Given the**

---

[67] August 2, 2017 Press Release.
[68] June 1, 2017 Oppenheimer Report.

**amount of lead produced and our belief of what has already been sold, coupled with the throughput of the current modules for the month of June, we believe that our revenue estimate for the June quarter of $2 million is achievable**."[69]

- Euro Pacific Capital: "On May 31, 2017, we attended the Analyst Day hosted by Aqua Metals where we had an opportunity to see the facility and operations and meet with the management and operational team. **During our visit, we saw the entire process of lead production starting from the feedstock/lead acid batteries being loaded on the conveyor belt moving into the battery breaker system to the AquaRefining preparation process (desulphurization process) and to the AquaRefining modules, where the end product (AquaRefined lead) comes out at the end of the process. The key takeaway from the site visit was as the Company fixes the minor issues/modification to the equipment/process over the next few weeks, it should be able to produce guided quantities of lead by the end of this year**."[70]

- H.C. Wainwright & Co.: "We visited AQMS' TRIC facility on August 8, 2017, and were given a tour of the operations by the company's COO, Selwyn Mould. **We observed: 1) infrastructure to recycle lead batteries using the company's proprietary process is in place; 2) four modules were operational, producing recycled lead paste; 3) room to deploy 12 additional modules has been carved out in the setup; 4) there is adjacent available space to add another line of 16 modules; 5) the operational crew appears to be scaling the learning curve; 6) facilities were quite clean for a place where lead is recycled; and 7) technology and infrastructure deployed were fairly straightforward and should be easy to bolt on to, or lined up with, licensee infrastructure....after our site visit, we believe the solvent based lead recycling process can be scaled up and the company should be closer to full utilization levels beginning in 1Q18**."[71]

314.   The Individual Defendants are liable for these materially false and misleading statements because they endorsed and adopted these misrepresentations. As to the statement by Longboard Capital Advisors LLC, this is demonstrated by their express incorporation of the statement into the Aqua Metals press release. Further, as to that statement and all of the analyst

---

[69]   June 1, 2017 National Securities Corporation Report.

[70]   June 5, 2017 Euro Pacific Capital Report.

[71]   August 14, 2017 H.C. Wainwright & Co. Report.

statements above, the Individual Defendants' endorsement and adoption are demonstrated by (a) the public invitation to analysts and investors to the site visits made by defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson, *see, e.g.,* ¶¶ 206, 309 ("We believe the best way to address this misinformation is to openly show analysts and investors our facility in operation"); ¶¶ 219, 309 ("[W]e announced earlier on that we actually are doing some invitational site visits. So we have arranged an invitational for sell-side analysts in May that will take place in May… . We are arranging invitationals of buy-side analysts and investors which will occur in June and beyond"); (b) the orchestration of sham demonstrations by defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson that misled the visitors as alleged above; (c) the Individual Defendants' misrepresentations about the site visits detailed above; (d) the Individual Defendants' request and encouragement of analysts and others to publish reports on what they saw, *see, e.g.*, ¶¶ 219, 309 ("I believe the analysts want some time to prepare and publish"); ¶ 226 ("The Company expects all the analysts who attended the visitor day to update their coverage reports to reflect findings from the site visit in the coming days"); ¶¶ 219, 309 ("Well we had – it was about 90 people through the facility watching it work now at some point, some of those 90 people will start communicating to the guys who are holding [] short positions and explaining actually it does work"); and (e) the Individual Defendants' failure to correct any of the false and misleading statements.

315.    The bolded adopted and endorsed statements in ¶ 313 were materially false and misleading when made because defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson were not showing visitors what was actually going on with AquaRefining or at the Reno Plant as the AquaRefining process was malfunctioning and not operational, and the site visits were sham demonstrations carefully orchestrated to conceal these pervasive problems.

316.    The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is demonstrated by:

    (i)    the end of and post-Relevant Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 259, 267, 269); and

    (ii)    the end of and post-Relevant Period admissions that the AquaRefining process was "unproven technology" (¶¶ 263, 269).

317.    In fact, rather than what defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson deceptively portrayed during the sham site visits, Aqua Metals had barely produced any pure lead. This fact is evidenced by:

    (i)    the disclosures beginning on May 9, 2017, including that the Company had only "produced small quantities of AquaRefined lead" (¶ 258); and the Company had "not commenced the commercial production of AquaRefined lead" (¶ 263); and

    (ii)    the admissions that, as of October 2017, the Company was still in the commissioning process (¶¶ 269, 263); as of March, 2017, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 269(f)); that it was not until June 11, 2018, well after the end of the Relevant Period, that the Company cast its first block of AquaRefined lead (¶ 269(i)); and it was not until August 8, 2018 that the Individual Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 269(j)).

**Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson Issue Additional False and Misleading Statements Regarding Site Visits**

318.    Moreover, even beginning prior to the statements issued above, from the start of the Relevant Period through August 2017, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson issued additional false and misleading statements regarding site visits to both the California Testing Facilities and the Reno Plant as a way to show the AquaRefining process to industry participants, third-party licensees, investors and strategic partners:

- Defendant Clarke: "What we've added to that is a new **full-sized electrolyzed test facility, which allows us to demonstrate our process to third-party licenses without having to take into Reno [*sic*] to show the process there**."[72]

- Defendant Clarke: "So, the last couple of points, the battery industry, I mentioned earlier a **vast majority of the North American lead-acid battery industry has been on site now. It seemed what we've got the overwhelming response is wow, you guys really thought this through. Yet, yet – and we ticked all the boxes and even some companies have visited the site, wanting to find a problem and went away smiling and shaking our hands. So, basically, there is a real alternative to smelting**."[73]

- Aqua Metals: "**A substantial majority of U.S. battery producers have visited our facility and expressed interest in AquaRefining. … In July, the Company held a successful grand opening ceremony at its TRIC AquaRefinery which was attended by over 200 people**, including investors, strategic partners, industry participants, key employees and government officials. **The tour highlighted the installed equipment and processing lines**, while enabling discussions with key personnel about how the production facility and the supply chain will proceed."[74]

- Defendant Clarke: "We have also accelerated discussions with U.S. based leadacid battery manufacturers and distributors, who collectively represent a substantial majority of the U.S. battery industry. **Most have already visited our acility and expressed interest in our products and technology.** We are now sending our initial production samples to these companies, to allow them to conduct their own assays."[75]

- Defendant Murphy: The additional licensees coming from battery companies and lead companies, we see it as – **the level of interest on multiple site visits and observing processes in operation**….[76]

---

[72]    May 24, 2016 Q1 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

[73]    August 10, 2016 Q2 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

[74]    August 10, 2016 Q2 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[75]    November 7, 2016 Q3 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[76]    August 9, 2017 Q2 2017 Conference Call.

319.    The bolded statements in ¶ 318 were materially false and misleading when made because defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson were not showing visitors what was actually going on with AquaRefining, at the California Testing Facilities or at the Reno Plant, and that the AquaRefining process was malfunctioning and not operational and the issues at the test sites were expected to and did persist and worsen at the Reno Plant. These statements were also materially false and misleading when made because the site visits were sham demonstrations carefully orchestrated to conceal these pervasive problems.

320.    The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is demonstrated by:

(i)     The Individual Defendants' end of and post-Relevant Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 259, 267, 269); and

(ii)    The Individual Defendants' end of and post-Relevant Period admissions that the AquaRefining process was "unproven technology" (¶¶ 263, 269).

321.    In fact, rather than what defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson deceptively portrayed during the sham site visits, Aqua Metals had barely produced any pure lead. This fact is evidenced by:

(i)     the disclosures beginning on May 9, 2017, including that the Company had only "produced small quantities of AquaRefined lead" (¶ 258) and the Company had "not commenced the commercial production of AquaRefined lead" (¶ 263); and

(ii)    the admissions that, as of October 2017, the Company was still in the commissioning process (¶¶ 259, 263); as of March, 2017, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 269(f)); that it was not until June 11, 2018, well after the end of the Relevant Period, that the Company cast its first block of AquaRefined lead (¶ 269(i)) and it was not until August 8, 2018 that the Individual Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 269(j)).

**THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS CONCERNING THE "STRATEGIC PARTNERSHIPS" WITH INTERSTATE BATTERIES AND JOHNSON CONTROLS**

322.     Throughout the Relevant Period, the Individual Defendants issued materially false and misleading statements[77] announcing and touting "strategic partnerships" with Interstate Batteries and Johnson Controls, key players in the lead battery industry, and that these strategic partnerships validated that AquaRefining works and provided the Company what it needs to expand and to scale up.

**The Statements of Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson Touting That the Partnerships with Interstate Batteries and Johnson Controls Validate the AquaRefining Technology were Materially False and Misleading**

323.     Throughout the Relevant Period, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson issued materially false and misleading statements that the Interstate Batteries and Johnson Controls partnerships validated the AquaRefining technology:

- Defendant Clarke: "**We believe this [Interstate Batteries Partnership] serves as a strong validation of our technology**…."[78]

- Aqua Metals: "Aqua Metals, which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, today announced the signing of definitive agreements with Interstate Batteries…. 'Interstate Batteries seeks out innovation, pursues opportunities and invests in the technology we need to succeed not just today, but also tomorrow,' said Scott Miller, president and CEO of Interstate Batteries. 'Our focus is on the future of our industry and continued growth. **Aqua Metals' breakthrough technology** is a promising new way for recycling lead-acid batteries.' Aqua Metals' patent-pending AquaRefining process is an environmentally friendly electrochemical process for recycling lead-acid batteries. AquaRefining is a closed-loop, room temperature, water-based recycling method that is fundamentally non-polluting, yet able to yield nearly 100 percent lead recovery. 'With its forward-

---

[77]     Bolded statements are alleged to be false and misleading, while other statements are provided for context. To the extent the other statements are also alleged to be false and misleading, they will be included in the relevant falsity section herein.

[78]     May 24, 2016 Q1 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

thinking environmental goals, broad distribution network and strong brand name, Interstate Batteries is an ideal partner for us as we scale our business,' said Dr. Stephen Clarke, chairman and CEO of Aqua Metals."[79]

- Defendant Clarke: "And as you'll be aware, we made an announcement last week covering **the strategic relationship with Interstate Batteries. . . . . we see that as a pretty significant event and a pretty good endorsement of our business and what we're trying to achieve here.**"[80]

- Defendant Clarke: "So Interstate have agreed to supply more than a million automotive another lead-acid batteries as feedstock for our AquaRefining. They are making a strategic investment of approximately $10 million into the company and the details of that have been provided in the press release and in our filings.... And we believe it also **brings a huge amount [*sic*] of credibility to what we're trying to build**."[81]

- Defendant Clarke: "What I can say is that what's happened since then is that – and I think down to the commitment of Battery Systems **and, in particular, Interstate Batteries has driven a phenomenal level of credibility and interest in our technology.** So, we're now in pretty significant discussions with multiple additional strategic partners."[82]

-  "Aqua Metals Inc. CEO and co-founder Stephen Clarke sees a new partnership with **Johnson Controls International Plc as a 'massive vote of credibility' in his company's technology**.... Clarke said 'he expects to see a 'dramatic transformation' in revenue in the next two or three years.'"[83]

- Defendant Mould: "I think **Johnson Controls backing us is a great statement to the industry and to the world that aqua refining [*sic*] is the future.**"[84]

324.    The bolded statements in ¶ 323 were materially false and misleading when made

because the partnerships were not a strong validation of Aqua Metals' technology or endorsement

---

[79]    May 19, 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[80]    May 24, 2016 Q1 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

[81]    May 24, 2016 Q1 2016 Conference Call.

[82]    August 10, 2016 Q2 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

[83]    February 9, 2017 Bloomberg News Article.

[84]    February 10, 2017 KOLO News Article.

of Aqua Metals' business and did not did bring credibility to AquaRefining because the "partnerships" were based on the Individual Defendants' sham demonstrations that made the technology appear to be working, when in fact the technology was malfunctioning.

325. The fact that Interstate Batteries and Johnson Controls were subjected to sham demonstrations is demonstrated by:

> Defendant Clarke's May 24, 2016 statement that, "What we've added to that is a new fullsized electrolyzed test facility, which allows us to demonstrate our process to third-party licenses without having to take into Reno [*sic*] to show the process there" (¶ 116).

326. Further, despite repeatedly touting the relationships as a "strategic partnership," on the last day of the Relevant Period, the Individual Defendants admitted that the Company had not entered into any licensing, joint venture or strategic alliance agreements. ¶ 265. To date, the Company still has not entered into any licensing, joint venture or strategic alliance agreements. ¶ 266.

327. All of the above statements were also misleading by omission as they failed to disclose that the "partnerships" were the result of representatives from Interstate Batteries and Johnson Controls being subjected to the sham dog and pony shows orchestrated by defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson at both the California Testing Facility and the Reno Plant that concealed the pervasive issues with the AquaRefining technology and further failed to disclose that AquaRefining was not operational. Without a working technology, the partnerships were meaningless.

**The Statements of Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson Touting that the Partnerships with Interstate Batteries and Johnson Controls De-Risking Aqua Metals Ramp Up and Providing It What It Needs to Scale and Grow were Materially False and Misleading**

328. In addition to touting the strategic partnerships as validating the AquaRefining technology, throughout the Relevant Period, defendants Clarke, Murphy, Mould, DiVito, Slade

and Stevenson also issued materially false and misleading statements that the strategic partnerships de-risked Aqua Metals' ramp up and provided Aqua Metals with what they need to expand and scale up:

- Aqua Metals: "'With its forward-thinking environmental goals, broad distribution network and strong brand name, **Interstate Batteries is an ideal partner for us as we scale our business**,' said Dr. Stephen Clarke, chairman and CEO of Aqua Metals."[85]

- Aqua Metals: "**Johnson Controls and Aqua Metals Sign Break-through Battery Recycling Technology Partnership… 'Our partnership with Johnson Controls is a tremendous step forward and is an opportunity for us to work with the global leader in automotive battery manufacturing and responsible recycling**,' said Dr. Stephen Clarke, Chairman and CEO of Aqua Metals. 'We will build on this exciting relationship in order to enable clean and efficient battery recycling around the world.'"[86]

- Defendant Clarke: "our focus right now is that we have a strategic partner [Interstate Batteries] who is essentially looking towards to expand rapidly so that they can take advantage of lead produced that isn't subject to a smelter. So that's our entire focus and what it gives us is surety of not only supply of batteries, but of locations, **so it allows us to accelerate.** And as I said earlier, we talked a lot about our desire to build 10 facilities a year, which is a great statement, **but how do you validate and move towards the end, and this relationship provides us the pathway to do that**."[87]

- Defendant Clarke: "So now I'll talk to – address some of our first strategic relationships and I'm going to talk to the recently announced **strategic partnership with Interstate Batteries, and the whole point of this relationship is to accelerate growth**."[88]

- Defendant Clarke: "With the strategic relationships we have in place, we now **believe we can expand quickly with relatively low risk** whilst we control IP and quality…."[89]

---

[85] May 19, 2016 Press Release.

[86] February 9, 2017 Press Release.

[87] May 24, 2016 Q1 2016 Conference Call.

[88] May 24, 2016 Q1 2016 Conference Call.

[89] May 24, 2016 Q1 2016 Conference Call.

- Defendant Clarke: "**We're generating strong positive interest that's an understatement, we are generating massive interest in the market with supplies and customers as evidenced by our recent announcement [referring to the Interstate Batteries partnership]**,...."[90]

- Defendant Clarke: "**[Interstate Batteries] initial [audio gap] to provide a million batteries a year to help with our scale up**...."[91]

- Defendant Mould: "**Johnson Controls...is major for this facility. It allows us to build out the facility to its full capacity**."[92]

- Defendant Clarke: "**Our partnerships, most recently with Johnson Controls** – the global leader in automotive battery manufacturing and responsible recycling – **and Interstate Batteries** – the largest independent battery distribution system in North America and the country's leading battery recycler. – and Battery Systems Inc. – one of the largest independent battery distributors in the U.S. **effectively rounds out a sustainable ecosystem for the automotive lead acid battery industry and provides a level of supply and off-take to support our expansion of AquaRefinery 1 and the construction of additional facilities**."[93]

- Defendant Clarke: "If you take what we've got with Interstate Batteries and Battery Systems, Inc., and then layer on top the demand and supply and off-take with JCI, **it gives us everything that we need scale from 160 tonnes to 800 tonnes a day**."[94]

- Defendant Clarke: "Well, we have been working on this agreement with JCI for a number of months now. And looking at the tolling/lead purchase agreement, I alluded to this a moment ago, it pretty much gives us all the supply. **Together with our relationships with Interstate Batteries and Battery Systems Inc.,**

---

[90] May 24, 2016 Q1 2016 Conference Call.

[91] August 10, 2016 Q2 2016 Conference Call.

[92] February 10, 2017 KOLO News Article.

[93] February 14, 2017 FY 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[94] February 14, 2017 FY 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

**we believe we have secured sufficient supply and off-take to underpin our growth from 160 to 800T/day in North America.**"[95]

- Defendant Clarke: "**But more importantly, [the JCI partnership] it transitions us to the start of a really exciting new phase of the company, which is licensing**…."[96]

- Defendant Clarke: "Another headline that I'm going to talk about is obviously our agreement with Johnson Control. And that really has two key aspects for us that we want to talk about. The first one is that **it provides the feed and off take for the additional facilities that we've been talking about for the past two years. It fills AquaRefinery long-term capacity and it moves us forward in the additional AquaRefineries that we want to build on and upgrade ourselves**."[97]

- Aqua Metals: "Through our relationships with Battery Systems Inc., Interstate Battery System International, Inc., and Johnson Controls, we believe **we are now able to pursue our expansion of our directly-owned recycling U.S. subject to our receipt of necessary funding**."[98]

- Defendant Clarke: "**Strategic partners [Interstate Batteries and Johnson Controls] brought scale and urgency. They de-risked our ramp up, they provided stability for efficient scale up and the planning of efficient scale up, and allowed for a more aggressive build-out**."[99]

- Aqua Metals: "**Strategic relationships helped de-risk our start-up**…"[100]

---

[95] February 14, 2017 FY 2016 Conference Call.

[96] February 14, 2017 FY 2016 Conference Call.

[97] February 14, 2017 FY 2016 Conference Call.

[98] March 2, 2017 2016 Form 10-K. The 2016 Form 10-K was signed by defendants Clarke, Murphy, DiVito, Slade and Stevenson and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[99] May 9, 2017 Q1 2017 Conference Call. Defendants Clarke and Murphy participated on the call.

[100] May 9, 2017 Slide Presentation, attached as Exhibit 99.2 to the Company's May 9, 2017 Form 8-K. The Form 8-K was signed by defendant Clarke.

- Aqua Metals: "**Strategic partners brought scale and urgency**:

  o **De-risked our ramp-up**
  o **Provided stability for efficient scale-up**
  o **Allows for more aggressive build out**"[101]

329.    The bolded affirmative statements in ¶ 328 were materially false and misleading when made because neither "partnership" had the ability to accelerate or support Aqua Metals' growth, scale up, build out or expansion, allow Aqua Metals to build out to full capacity; transition the Company to licensing; or de-risk its ramp-up because the technology was malfunctioning and not operational. Without a working technology none of this could happen.

330.    The truth of the fact that the technology was malfunctioning is demonstrated by the Individual Defendants' end of and post-Relevant Period admissions:

(i)    regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 259, 267, 269);

(ii)    that the AquaRefining process was "unproven technology" (¶¶ 263, 269); and

(iii)    even as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 269(f)); and (iv) not until August 8, 2018 had they "t[aken] the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 269(j)).

331.    All of the above statements were also misleading by omission as they failed to disclose that the "partnerships" were the result of representatives from Interstate Batteries and Johnson Controls being subjected to the sham dog and pony shows orchestrated by defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson at both the California Testing Facility and the Reno Plant that concealed the pervasive issues with the AquaRefining technology and further

---

[101] June 2017 Corporate Presentation.

failed to disclose that AquaRefining was not operational. Without a working technology, the partnerships were meaningless.

332.    The fact that Interstate Batteries and Johnson Controls were subjected to sham demonstrations is demonstrated by:

> Clarke's May 24, 2016 statement that, "What we've added to that is a new fullsized electrolyzed test facility, which allows us to demonstrate our process to third-party licenses without having to take into Reno [*sic*] to show the process there" (¶ 116), suggesting that the demonstrations at the California Testing Facilities before the Reno Plant opened were also shams.

> **The Individual Defendants' Statements Regarding the Retrofitting of a Johnson Controls Facility were Materially False and Misleading**

333.    The Individual Defendants also issued materially false and misleading statements concerning the development program agreement with Johnson Controls and retrofitting of a Johnson Controls' facility:

- Aqua Metals: "**Equipment licensing has started: Working with JCI to plan the retrofit of an existing facility, as the blueprint for others**."[102]

- Defendant Clarke: "…securing non-dilutive financing to accommodate our growth **and finalizing our plan to retrofit a to-be-named recycling facility with our strategic partner in 2018**."[103]

- Aqua Metals: "AquaRefinery 1 is ramping towards a total production output of 120 metric tonnes of lead products per day by the end of 2017. **Aqua Metals is currently also working on… integrating AquaRefining into a to-be-named existing lead smelter with its strategic partner, Johnson Controls**."[104]

---

[102] May 9, 2017 Slide Presentation.

[103] May 9, 2017 Q1 2017 Press Release. Defendant Murphy was identified as the "Company Contact."

[104] May 31, 2017 Press Release.

- Aqua Metals: "Aqua Metals is currently also working on plans to . . . **integrat[e] AquaRefining into a 'to-be-named' existing lead smelter with its strategic partner, Johnson Controls**."[105]

- Aqua Metals: "**[W]e delivered to Johnson Controls written notice our readiness to commence discussions to convert or retrofit a Johnson Controls facility to be capable of using AquaRefining to produce lead**."[106]

334.    The bolded statements in ¶ 333 were materially false and misleading when made because the AquaRefining technology was malfunctioning and Aqua Metals could not get AquaRefining or the Reno Plant to function; thus, Aqua Metals was not in a position to retrofit or convert third-party facilities throughout the Relevant Period.

335.    The truth of the fact that the technology was malfunctioning is demonstrated by the Individual Defendants' end of and post-Relevant Period admissions:

   (i)     regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 259, 267, 279);

   (ii)    that the AquaRefining process was "unproven technology" (¶¶ 263, 269); and

   (iii)   even as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 269(f)); and (iv) not until August 8, 2018 had they "t[aken] the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 269(j)).

336.    All of the above statements were also misleading by omission as they failed to disclose that the "partnership" was the result of representatives from Johnson Controls being subjected to the sham dog and pony shows orchestrated by defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson at both the California Testing Facility and the Reno Plant that concealed the pervasive issues with the AquaRefining technology and further failed to disclose

---

[105] August 2, 2017 Press Release.

[106] September 28, 2017 Form 8-K. The Form 8-K was signed by defendant Clarke.

that AquaRefining was not operational. Without a working technology, the partnership was meaningless.

337.     The fact that Johnson Controls were subjected to sham demonstrations is demonstrated by:

> Defendant Clarke's May 24, 2016 statement that, "What we've added to that is a new fullsized electrolyzed test facility, which allows us to demonstrate our process to third-party licenses without having to take into Reno [*sic*] to show the process there" (¶ 116), suggesting that the demonstrations at the California Testing Facilities before the Reno Plant opened were also shams

**THE INDIVIDUAL DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS CONCERNING LICENSING**

338.     Throughout the Relevant Period, the Individual Defendants issued materially false and misleading statements[107] representing that they were working on the licensing of AquaRefining technology to third parties despite the fact that the Company was not in a position to do so as the technology did not work:

339.     As outlined below, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson issued materially false and misleading statements concerning the Company's licensing efforts:

- Defendant Clarke: "So, on that basis, with both the U.S. and non-U.S. licensing rollout, what we said to the interested parties is that we're not going to – **we don't plan to ship any modules until quarter three of 2017 not because we can't, but we just think it's prudent to have got six to seven months of operating experience under our belt before we do that**."[108]

---

[107] **Bolded** statements are alleged to be false and misleading, while other statements are provided for context.

[108] August 10, 2016 Q2 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

- Aqua Metals: "**Providing AquaRefining technology and equipment on a fully serviced licensing model is the next stage of the Company's business strategy. The first module deliveries to third parties are expected in 2017**."[109]

- Defendant Clarke: "**we expect to start shipping licensed AquaRefining equipment during 2017**."[110]

- Tailwinds Question: "[S]ince in 2017 you only have the one facility up and running. Now you have the opportunity to revolutionize a whole industry that is $22 billion in size. **Now that you've got one facility running** I'm guessing your licensing partners must be highly interested in what's going on. Can you give us a little update on where you stand on the licensing side right now?"

- Defendant Clarke's Response: "So looking forward, one of the things that we expected was that **we'd need to be running for six months to maybe even twelve months before we moved ahead** . . . broke out into licensing our equipment to third parties. You know **we're confident that we'll be announcing some licensing deals within quarter 1 of next year and planning a very accelerated roll out**."[111]

340.    The bolded statements in ¶ 339 contained the following misstatements: (a) that Aqua Metals did not plan to ship until Q3 2017 "not because we can't"; (b) Tailwind's uncorrected statement that Aqua Metals has "got one facility running;" and (c) that defendant Clarke was "confident that we'll be announcing some licensing deals within quarter 1 of next year." It was also false and misleading for the Individual Defendants to represent that Aqua Metals plans and expects to begin licensing and shipping licensed equipment in 2017.

---

[109] November 7, 2016 Q3 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[110] November 7, 2016 Q3 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

[111] December 22, 2016 Clarke Interview with Tailwinds.

341.    These statements were materially false and misleading when made because Aqua
Metals was never in a position to license AquaRefining to third parties during the Relevant Period
because AquaRefining was malfunctioning and not operational throughout the Relevant Period
and the interest from potential licensees was generated through the dog and pony shows
orchestrated by defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson.

342.    The following statements regarding the Company's licensing efforts were also false
and misleading:

- Aqua Metals: "Providing AquaRefining technology and equipment on a fully
  serviced licensing model is the next stage of the Company's duel business
  model**, and the first module deliveries to third parties are expected in the
  third quarter of 2017**."[112]

- Aqua Metals: "Company Highlights: ….

   o **Providing AquaRefining technology and equipment on a
      serviced licensing model, which is expected to commence in
      2017**"[113]

- Aqua Metals issued nearly identical statements between November 7, 2016
  through August 9, 2017: "**Our plan of operations for the 12-month period
  following the date of this report is to . . . [begin to expand/expansion of] our
  business with . . . licensing of our recycling technology and equipment to
  third parties**." [114]

---

[112] August 10, 2016 Q2 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[113] November 7, 2016 Q3 2016 Press Release.

[114] November 7, 2016 Q3 2016 Form 10-Q; March 2, 2017 2016 Form 10-K; August 9, 2017 Q2 2017 Form 10-Q. The Form 10-Qs were signed by defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy. The 2016 Form 10-K was signed by defendants Clarke, Murphy, DiVito, Slade and Stevenson and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

343.     These statements were materially false and misleading when made because Aqua Metals was never in a position to license AquaRefining to third parties throughout the Relevant Period, because AquaRefining was malfunctioning and not operational throughout the Relevant Period and the interest from potential licensees was generated through the dog and pony shows orchestrated by defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson.

**THE INDIVIDUAL DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS CONCERNING LEAD PRODUCTION RATES**

344.     Throughout the Relevant Period, the Individual Defendants made numerous false and misleading statements touting Aqua Metals' recycled lead production capacity and projected production rates.[115]

345.     Beginning in November 2016, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson repeatedly issued affirmative false and misleading statements that they had the current capacity to produce at least 120 tons of AquaRefined lead per day:

- Defendant Clarke: "The second bullet point here is that and I've mentioned before, we want to build up to 800 tonnes a day of our own lead recycling capacity and **with 120 under our belt,** we're looking to expand into the remainder. . . . **To put that in perspective, the AquaRefinery that we've built at Tahoe Reno Industrial Complex has currently got a capacity of 120 tonnes a day…**"[116]

---

[115] **Bolded** statements are alleged to be false and misleading, while other statements are provided for context. To the extent the other statements are also alleged to be false and misleading, they will be included in the relevant section herein.

[116] November 7, 2016 Q3 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

- Aqua Metals: "Additionally, **we have implemented process and other improvements which have increased the capacity of the TRIC facility to 120 tonnes per day**."[117]

- Defendant Clarke [responding to analyst question about increase from 80 tons to 120 tons]: "So, first question. Yes, it's something that we considered might be possible early on. **We wanted to make sure we could do it, before we told anybody. It is a theme here of make sure you can do it before you tell anybody is kind of key within the company**. So, we thought we might be able do it. As we built the facility, as we bought staff on with expertise in operating the various systems, **we started to test that idea and found out we could, then we validated it and then we did**. So, it was kind of a gradual process, but there is a thought that we might be able to do it from the beginning."[118]

- Aqua Metals: "During late 2016, we implemented upgrades to the facility that have **resulted in an initial production capacity of 120 metric tons per day** of lead based products."[119]

- Defendant Clarke: "So, the – in it – what we're saying is, and we mentioned this at the last earnings call, the original four-shift capacity of the plant was 80 tonnes a day, and **we figured out how to expand that to 120 tonnes a day with the equipment we had onsite. 120 tonnes a day is our four-shift capacity**."[120]

---

[117] November 7, 2016 Q3 2016 Form 10-Q. The November 7, 2016 Q3 2016 Form 10-Q was signed by defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[118] November 7, 2016 Q3 Conference Call.

[119] March 2, 2017, 2016 Form 10-K. The 2016 Form 10-K was signed by defendants Clarke, Murphy, DiVito, Slade and Stevenson and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[120] February 14, 2017 FY 2016 Conference Call. Defendants Clarke and Murphy were participants on the call.

- Defendant Clarke: "**So, AquaRefinery, number one at Tahoe-Reno Industrial Complex is starting out with a plant capacity of 120 tonnes of lead per day**."[121]

- Aqua Metals: "We have implemented numerous process improvements and expect to be capable of producing significantly more than 120 metric tonnes of recycled lead per day by the end of 2017. This is more battery processing capacity than we can utilize with 16 AquaRefining modules. As such, until we have increased our AquaRefining capacity, we will have the option of producing lead compounds from un-used AquaRefining feedstock. The lead compounds have a less established market and some demand uncertainty. **For this reason, following the commission of all 16 modules, we may choose to run TRIC at less than 120 tonnes per day, should this provide for a more optimal product mix**."[122]

- Defendant Clarke: "**So it's all about AquaRefining but optimal product mix and profitability. We're focused on running all of our AquaRefining modules to the maximum benefit. And that means that we may choose to operate the overall facility with an output of less than 120 tons a day, but with maximized AquaRefining. And we're looking to change our product mix to a higher level of AquaRefining product**."[123]

346.    The bolded statements in ¶ 345 were materially false and misleading when made because at no point during the Relevant Period did Aqua Metals have the capacity to produce "120 tons a day" of AquaRefined lead as the AquaRefining process was malfunctioning and not operational and these problems remained unresolved throughout the Relevant Period and AquaRefining could barely produce *any* AquaRefined lead during the Relevant Period. Thus, the Company did not have 120 tons of production per day "under [its] belt" or the capacity to produce

---

[121] February 14, 2017 FY 2016 Conference Call.

[122] August 9, 2017 Q2 2017 Form 10-Q. The Q2 2017 Form 10-Q was signed by defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[123] August 9, 2017 Q2 2017 Conference Call. Defendants Clarke and Murphy participated on the call.

120 tons, nor did the Individual Defendants ever "choose" to operate the Reno Plant at less than 120 tons of lead production per day.

347. The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is demonstrated by:

(i) the end of and post-Relevant Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 259, 267, 269);

(ii) the end of and post-Relevant Period admissions that the AquaRefining process was "unproven technology" (¶¶ 263); and

(iii) the end of and post-Relevant Period admissions that the Company was still in the commissioning process even in Fall 2017 (¶¶ 259-260); as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 269(f)); and that it was not until August 8, 2018 that the Individual Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 269(j)).

348. The truth that Aqua Metals had not met the touted capacity and barely produced any AquaRefined lead throughout the Relevant Period is also demonstrated by:

(i) the disclosure at the end of the Relevant Period that the Company had only "produced small quantities of AquaRefined lead" (¶ 258); and

(ii) the end of and post-Relevant Period admissions that it was not until June 11, 2018, well after the end of the Relevant Period, that the Company cast its first block of AquaRefined lead (¶ 269(i)) and that as of October 12, 2018, Aqua Metals was only generating "daily production of 2+ metric tons of AquaRefined lead per day on those individual modules" (¶ 269(k))

349. Before the Reno Plant opened, defendants Clarke, Murphy, Mould, DiVito and Slade made the following similar statements regarding production rates of 80 tons per day by the end of 2016 and expanding to 160 tons per day thereafter:

- Aqua Metals: "Consequently, **we have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day. Our TRIC facility is designed and is being constructed in order to accommodate a**

**total of 32 AquaRefining modules and additional battery breaking and
component separations equipment sufficient to support expansion to 160
tons of recycled lead per day**."[124]

- Aqua Metals: "[Aqua Metals expected to install modules at the Reno Plant] to
  support **an initial lead production capacity of 80 tons per day by the close
  of the third quarter of 2016**."[125]

- Defendant Clarke: "**Our plan remains to increase production to 80 metric
  tons of lead per day by the end of 2016.**"[126]

- Defendant Clarke: "So **we still remain on track to achieve 80 metric tons of
  lead per day output by the end of 2016 and on track to expand that to 160
  metric tons per day by 2018**."[127]

350.   These bolded statements in ¶ 349 contained misstatements of present fact. The
present facts contained in the statements include that they "have implemented a plan," "have a
plan," and were "on track" to achieve 80 tons and 160 tons of production and that the equipment
is "sufficient to support" such production levels. These were statements of current existing
conditions and focus of the Company. The forward-looking portion of these bolded statements
above are those that refer to producing 80 tons of lead by fourth quarter/end of 2016 and to
expanding production to 160 tons.

351.   Both the statements of actual fact and the forward looking portions were materially
false and misleading when made because no number of modules would support these production

---

[124] May 19, 2016 Q1 2016 Form 10-Q. The Q1 2016 Form 10-Q was signed by Defendants Clarke
and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[125] May 19, 2016 Q1 2016 Form 10-Q.

[126] May 24, 2016 Q1 2016 Press Release. Defendant Murphy was identified as the "Company
Contact."

[127] May 24, 2016 Q1 2016 Conference Call. Defendants Clarke and Murphy participated on the
call.

numbers and there was no plan or reasonable basis for production of 80 tons, let alone 160 tons, because AquaRefining could not produce such levels of AquaRefined lead and, in fact, AquaRefining was malfunctioning throughout the Relevant Period and could barely produce *any* AquaRefined lead during the Relevant Period.

352.    The truth that the AquaRefining technology was malfunctioning and never proven is demonstrated by:

(i)     the end of and post-Relevant Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 259, 267, 269);

(ii)    the end of and post-Relevant Period admissions that the AquaRefining process was "unproven technology" (¶¶ 263); and

(iii)   the end of and post-Relevant Period admissions that it was still in the commissioning process even in Fall 2017 (¶¶ 259-260); as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 269(f)); and that it was not until August 8, 2018 that the Individual Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" ( ¶ 269(j)).

353.    After the Reno Plant opened, defendants Clarke, Murphy, Mould, DiVito and Slade continued to make statements regarding production rates of 80 tons per day by the end of 2016 and expanding to 160 tons per day:

• Defendant Clarke: "So, basically, the world's first AquaRefinery is now opening for business. **As we've said before, it's planned to be 160 tons of lead produced per day. It's going to start with 80 tons a day of lead output by Q4 2016 and then have a 160 tons of lead output by 2018**."[128]

---

[128] August 10, 2016 Q2 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

- Aqua Metals: "**Lead production projected to scale quickly during the fourth quarter, reaching 80 metric tons per day by the end of 2016.**"[129]

- Defendant Clarke: "We're quickly approaching a meaningful inflection as we bring our first facility online and **begin producing lead** early in the fourth quarter of 2016. **Most importantly, we remain on track to reach full scale capacity of 80 metric tons of lead output per day by the end of 2016**."[130]

- Aqua Metals: "**[W]e have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day**."[131]

- Aqua Metals: "We began installing our first AquaRefining modules in June 2016 and **expect** to install a total of 16 AquaRefining modules **to support an initial lead production capacity of 80 tons per day by the close of the fourth quarter of 2016**."[132]

- Defendant Clarke [referring to presentation slide below]: "And so, in terms of the time line, we broke it out to August, September, October through the end of the year…. **But that's our plan, and we're on schedule for it**. We are – we've got most of – well, **we've got all of it. . . . .So, by the beginning of November, we're targeting to be at somewhere around 20 tons a day of lead production, while the beginning of December to be at 40 tons a day of lead production and by the end of the year at 80 tons of lead production.**"[133]

---

[129] August 10, 2016 Q2 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[130] August 10, 2016 Q2 2016 Press Release.

[131] August 10, 2016 Q2 2016 Form 10-Q. The Q2 2016 Form 10-Q was signed by defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[132] August 10, 2016 Q2 2016 Form 10-Q.

[133] August 10, 2016 Q2 2016 Conference Call.



- Defendant Clarke: "In that, we plan to expand the Tahoe Reno facility to 160 **tons a day by 2018**."[134]

- Aqua Metals: "The Company has built and delivered a total of five modules to its Nevada AquaRefinery thus far and currently plans to install and commission a total of 16 modules **for initial production capacity of 80 metric tons of lead per day. The Company anticipates that the Nevada AquaRefinery will reach its initial production capacity within the coming months**."[135]

354.    The bolded statements in ¶ 353 contained affirmative statements of present fact. The present facts contained in this statement are that they "have implemented a plan," are "on schedule" for their plan, were currently "on track," to reach full scale capacity of 80 tons and then 160 tons, and that the modules can "support" those levels of production and "expect to scale quickly." These were statements of current existing conditions and focus of the Company. The forward-looking portion of this statement refers to producing 20 tons in November, 40 tons by the end of the year, 80 tons of lead per day by the end of 2016, and expanding to 120 tons, and then 160 tons.

---

[134] August 10, 2016 Q2 2016 Conference Call.

[135] November 1, 2016 Press Release. Exhibit 99.1 to Form 8-K. The Form 8-K was signed by defendant Clarke.

355.    Both the statements of actual fact and the forward looking statements were materially false and misleading when made because there was no plan or basis for production of even 20 tons, let alone an expansion of production, because AquaRefining could not produce such levels of AquaRefined lead and, in fact, AquaRefining was malfunctioning throughout the Relevant Period and could barely produce *any* AquaRefined lead during the Relevant Period.

356.    The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is demonstrated by:

(i)     the end of and post-Relevant Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 259, 267, 269);

(ii)    the end of -Relevant Period admissions that the AquaRefining process was "unproven technology" (¶¶ 263); and

(iii)   the end of and post-Relevant Period admissions that it was still in the commissioning process even in Fall 2017 (¶¶ 259-260); as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶ 269(f)); and that it was not until August 8, 2018 that Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 269(j)).

357.    The truth that Aqua Metals barely produced any AquaRefined lead throughout the Relevant Period is demonstrated by:

(i)     the disclosure at the end of the Relevant Period that the Company had only "produced small quantities of AquaRefined lead" (¶ 258); and

(ii)    the end of and post-Relevant Period admissions that it was not until June 11, 2018, well after the end of the Relevant Period that the Company cast its first block of AquaRefined lead (¶ 269(i)) and as of October 12, 2018, Aqua Metals was only generating "daily production of 2+ metric tons of AquaRefined lead per day on those individual modules" (¶ 269(k)).

358.    Additionally, none of Aqua Metals' risk disclosures mention production rates nor do they warn against or disclose the known and pervasive issues with the AquaRefining technology that rendered it incapable of the touted production rates.

359.    At the end of 2016 and early 2017, having not achieved 1 ton of AquaRefined lead, much less the 80 tons, per day of AquaRefined lead that had been touted would be produced by the end of 2016, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson *increased* the Company's production rates to 120 tons per day in early 2017 and 160 tons per day in 2018. In addition to their affirmative statements above that they had the capacity for 120 tons per day, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson also stated:

- Aqua Metals: "Additionally, we have implemented process and other improvements which have increased the capacity of the TRIC facility to 120 tonnes per day. **We expect to achieve a production rate of 120 tonnes per day early in 2017**."[136]

- Aqua Metals: "**Our plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day**. . . ."[137]

- Aqua Metals: "Our TRIC facility is designed to accommodate additional AquaRefining modules and has battery breaking and component separations equipment **sufficient to support expansion to 160 tonnes of recycled lead per day**."[138]

- Aqua Metals: "**Our goal is to increase our production of lead at our TRIC facility to 160 tonnes per day by 2018**."[139]

---

[136] November 7, 2016 Q3 2016 Form 10-Q.

[137] November 7, 2016 Q3 2016 Form 10-Q.

[138] November 7, 2016 Q3 2016 Form 10-Q.

[139] November 7, 2016 Q3 2016 Form 10-Q.

- Aqua Metals: "While working to bring the AquaRefinery online, we incorporated several process and other improvements, and consequently**, we now expect to ramp to a capacity of 120 T/day in early 2017,** which will provide greater revenue and earnings potential."[140]

- Aqua Metals: "Due to process and other improvements, **the Company expects to reach initial capacity of 120 T/day in early 2017, representing a 50% increase to the previously announced capacity of 80 T/day of lead output. Aqua Metals plans to expand to 160 metric tons of lead per day at the TRIC AquaRefinery in 2018.** The facility was specifically designed to enable this expansion."[141]

- Aqua Metals: "**Determined that when fully commissioned, the TRIC facility will have the capacity to produce 120 metric tons per day (T/day) of lead; a 50% improvement over the previously announced 80 T/day capacity**…"[142]

- Defendant Clarke: "And **we expect to expand our capacity to 120 tonnes a day in early 2017**."[143]

- Defendant Clarke: "**[W]e're going to expand [production] to 160 tonnes a day**."[144]

- Defendant Clarke: "And what we'd been able to do is actually achieve the ability to de-link those processes. That's given us a large degree of flexibility in how we operate the plant. **And it allows us to actually release additional capacity that gets us to that 120 tonnes a day**."[145]

---

[140] November 7, 2016 Q3 2016 Press Release.

[141] November 7, 2016 Q3 2016 Press Release.

[142] November 7, 2016 Q3 2016 Press Release.

[143] November 7, 2016 Q3 2016 Conference Call.

[144] November 7, 2016 Q3 2016 Conference Call.

[145] November 7, 2016 Q3 2016 Conference Call.

- Defendant Clarke [responding to analyst question about increase from 80 tons to 120 tons]: "**Is there an opportunity to expand beyond that, never say never, but we think 120 tonne to 160 tonne is optimal for that particular site**."[146]

- Danial Carlson of Tailwinds: "So it appears your on pace to be running at full volume in the not too distant future and you've recently announced that volumes from your Tahoe facility will be greater than originally anticipated. Can you provide us with a little more details around the volumes here?"
  Defendant Clarke: **We announced the earnings call that we are able to get better use out of the equipment on site so that we are not starting at 80 tons a day. We are starting actually starting at 120 tons and we are expecting to be able to quickly take that to 160 tons a day in the second half of next year**.[147]

- Aqua Metals: "**Expanded potential capacity to 120T/day**."[148]

- Defendant Clarke: "**We've mentioned in the last earnings call that we have expanded that potential capacity from 80 tonnes to 120 tonnes a day. And we're now looking at expanding from 120 tonnes to 160 tonnes a day**."[149]

- Defendant Clarke: "And **we're expecting to expand that to 160 tonnes a day.** To do that will require 32 AquaRefining modules."[150]

- Aqua Metals: "**Our plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to**

---

[146] November 7, 2016 Q3 2016 Conference Call.

[147] Interview by Daniel Carlson with Stephen Clarke, Chairman and CEO of Aqua Metals, Tailwinds Research Group (Dec. 22, 2016), https://tailwindsresearch.com/2016/12/aqua-metals-ceo-interview/.

[148] February 14, 2017 Slide Presentation (Ex. 99.2 to Form 8-K). Defendant Clarke signed the Form 8-K.

[149] February 14, 2017 FY 2016 Conference Call.

[150] February 14, 2017 FY 2016 Conference Call.

**120 tonnes of lead production per day. In the longer term, our goal is to increase our production of lead at our TRIC facility to 160 tonnes per day**."[151]

- Aqua Metals: "**Our facility is designed to accommodate additional AquaRefining modules to support expansion to 160 tonnes of lead products per day**."[152]

360.   The bolded mixed statements in ¶ 359 contained affirmative statements of present fact. The present facts contained in this statement are that they have a "plan" and a "goal," are "on track," can "expand" their capacity and that the modules are sufficient to "support" production of 120 tons per day and then 160 tons, and were able to "ramp[] production." These were statements of current existing conditions and focus of the Company. The forward-looking portion of these statements refers to producing 20 tons in November, 40 tons by the end of the year, 80 tons of lead per day by the end of 2016, and expanding to 120 tons in early 2017, and then 160 tons.

361.   Both the statements of actual fact and the forward looking statements were materially false and misleading when made because there was no plan or basis for production of even 20 tons, let alone an expansion of production because AquaRefining could not produce such levels of AquaRefined lead, and, in fact, AquaRefining was malfunctioning throughout the Relevant Period and could barely produce *any* AquaRefined lead during the Relevant Period.

362.   The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is demonstrated by:

(i)      the end of and post-Relevant Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 259, 267, 269);

(ii)     the end of -Relevant Period admissions that the AquaRefining process was "unproven technology" (¶¶ 263); and

---

[151] March 2, 2017 Form 10-K.

[152] March 2, 2017 Form 10-K.

      (iii)    the end of and post-Relevant Period admissions that the Company was still in the commissioning process even in Fall 2017 (¶¶ 259-260); as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶ 269(f)); and that it was not until August 8, 2018 that the Individual Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 269(j)).

363.    The truth that Aqua Metals barely produced any AquaRefined lead throughout the Relevant Period is demonstrated by:

      (i)    the disclosure at the end of the Relevant Period that the Company had only "produced small quantities of AquaRefined lead" (¶ 258); and

      (ii)    the end of and post-Relevant Period admissions that it was not until June 11, 2018, well after the end of the Relevant Period that the Company cast its first block of AquaRefined lead (¶ 269(i)) and October 12, 2018, Defendants were only generating "daily production of 2+ metric tons of AquaRefined lead per day on those individual modules." (¶ 269(k)).

364.    In mid-2017, having not achieved 1 ton of AquaRefined lead, much less the touted 120 tons per day of AquaRefined lead that had been touted would be produced by early 2017, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson then pushed the projection of 120 tons per day to be achieved by the end of 2017 and 160 tons per day thereafter:

- Defendant Clarke: "In the meantime, the entire Aqua Metals team **remains focused on our primary goal – to scale commercial operations at the first AquaRefinery to 120 metric tons per day by the end of the year**."[153]

- Defendant Clarke: "**For remainder of this year, we're going to do ramping production to 120 metric tonnes a day of lead which we aim to achieve by the end of 2017 or sooner. And we'll be going through how that's validating our economic projections and incorporating lessons learned into the operation of our first AquaRefinery**…."[154]

---

[153] April 24, 2017 Press Release.

[154] May 9, 2017 Q1 2017 Conference Call. Defendants Clarke and Murphy were participants on the call.

- Defendant Clarke: "So moving on, the AquaRefinery that we are working towards and **we are on track to be at 120 metric tonnes a day by the end of the year, I want to say by the end of the year, we are hoping to be there sooner than that**."[155]

- Defendant Clarke: "And then on looking at potential annual revenue and then looking at the timing of that. So, if **we look at AquaRefinery 1, we're planning on having a production capacity of 120 metric tonnes a day by the end of the year, and then expanding it to 160 metric tonnes a day in 2018. And that essentially means that we will have 16 AquaRefining modules on-site and operational at 120 tonnes a day and 32 modules on-site and operational 160 tonnes a day.**"[156]

- Aqua Metals: "**We expect TRIC to achieve a production rate of 120 metric tons of recycled lead per day by the end of 2017**."[157]

- Aqua Metals: "**Our plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day by the end of 2017. In the longer term, our goal is to increase our production of lead at our TRIC facility to 160 tonnes per day**."[158]

- Aqua Metals: "**AquaRefinery 1 is ramping towards a total production output of 120 metric tonnes of lead products per day by the end of 2017.**"[159]

- Defendant Clarke: "[T]here's a **'reasonable chance' company will reach 120 tons of capacity before end of year**…."[160]

---

[155] May 9, 2017 Q1 2017 Conference Call.

[156] May 9, 2017 Q1 2017 Conference Call.

[157] May 10, 2017 Q1 2017 Form 10-Q. The Q1 2017 Form 10-Q was signed by defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[158] May 10, 2017 Q1 2017 Form 10-Q.

[159] May 31, 2017 Press Release.

[160] June 1, 2017 Bloomberg News Article. Not accompanied by any cautionary language.

- Aqua Metals: "AquaRefinery 1: **On Track for 120mT/Day by Dec 2017 . . . . Expansion to 160mT/day in 2018 being evaluated**."[161]

- Defendant Clarke: "[We] are now working to install the balance of our AquaRefining modules **as we work towards our goal of achieving 120 metric tonnes per day of capacity by year end**."[162]

365.    The bolded statements in ¶ 364 contained present affirmative statements of fact. The present facts contained in this statement are that they have a "plan," a "goal" and "expect" and were currently "on track" to reach and "ramp up production" to capacity of 120 tons and then 160 tons, and were able produce "significantly more" lead. These were statements of current existing conditions and focus of the Company. The forward-looking portion of these statements refers to producing 120 tons per day by the end of 2017, and then expanding to 160 tons per day.

366.    Both the statements of actual fact and the forward looking statements were materially false and misleading when made because there was no plan or basis for production of even 20 tons, let alone an expansion of production because AquaRefining could not produce such levels of AquaRefined lead and, in fact, AquaRefining was malfunctioning and could barely produce *any* AquaRefined lead throughout the Relevant Period.

367.    The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is demonstrated by:

(i)      the end of and post-Relevant Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 259, 267, 269);

(ii)     the end of Relevant Period admissions that the AquaRefining process was "unproven technology" (¶¶ 263); and

---

[161] June 2017 Corporate Presentation.

[162] July 25, 2017 Press Release. Defendant Murphy was identified as the "Company Contact."

(iii)    the end of and post-Relevant Period admissions that the Company was still in the commissioning process even in Fall 2017 (¶¶ 259-260); as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶ 288(f)); and that it was not until August 8, 2018 that Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 267(j)).

368.    The truth that Aqua Metals barely produced any AquaRefined lead throughout the Relevant Period is demonstrated by:

(i)    the disclosure at the end of the Relevant Period that the Company had only "produced small quantities of AquaRefined lead" (¶ 258); and

(ii)    the end of and post-Relevant Period admissions that it was not until June 11, 2018, well after the end of the Relevant Period that the Company cast its first block of AquaRefined lead (¶ 269(i)) and as of October 12, 2018, AquaMetals was only generating "daily production of 2+ metric tons of AquaRefined lead per day on those individual modules" (¶ 240(k)).

## MATERIALLY FALSE AND MISLEADING PROXY STATEMENT ISSUED BY THE INDIVIDUAL DEFENDANTS

369.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants likewise caused the Company to issue a false and misleading proxy statement, which sought shareholder votes for, *inter alia,* director re-election and the Company's Amended and Restated 2014 Stock Incentive Plan (the "Plan").

370.    On April 24, 2017, Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson caused the Company to file with the SEC on Form DEF 14A and disseminated to shareholders the  2017 Proxy in connection with the Company's annual shareholder meeting. Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson drafted, approved, reviewed, and/or signed the 2017 Proxy before it was filed with the SEC and disseminated to Aqua Metals' shareholders. Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson knew or were

deliberately conscious in not knowing, that the 2017 Proxy was likewise materially false and misleading.

371.   Among other things, the 2017 Proxy provided information about the director nominees up for election, defendants Clarke, Murphy, DiVito, Slade and Stevenson. In addition, the 2017 Proxy described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

372.   The 2017 Proxy was false and misleading because it solicited Aqua Metals shareholder votes for director reelection even though Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson were aware, but had failed to disclose: (1) that Aqua Metals' breaking and separating process was facing substantial obstacles due to AquaRefining's need for a much higher degree of separation than is normal in the industry; (2) that the Company's breaking and separating process was not operating reliably or efficiently; (3) that the breaking and separating obstacles and issues were negatively impacting the Company's output; (4) that, as a result of the foregoing, the ramp up of the Company's recycling process was being significantly hindered and delayed; and (5) that, as a result of the foregoing, Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson statements about Aqua Metals' business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

373.   In addition to the election of directors, the 2017 Proxy sought shareholder approval of the Plan, which dealt with compensation of the Individual Defendants.

374.   As to the Plan, Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson stated:

> Our 2014 Stock Incentive Plan was originally adopted by our stockholders
> on September 24, 2014 and amended on May 1, 2015 (the "Current Plan").

We may issue incentive awards pursuant to the Current Plan to acquire up to 1,363,637 shares of our common stock. As of March 31, 2017, we have issued options to purchase 915,402 shares of common stock under the Current Plan.

Our Board has reviewed the Current Plan and the lack of available shares thereunder and determined that the Current Plan requires additional shares to provide the flexibility with respect to stock-based compensation that our Board believes is necessary to establish appropriate long-term incentives to achieve our objectives. Our Board believes that it is advisable to increase the 1,363,637 share limit in the Current Plan to 2,113,637 shares in order to attract and compensate employees, officers and directors upon whose judgment, initiative and effort we depend. The issuance of common shares and stock options to eligible participants is designed to align the interests of such participants with those of our stockholders. Our Board has also recommended that the Current Plan be amended to provide for performance cash awards intended to qualify as performance-based compensation so as not to be subject to the $1,000,000 limitation on the income tax deductibility imposed by Section 162(m) of the Internal Revenue Code of 1986 ("Code").

The Plan increases the number of shares of common stock that may be issued under the Current Plan by 750,000 shares, or approximately 3.8% of the 19,960,356 shares of common stock outstanding on March 31, 2017. As amended, the Plan will also provide for performance cash awards….

375.     The Plan itself states that the purpose of the Plan is:

The purpose of this Aqua Metals, Inc. Amended and Restated 2014 Stock Incentive Plan (the "Plan") is to advance the interests of Aqua Metals, Inc. ("Company") and its stockholders by enabling the Company and its Subsidiaries to attract and retain qualified individuals through opportunities for equity participation in the Company, and to reward those individuals who contribute to the Company's achievement of its economic objectives….

376.     The Plan goes on to state:

Performance Awards.
8.1. Grant. An Eligible Recipient may be granted one or more Performance Awards under the Plan, and such Performance Awards will be subject to such terms and conditions, if any, consistent with the other provisions of the Plan, as may be determined by the Committee in its sole discretion. The Committee may impose such restrictions or conditions, not inconsistent with the provisions of the Plan, to the vesting of such Performance Awards as it deems appropriate, including, without limitation, (i) the achievement of one or more of the Performance Criteria and/or (ii) that the Participant

remain in the continuous employ or service of the Company or a Subsidiary for a certain period.

8.2 Performance Periods. The Performance Period with respect to each Performance Award will be such period of time commencing with the date of grant as is determined by the Committee on the date of grant.

8.3 Specification of Performance Criteria. Any grant of Performance Awards will specify Performance Criteria that, if achieved, will result in payment or early payment of the Award, and each grant may specify in respect of such specified Performance Criteria a minimum acceptable level of achievement and shall set forth a formula for determining the amount of the Performance Award that will be earned if performance is at or above the minimum level, but falls short of full achievement of the specified Performance Criteria. The grant of Performance Awards will specify that, before the Performance Awards will be earned and paid, the Compensation Committee of the Board must certify that the Performance Criteria have been satisfied.

377.   The 2017 Proxy was false and misleading because it solicited Aqua Metals' shareholder votes for the Plan even though Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson were aware, but had failed to disclose: (1) that Aqua Metals' breaking and separating process was facing substantial obstacles due to AquaRefining's need for a much higher degree of separation than is normal in the industry; (2) that the Company's breaking and separating process was not operating reliably or efficiently; (3) that the breaking and separating obstacles and issues were negatively impacting the Company's output; (4) that, as a result of the foregoing, the ramp up of the Company's recycling process was being significantly hindered and delayed; and (5) that, as a result of the foregoing, Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson statements about Aqua Metals' business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

## DAMAGES TO AQUA METALS

378.   As a result of the Individual Defendants' wrongful conduct, Aqua Metals disseminated false and misleading statements and omitted material information to make such

statements not false and misleading when made. The improper statements have devastated Aqua Metals's credibility. Aqua Metals has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

379.    Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected Aqua Metals to costs and expenses incurred in connection with the defense and/or settlement of the Securities Class Action. On August 14, 2019, the Court entered an order granting in part and denying in part defendants' motion to dismiss and plaintiffs' motion to strike ("Securities Order"). The Securities Order, *inter alia,* concluded:

> Plaintiff has sufficiently alleged that Defendants intentionally engaged in a fraudulent scheme to conceal material facts, thereby leading to the dissemination of untrue statements about the commercial viability of the [AquaRefining] process. This alleged scheme went beyond the making of any alleged misrepresentations and statements.

380.    Plaintiffs filed an amended complaint on September 20, 2019. Regardless, given the Court's original ruling, the Securities Class Action will move forward.

381.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Aqua Metals' market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

382.    Moreover, these actions have irreparably damaged Aqua Metals' corporate image and goodwill. For at least the foreseeable future, Aqua Metals will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Aqua Metals' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFFS' DEMAND AND DERIVATIVE ALLEGATIONS

383. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

384. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

385. Plaintiffs are owners of Aqua Metals common stock and were owners of Aqua Metals common stock at all times relevant hereto.

386. Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

387. As a result of the facts set forth herein, Plaintiffs have not made any demand on the Aqua Metals Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**AT THE TIME THIS ACTION WAS COMMENCED, THE BOARD CONSISTED OF FIVE DIRECTORS: DEFENDANTS CLARKE, MOULD, DIVITO, SLADE AND STEVENSON. ALL FIVE MEMBERS OF THE BOARD ARE INCAPABLE OF MAKING AN INDEPENDENT AND DISINTERESTED DECISION TO INSTITUTE AND VIGOROUSLY PROSECUTE THIS ACTION. DEMAND IS FUTILE AS TO DEFENDANTS CLARKE, MOULD, DIVITO, SLADE AND STEVENSON BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

388. Defendants Clarke, DiVito, Slade, Mould and Stevenson all face a substantial likelihood of liability for their individual misconduct. Defendants Clarke, DiVito, Slade, Mould and Stevenson were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

389.    Moreover, defendants Clarke, DiVito, Slade, Mould and Stevenson as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

390.    Demand is futile as to defendants Clarke, DiVito, Slade, Mould, and Stevenson because they signed many of the SEC filings in question. Defendant Clarke signed every Form 10-Q in question filed with the SEC. Moreover, defendants Clarke, DiVito, Slade and Stevenson signed both the 2016 Form 10-K and 2017 Form 10-K filed with the SEC, and defendant Mould signed the 2017 Form 10-K.

391.    By reason of their positions as officers and directors of Aqua Metals and because of their ability to control and oversee the business and corporate affairs of Aqua Metals, it is not possible that Defendants Clarke, DiVito, Slade, Mould and Stevenson were unaware of the truth regarding the AquaRefining process. Defendants Clarke, DiVito, Slade, Mould and Stevenson's conscious and knowing making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the defendants Clarke, DiVito, Slade, Mould and

Stevenson face a substantial likelihood of liability. If defendants Clarke, DiVito, Slade, Mould and Stevenson were to bring a suit on behalf of Aqua Metals to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason demand is futile as to defendants Clarke, DiVito, Slade, Mould and Stevenson.

**DEFENDANT CLARKE LACKS INDEPENDENCE**

392.    As an initial matter, Aqua Metals has conceded in its SEC filings that Clarke was not an independent director of the Company. In its 2017 Proxy, Aqua Metals states that:

> Our Board has determined that, other than Mr. Clarke and Mr. Murphy, by virtue of their executive officer positions, none of our director nominees has a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each is "independent" as that term is defined under the applicable rules and regulations of the SEC and the listing requirements and rules of the Nasdaq Stock Market.

393.    In addition to this lack of independence, Clarke is not disinterested for purposes of demand futility because his principal occupation was CEO and Chairman of the Board of Aqua Metals. According to the Company's SEC filings, in 2015 and 2016, Clarke received total compensation of $420,000 and $549,000, respectively. These amounts are material to him.

394.    Defendant Clarke is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**DEFENDANT MOULD LACKS INDEPENDENCE**

395.    As with defendants Clarke and Murphy, defendant Mould was an executive officer and one of the founders of Aqua Metals. Thus, as noted in the 2017 Proxy for Defendants Clarke and Murphy, defendant Mould's executive officer position means he lacks independence.

396.     In addition to this lack of independence, Mould is not disinterested for purposes of demand futility because his principal occupation was COO of Aqua Metals. According to the Company's SEC filings, in 2015 and 2016, Mould received total compensation of $375,000 and $525,000, respectively. These amounts are material to him.

**DEMAND IS EXCUSED AS TO DEFENDANTS DIVITO, SLADE AND STEVENSON BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

397.     Defendants DiVito, Slade and Stevenson, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowed the Individual Defendants to cause the Company to make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, defendants DiVito, Slade and Stevenson were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, defendants DiVito, Slade and Stevenson, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to defendants DiVito, Slade and Stevenson.

**DEFENDANTS CLARKE AND MOULD ARE UNABLE TO INDEPENDENTLY CONSIDER A DEMAND DUE TO THEIR BUSINESS AFFILIATIONS**

398.     Defendants Clarke and Mould lack the independence required to impartially consider a demand by Plaintiffs due to their longstanding business relationship. Defendants Clarke, Mould and Murphy all worked together in executive positions at Applied Intellectual Capital, Ltd., and when that venture fell apart, they together founded Aqua Metals and once again placed themselves in executive positions.

**DEMAND IS FUTILE AS TO DEFENDANT MOULD BECAUSE HE FINANCIALLY BENEFITED FROM THE ABOVE-REFERENCED FALSE AND MISLEADING STATEMENTS**

399.    As noted above, Defendant Mould personally benefited from the Individual Defendants false and misleading statements by having the opportunity to sell shares of Aqua Metals stock at artificially inflated prices, a benefit not shared by the rest of Aqua Metals' stockholders.

**DEMAND IS FUTILE AS TO DEFENDANTS CLARKE, MOULD, DIVITO, SLADE AND STEVENSON FOR THE FOLLOWING ADDITIONAL REASONS**

400.    If Aqua Metals' current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders. However, Plaintiffs are informed and believe that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Aqua Metals against the Individual Defendants, known as the "insured versus insured exclusion."

401.    As a result, if defendants Clarke, Mould, DiVito, Slade and Stevenson were to sue themselves or certain of the officers of Aqua Metals, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, defendants Clarke, Mould, DiVito, Slade and Stevenson cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

402.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Aqua Metals by prosecuting this action. Therefore, demand on Aqua Metals and its Board is futile and is excused. Aqua Metals has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, defendants Clarke, Mould, DiVito, Slade and Stevenson have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, defendants Clarke, Mould, DiVito, Slade and Stevenson face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I
## BREACH OF FIDUCIARY DUTY
### Against the Individual Defendants

403.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

404.    The Individual Defendants owed and owe Aqua Metals fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Aqua Metals the highest obligation of loyalty, good faith, due care, oversight, and candor.

405.     All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor.

406.    Each of the Individual Defendants had actual or constructive knowledge of and failed to disclose: (1) that Aqua Metals' breaking and separating process was facing substantial obstacles due to AquaRefining's need for a much higher degree of separation than is normal in the industry; (2) that the Company's breaking and separating process was not operating reliably or efficiently; (3) that the breaking and separating obstacles and issues were negatively impacting the Company's output; (4) that, as a result of the foregoing, the ramp up of the Company's recycling

process was being significantly hindered and delayed; and (5) that, as a result of the foregoing, the Individual Defendants' statements about Aqua Metals' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis. These actions caused severe risks to the Company financial viability and were causing harm to the Company by subjecting the Company to the Securities Class Action. The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

407.   The Individual Defendants consciously caused or allowed Aqua Metals to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements regarding its AquaRefining capabilities.

408.   The Individual Defendants consciously failed to supervise, and to exert internal controls over, and consciously disregarded their responsibilities involving the Company.

409.   As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Aqua Metals has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. The Individual Defendants breached their fiduciary duties owed to Aqua Metals and its shareholders by willfully, consciously, and/or intentionally failing to perform their fiduciary duties. They caused the Company to waste valuable assets and unnecessarily expend corporate funds. They also failed to properly oversee Aqua Metals' business, rendering them personally liable to the Company.

**COUNT II**
**BREACH OF FIDUCIARY DUTY FOR INSIDER SELLING**
**AND MISAPPROPRIATION OF INFORMATION**
**Against the Insider Selling Defendants (Murphy and Mould)**

410.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

411.    At the time of the stock sales set forth herein, defendants Murphy and Mould knew of the information described above, and sold Aqua Metals common stock on the basis of such information.

412.    The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which Murphy and Mould used for their own benefit when they sold Aqua Metals common stock.

413.    Defendants Murphy's and Mould's sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

414.    Since the use of the Company's proprietary information for their own gain constitutes a breach of defendants Murphy's and Mould's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits defendants Murphy and Mould obtained thereby.

## COUNT III
## UNJUST ENRICHMENT
### Against the Insider Selling Defendants (Murphy and Mould)

415.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

416.    The Insider Selling Defendants were unjustly enriched by their receipt of proceeds from their illegal sales of Aqua Metals common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

417.    Plaintiffs, as shareholders and representatives of Aqua Metals, seeks restitution from each of the Insider Selling Defendants, and seeks an order of this Court disgorging all

proceeds derived from their illegal sales of Aqua Metals common stock from the Insider Selling Defendants.

## COUNT IV
### VIOLATIONS OF § 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9
### Against Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson

418.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

419.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

420.    The 2017 Proxy violated Section 14(a) and Rule 14a-9 because it solicited Aqua Metals shareholder votes for, *inter alia,* director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings in connection with its AquaRefining system.

421.    As alleged herein, in the 2017 Proxy, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson specifically referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate. Because the Company, under defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson direction and on their watch, was issuing false and misleading statements, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson affirmatively violated the Code. The 2017 Proxy failed to disclose that express terms of the Code were being violated.

422.    Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2017 Proxy, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson were aware of this information and of their duty to disclose this information in the 2017 Proxy.

423.    Defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson knew that the statements contained in the 2017 Proxy were materially false and misleading.

424.    The omissions and false and misleading statements in the 2017 Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the re-election of directors. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2017 Proxy and in other information reasonably available to shareholders.

425.    As a direct and proximate result of the dissemination of the false and/or misleading 2017 Proxy, defendants Clarke, Murphy, Mould, DiVito, Slade and Stevenson used to obtain shareholder approval of and thereby re-elect directors, nominal defendant Aqua Metals suffered damage and actual economic losses (i.e., wrongful re-election of directors) in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Declaring that Plaintiffs may maintain this derivative action on behalf of Aqua Metals and that Plaintiffs are proper and adequate representatives of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.     Ordering defendants Murphy and Mould to disgorge the profits obtained as a result of their sale of Aqua Metals stock while in possession of insider information as described herein;

D.     Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: January 24, 2020                     Respectfully submitted,

                                            **RIGRODSKY & LONG, P.A.**

                                            By: _Brian D. Long_

                                            Seth D. Rigrodsky (#3147)
                                            Brian D. Long (#4347)
                                            Gina M. Serra (#5387)
                                            300 Delaware Avenue, Suite 1220
                                            Wilmington, DE 19801
                                            Telephone: (302) 295-5310
                                            Facsimile: (302) 654-7530

                                            *Liaison Counsel for Plaintiffs Al Lutzker,*
                                            *Albert Stafford, and Jerry Davis and Co-*
                                            *Liaison Counsel for Plaintiffs*

                                            **HYNES & HERNANDEZ, LLC**

Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116

*Counsel for Plaintiff Al Lutzker and Co-Lead Counsel for Plaintiffs*

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone: (212) 308-5858

*Counsel for Plaintiffs Albert Stafford and Jerry Davis*

**FARNAN LLP**
Brian E. Farnan (# 4089)
Michael J. Farnan (# 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300

*Liaison Counsel for Plaintiffs Chau Nguyen and Shelly Lu and Co-Liaison Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427

*Counsel for Plaintiff Chau Nguyen and Co-Lead Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A**.
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060

*Counsel for Plaintiff Sherry Lu*

**O'KELLY ERNST & JOYCE, LLC**

Ryan M. Ernst (#4788)
Daniel P. Murray (#5785)
901 N. Market St., Suite 1000
Wilmington, DE 19801
Telephone: (302) 778-4000

*Delaware Counsel for Plaintiffs Richard
Byrne and Christopher Ballentine*

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY 10016
Telephone: (212) 983-1300

*Counsel for Plaintiffs Richard Byrne and
Christopher Ballentine*